# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STEPHEN DEARTH, et al.,    )    Case No. 12-5305
)
        Appellants,    )    UNDERLYING DECISION
)
        v.    )
)
ERIC HOLDER,    )
)
        Appellee.    )
_____ )

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEPHEN DEARTH, *et al.*,

Plaintiffs,

v.

ERIC H. HOLDER, Jr., Attorney General
of the United States, in his official capacity,

Defendant.

Civil Action No. 9-cv-587 (RLW)

## MEMORANDUM OPINION

Plaintiff Stephen Dearth, a U.S. citizen who currently resides in Canada, and the Second

Amendment Foundation, Inc. ("SAF"), bring this action to challenge the constitutionality of two

federal firearms laws, 18 U.S.C. §§ 922(a)(9) and 922(b)(3). [1] Dearth contends that the

challenged laws and implementing regulations promulgated by the Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF) make it impossible for a U.S. citizen who resides outside of the

United States to lawfully purchase a firearm in the United States.  Dearth further contends that

the challenged statutes and regulations impermissibly encroach upon his Second Amendment

right to keep and bear arms and his Fifth Amendment rights to travel overseas and enjoy the

equal protection of the law.  Plaintiff SAF has joined in this lawsuit because it claims that its

members and supporters are likewise impacted by the operation of these laws.  The parties

contend that no factual disputes exist and have filed cross-motions for summary judgment.  For

the reasons set forth below, the Court concludes that the challenged laws permissibly regulate the

---

[1]     Plaintiffs contend they are making a facial challenge to Section 922(a)(9) and an as-
applied challenge to Section 922(b)(3). (Pls.' Mot., Dkt. No. 23, at pp. 8-18; Pls.' Resp. to
Notice of Supplemental Authority, Dkt. No. 36, at pp. 4-5; Pls.' Resp. to Notice of
Supplemental Authority, Dkt. No. 40, at pp. 3-5).

sale of firearms to non-residents within the bounds of the Second Amendment and the other

constitutional provisions at issue.  Accordingly, the Court denies Plaintiffs' motion for summary

judgment and grants Defendant's cross-motion for summary judgment.

## I.   BACKGROUND

### A.  Statutory and Regulatory Background

Sections 922(a)(9) and (b)(3) are part of a comprehensive statutory framework Congress

enacted to regulate commerce in firearms known as the Omnibus Crime Control and Safe Streets

Act of 1968 ("Omnibus Crime Control Act").  Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat.

225.[2]

The Omnibus Crime Control Act was enacted following a multi-year investigation of

violent crime, which revealed "the serious problem of individuals going across State lines to

procure firearms which they could not lawfully obtain or possess in their own State and without

the knowledge of their local authorities."  S. REP. NO. 89-1866, at 19 (1966).  The investigation

also revealed that "[n]ot only is mail order a means of circumventing State and local law, but the

over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the

locale in which the dealer conducts his business, affords similar circumvention."  S. REP. NO. 89-

1866, at 3.  In subsequent amendments to the Omnibus Crime Control Act, Congress sought to

"strengthen Federal controls over interstate and foreign commerce in firearms and to assist the

States effectively to regulate firearms traffic within their borders."  H.R. REP. NO. 90-1577, at 6

(1968).  Moreover, Congress found that "concealable weapons" posed a particular challenge for

state and local law enforcement authorities and that "the sale or other disposition of concealable

---

[2]      Congress built upon this regulatory framework in subsequent years, amending the
Omnibus Crime Control Act several times.  Section 922(a)(9) was added when Congress
enacted the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108
Stat 1796.

weapons by importers, manufacturers, and dealers holding Federal licenses, to non-residents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms."  Pub. L. No. 90-351, Title IV, § 901(a)(5), 82 Stat. 225.  Thus, Congress determined "that only through adequate federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be dealt with, and effective State and local regulation of this traffic be made possible."  Id. at § 901(a)(3), 82 Stat. 225.  It is against this backdrop that Congress enacted the laws Plaintiffs challenge here.

Section 922(a)(9) makes it unlawful "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to *receive* any firearms unless such receipt is for lawful sporting purposes." 18 U.S.C. § 922(a)(9) (emphasis added).  The ATF's implementing regulation, with certain exceptions, prohibits a person from transporting into or receiving in the State where one resides any firearm that was purchased or obtained by that person outside his State of residence.  27 C.F.R. § 478.29.

Section 922(b)(3) prohibits the *sale* of a firearm by a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to "any person who the licensee knows or has reasonable cause to believe does not reside in . . .  the State in which the licensee's place of business is located[.]" 18 U.S.C. § 922(b)(3).  Under Section 922(b)(3), federal firearms licensees may, however, sell or deliver "any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States[.]"  Id. § 922(b)(3)(A).  Additionally, a licensee may

provide "the loan or rental of a firearm to any person for temporary use for lawful sporting purposes." Id. § 922(b)(3)(B).

The ATF's implementing regulations, 27 C.F.R. §§ 478.96, 478.99, track closely to the federal statute and place similar prohibitions on the sale of firearms to purchasers who do not reside in the State in which the licensee's place of business is located. To ensure compliance with the regulations, the ATF requires federal firearms licensees to record firearms transactions on a firearms transaction record, Form 4473. 27 C.F.R. § 478.124(a). Prior to making a transfer of a firearm, the licensee is required to establish both the transferee's identity and his or her eligibility to possess a firearm by documenting on Form 4473, *inter alia*, the "transferee's name, sex, residence address," "date and place of birth," "height, weight and race," "country of citizenship," and the transferee's "*State of residence*." 27 C.F.R. § 478.124(c)(1) (emphasis added).

Thus, Section 922(a)(9) prohibits one who does not reside in any State to *receive* any firearms unless such receipt is for "lawful sporting purposes." Section 922(b)(3) prohibits the *sale* of any firearm to one who does not reside in any State. Therefore, by operation of both statutes and their implementing regulations, a non-U.S. resident, such as Dearth, may not lawfully purchase any firearm in the United States, and he may only obtain a firearm in the United States if it is loaned or rented to him, and then only if such receipt is for "lawful sporting purposes."

## B. Factual Background

Plaintiff Stephen Dearth ("Dearth") is an American citizen who resides in Canada and does not maintain a residence in the United States. (Compl. ¶ 2). Dearth attempted to purchase firearms in 2006 and 2007 in the United States, but was denied both times since he could not

provide a response to Question 13 of Form 4473, which asks for the purchaser's State of residence, because he does not reside within a "State" in the United States.  (Id. at ¶¶ 22-23).  Both transactions were terminated.  (Id.)  Dearth is over the age of 21 and has a clear criminal record and a valid Utah permit to publicly carry a handgun.  (See Id. ¶ 12).  Dearth alleges that he intends to lawfully purchase firearms in the United States for sporting and self-defense purposes and store them securely with his relatives in Ohio.  (Id. ¶ 11).

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization that focuses on education, research, publication, and legal actions regarding the Second Amendment's right to bear arms.  According to Defendant, SAF's claims were dismissed for lack of organizational standing, and SAF is barred by collateral estoppel from raising the jurisdictional issue of organizational standing.  See Hodgkins v. Holder, 677 F. Supp. 2d 202, 206 (D.D.C. 2010); Dearth v. Holder, 641 F.3d 499, 503 n.* (D.C. Cir. 2011).

### C. Procedural History

On March 27, 2009, Plaintiffs Maxwell Hodgkins[3], Stephen Dearth, and SAF,  a non-profit membership organization that focuses on education, research, publication, and legal actions regarding the Second Amendment's right to bear arms, filed a complaint seeking declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C.§§ 2201, 2202.  (Compl. ¶¶ 25-37).  This Court granted the Government's motion to dismiss for lack of standing.  Plaintiffs appealed the Court's decision and the District of Columbia Circuit reversed the district court's dismissal and remanded the case for further proceedings.[4]  Plaintiffs have filed a motion

---

[3]     Plaintiff Maxwell Hodgkins returned to reside in the United States and was subsequently dismissed as a plaintiff in the case on August 23, 2011.

[4]     The Circuit Court concluded that the SAF did not raise any issue that was not also raised by Dearth and that the court need not reach the issue of whether the SAF had standing. Dearth v. Holder, 641 F.3d 499, 503 n.* (D.C. Cir. 2011) ("Dearth I") (citing Environmental Action,

seeking summary judgment on all counts in their complaint.  Defendant has filed a Motion for Judgment on the Pleadings or, in the alternative, for Summary Judgment.

Plaintiffs have characterized their claims as making a facial challenge to Section 922(a)(9) and an as-applied challenge to Section 922(b)(3).  Plaintiffs confirmed this position during oral argument.  However, the allegations in the Complaint do not support this position. The Complaint limits the Second Amendment challenge to § 922(a)(9) in Count 1 to "the receipt and use of firearms by otherwise qualified American citizens solely on account of their residence status outside the United States. . . ."  (Compl. ¶ 26).  Similarly, the Second Amendment challenge to § 922(b)(3) in Count 2 is limited "to the extent these are applied in such a manner as to forbid American citizens who do not reside in any state from purchasing firearms."  (Compl. ¶ 28).  These are as-applied challenges—the claims do not allege that the laws violate the Constitution as applied to everyone; instead, they allege that the laws violate the Constitution as applied to Mr. Dearth and persons similarly situated to him who do not maintain a residence in any State.

Moreover, Plaintiff alleges in the complaint that "Mr. Dearth intends to purchase firearms within the United States. . . ."  (Compl. ¶ 11).  Indeed, the prayer for relief for Counts 2, 4 and 6 seek to enjoin the enforcement of Section 922(b)(3) only with respect to the purchase of firearms.  (Compl., pg. 11, Prayer for Relief  ¶ 2).  While the prayer for relief for Counts 1, 3 and 5 is more general, as it seeks generally to enjoin enforcement of Section 922(a)(9),  Id. Prayer for Relief ¶ 1, the Court of Appeals construed Mr. Dearth's lawsuit as challenging only his inability

---

Inc. v. FERC, 939 F.2d 1057, 1061 n.* (D.C. Cir. 1991)).  It seems, therefore, that while the Circuit Court reversed the trial court's prior ruling that Dearth did not have standing to bring this challenge, the Circuit did not disturb the trial court's ruling that the SAF did not have standing.  Thus, the SAF is not a plaintiff in this case.  Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 739 (D.C. Cir. 1995) (explaining that under the law-of-the-case doctrine, "a court involved in later phases of a lawsuit should not re-open questions decided ... by that court or a higher one in earlier phases").

to purchase a firearm in the United States.   Dearth I, 641 F.3d at 500-501.  That construction of

his claims is binding on this Court.  Thus, the challenges to Section 922(a)(9) and Section

922(b)(3) are both solely limited to their prohibition on Dearth's ability to purchase a firearm

because he has no residence in any state.  The blanket prohibition on receipt of a firearm if solely

for self-defense purposes in Section 922(a)(9) is not before the Court.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows [through facts supported in the

record] that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  "The rule governing cross-motions for summary judgment ... is that neither

party waives the right to a full trial on the merits by filing its own motion; each side concedes

that no material facts are at issue only for the purposes of its own motion."  Sherwood v.

Washington Post, 871 F.2d 1144, 1148 n.4 (D.C. Cir. 1989), quoting McKenzie v. Sawyer, 684

F.2d 62, 68 n.3 (D.C. Cir. 1982).

## III.   ANALYSIS

Plaintiffs' complaint alleges six counts.  Count 1 alleges that Section 922(a)(9) and 27

C.F.R. § 478.29a violate Plaintiffs' Second Amendment right to keep and bear arms because the

statute and its regulations place limitations upon the receipt and use of firearms to United States

citizens who do not claim residency in any State.  Count 2 alleges that Section 922(b)(3) and 27

C.F.R. §§ 478.96, 478.99, 478.124 violate the Plaintiffs' rights under the Second Amendment for

the same reasons as Count 1.  Count 3 alleges that Section 922(a)(9) and 27 C.F.R. § 478.29a

violate Plaintiffs' rights to equal protection under the Fifth Amendment because they are being

discriminated against on account of residency and cannot exercise their Second Amendment

rights.[5]  Count 4 alleges that Section 922(b)(3) and 27 C.F.R. §§ 478.96, 478.99, 478.124 violate

Plaintiffs' equal protection rights for the same reasons as articulated in Count 3.  Count 5 alleges

that Section 922(a)(9) and 27 C.F.R. § 478.29a infringe Plaintiffs' liberty interest in international

travel which is protected by the Due Process Clause of the Fifth Amendment.  Count 6 alleges

that Section 922(a)(9) and 27 C.F.R. § 478.29a also infringe Plaintiffs' liberty interest in

international travel.

### Second Amendment Claims

The Supreme Court has held that the right to possess a firearm in one's home for self-

defense is the core right of the Second Amendment.  Dist. Of Columbia v. Heller, 554 U.S.570,

628-30 (2008); McDonald v. City of Chicago, 130 S. Ct. 3020, 3036 (2010).  The D.C. Circuit

has adopted the two-step approach followed by other circuits when analyzing Second

Amendment challenges.  Heller v. Dist. of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011)

("Heller II").  First, the court must evaluate whether the challenged law impinges upon a right

protected by the Second Amendment.  Id.  If it does not, the court's inquiry is complete; if it

does, the court must evaluate the law under the appropriate level of scrutiny to determine if the

challenged law passes constitutional muster.  Id.

In Heller, the Supreme Court made clear that "nothing in our opinion should be taken to

cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial

sale of arms."  554 U.S. at 626-27.  Seizing upon this pronouncement, the government contends

that the challenged laws are "presumptively lawful" because they are "longstanding," and,

therefore, are presumed not to burden conduct that falls within the scope of the Second

---

[5]     Plaintiffs allege that their rights to equal protection are also violated because the statute
permits non-resident Americans to use pre-possessed firearms for all purposes, but limits the
use and receipt of firearms purchased after said Americans' relinquishment of domestic
residence for only sporting purposes.

Amendment.  Id.  Thus, an initial point of contention is how to construe the challenged laws.

Are they restrictions on possession, or are they longstanding conditions and qualifications on

commercial sale?

The Court concludes they are the latter.  Section 922(a)(9) makes it unlawful for any

person who does not reside in any State to *receive* a firearm, unless the receipt is for lawful

sporting purposes.  Section 922(b)(3) is a restriction on firearms *sales* that, with the two

exceptions described above, prohibits the sale of a firearm to a person who do not reside in the

State of the firearms dealer's business.  Both laws thus pertain to the transfer or sale of firearms,

rather than the mere possession of firearms.  Furthermore, as stated above, Dearth's challenge is

based on his alleged inability to purchase a firearm because no dealer can sell one to him.

Therefore, as these laws are applied to Dearth, Sections 922(a)(9) and 922(b)(3) are fairly

construed as two "laws imposing conditions and qualifications on the commercial sale of arms."

See Heller, 554 U.S. at 626-27.  Consequently, as stated above, the two laws are "presumptively

lawful" if the "conditions and qualifications" they impose can be fairly described as

"longstanding."  Id.

The government points out that there have been state laws for over 100 years that have

banned the possession and/or purchase of firearms by non-residents.  (Def.'s Mot., Dkt 25, at 21-

22) (citing laws enacted between 1909 and 1939 from West Virginia, New York, Montana,

North Carolina, Missouri, Massachusetts, Connecticut, New Jersey, Indiana, Michigan, Rhode

Island, Maine, and the District of Columbia requiring a purchaser or possessor of firearms to be a

State resident or U.S. resident).  The federal statute, 18 USC § 922(b)(3), which requires every

firearm purchaser to be a resident of some State, so that the purchase and possession of the

firearm will be governed by the law of a specific State, serves a similar purpose to these

longstanding state laws.  The effect of the federal statute is to require a firearm purchaser to be a state resident so that he or she submits to the jurisdiction and authority of some State—any State—so that the firearms purchase can be regulated by state law.  Thus, the federal statutes serve a similar purpose as the longstanding state statutes governing the commercial sale of firearms.  Accordingly, the Court finds that the challenged federal laws restricting the sale of firearms to non-residents are not only "longstanding,"  but also "laws imposing conditions and qualifications on the commercial sale of arms" within the meaning of Heller and McDonald.  As such, the challenged laws are afforded a rebuttable presumption of validity.  See Heller II, 670 F.3d at 1253.

That does not end the matter.  A plaintiff may rebut this presumption by showing that the regulation has a more than "de minimis effect" upon his Second Amendment right.  Id.  Here, Section 922(a)(9) allows Dearth to receive a firearm for lawful sporting purposes[6], but it prohibits Dearth's receipt of a firearm solely for self-defense purposes.  Furthermore, Section 922(b)(3)(B) allows a firearms dealer to loan or rent a firearm to Dearth for temporary use for lawful sporting purposes, but it prohibits such a loan or rental if Dearth's sole purpose is self-defense.[7]  In sum, the challenged laws burden Dearth's Second Amendment rights not only by almost (but not completely, see infra) foreclosing his ability to purchase a firearm in the United States, but also by prohibiting a firearms dealer from loaning or renting a firearm to him, if Dearth's sole purpose is to use the firearm in self-defense.  The Court has no trouble holding that these restrictions evince more than a de minimis effect on Dearth's Second Amendment right.

---

[6]     The Gun Control Act does not define what a "sporting purpose" is, but "legislative history indicates that 'sporting purposes' refers to target shooting and hunting."  Springfield, Inc. v. Buckles, 116 F. Supp. 2d 85, 90 (D.D.C. 2000), aff'd, 292 F.3d 813 (D.C. Cir. 2002).

[7]     At oral argument, the Government agreed that this is the proper interpretation of the statute.

Because the presumption of validity has been sufficiently rebutted, the Court finds that the challenged laws impinge on Dearth's Second Amendment right, and the Court will proceed to the second step of the analysis.

Our Court of Appeals has held that the level of scrutiny to be given a challenged statute varies depending upon the level of burden that the law places upon the Second Amendment right. Heller II, 670 F.3d at 1257.  Applying this analysis, the Circuit has held that a law that "does not severely limit the possession of firearms" is given intermediate scrutiny.  Id. at 1257 & 1261-62.

Dearth alleges that the challenged provisions violate his Second Amendment rights because they limit his ability to purchase firearms while visiting friends and relatives in the United States.[8]  Dearth argues that the federal ban on firearm purchases by persons who are not residents of any State limits his ability to possess a firearm.  His argument is essentially that a person cannot "possess" a firearm unless he or she "receives" it from some source initially, and the most common way to receive a firearm is to "purchase" it.  This argument has some force. Cf. Heller, 554 U.S. at 583 n.7 (noting that at the time of the enactment of the Second Amendment, one commentator stated "[w]hat law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Place . . . ?")

---

[8]    One could argue that the core right of self-defense recognized in Heller may not apply to Dearth as he is not in his "home" while visiting the United States.  See United States v. Masciandaro, 638 F.3d 458, 471 (4th Cir. 2011) (declining to apply strict scrutiny to a law prohibiting possession of loaded firearms in a public park, distinguishing a public park from one's home).  However, the government has not made this argument.  The Court notes that as an overnight guest with a friend or relative in the United States, it is well-settled that Dearth would enjoy a Fourth Amendment right to be free of unreasonable searches and seizures.  See Minnesota v. Olson, 495 U.S. 91, 100 (1990); see also United States v. Breland, Nos. 89-3157, 89-3159, 1990 WL 180892, at *1 (D.C. Cir. Nov. 20, 1990) (citing Olson).  Thus, one could argue that Dearth similarly would enjoy the Second Amendment right to self-defense while he is an overnight guest inside the home of a friend or relative.  See Heller, 554 U.S. at 591 (noting similarities of the First and Fourth Amendments to the Second Amendment).  Because neither party raised nor briefed the issue, the Court assumes for the sake of argument that Dearth has a Second Amendment right inside the home of friends and relatives that he stays with while visiting the United States.

(emphasis added, citation omitted).  Furthermore, as noted above, Dearth cannot temporarily "receive" a firearm by loan or rental, if his sole purpose in doing so is self-defense.

However, as the government has pointed out, Dearth's argument is undermined because he owns and possesses firearms at his residence in Canada and he has the ability to bring one or more of his firearms with him when he visits the United States.[9]  At oral argument, counsel for Dearth conceded that Dearth owns firearms in Canada and that there is no legal impediment to him bringing one of those firearms with him when visits the United States.  Thus, Dearth can still exercise his Second Amendment right to possess a firearm during his visit to the United States, so long as he brings a firearm with him when he travels to the United States – because then he would have no need to "receive" a firearm from anyone – and so long as his possession of that firearm comports with the laws of the State(s) where he is visiting.  Furthermore, Dearth could rent or borrow a firearm for lawful sporting purposes pursuant to Section 922(b)(3)(B) and also use the firearm for self-defense purposes.  Dearth concedes that many sporting firearms, including many handguns – the classic self-defense weapon – also have lawful sporting purposes.

Dearth argues that his ability to bring a firearm with him from Canada is not relevant, because he should be able to exercise his Second Amendment rights by purchasing a firearm in the United States if he so desires.  Dearth argues that the fact that he can potentially *possess* a firearm for self-defense purposes so long as he brings it into the country with him is no answer; the ban on his ability to *purchase* a firearm for self-defense purposes still remains.  In making this argument, Dearth relies on Ezell v. City of Chicago, 651 F.3d 684 (7th Cir. 2011), which involved a Second Amendment challenge to a Chicago law that made training at the firing range

---

[9]    In a previous lawsuit, Dearth alleged that he "legally owns firearms in Canada." See First Am. Compl. ¶ 8, Dearth v. Gonzales, Case No. 2:06-cv-1012 (S.D. Ohio) (Doc. No. 12, filed Feb. 1, 2007).

a condition for obtaining a handgun permit, while simultaneously banning all firing ranges (except for public safety officials) within the city limits.  In striking down the law, the court criticized Chicago's argument that the presence of numerous firing ranges within 50 miles of the city eliminated the infringement of the Second Amendment right, calling it a "profoundly mistaken assumption" that "the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction."  Id. at 697.  Key to this criticism was the court's conclusion that the firing range ban "comes much closer to implicating the core of the Second Amendment right" because "[it] is a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense."  Id. at 708.

But Dearth's reliance on Ezell can only take him so far.  Dearth essentially analogizes this case to Ezell by contending that, just as the right to maintain proficiency by training at a firing range, the right to purchase a firearm is an important corollary to exercising the core right to possess a firearm for self-defense.  Even if the analogy is sound, the result is that the right to purchase a firearm is *only a corollary* to the right to possess a firearm for self-defense; the two rights *are not synonymous*.  Nor could they be, given the distinction between the regulation of firearms possession and the regulation of commercial firearms sales that was made by the Supreme Court in Heller and recognized by our Court of Appeals in Heller II, as noted above.  Ultimately, the court in Ezell did not hold that the firing range ban was *per se* unconstitutional, or even that it was subject to strict scrutiny.  See Heller II, 670 F.3d at 1265 (describing the court in Ezell as "applying [a] 'more rigorous showing' than intermediate scrutiny, 'if not quite strict scrutiny'") (citations omitted).  Instead, the court held that "[t]he City must establish a close fit between the range ban and the actual public interests it serves, and also that the public's interests

are strong enough to justify so substantial an encumbrance on individual Second Amendment rights." Ezell, 651 F.3d at 708-09.

In sum, as applied to Dearth, Sections 922(a)(9) and 922(b)(3) do not completely ban Dearth from possessing a firearm for self-defense and do not "severely limit the possession of firearms" by Dearth, and the Court holds that intermediate scrutiny applies.  Heller II, 670 F.3d at 1257, 1261-62.  As our Court of Appeals explained in Heller II, the Court will "apply intermediate scrutiny precisely because the [federal] laws do not affect the core right protected by the Second Amendment." Id. at 1266.  Thus, the question remains as to whether the challenged federal laws satisfy intermediate scrutiny.  To do so, the Court must compare the regulatory means with the government interests to analyze the "fit."

It cannot be gainsaid that the government interests here are substantial.  Congress has a strong interest in regulating the interstate commerce in firearms due to "the widely accepted knowledge that there is a vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such weapons once inside their borders." Navegar, Inc. v. United States, 192 F.3d 1050, 1063 (D.C. Cir. 1999).  The specific problem Congress wished to address by enacting Section 922(a)(9) is the "law enforcement problem posed by aliens legally in the United States, but not residing in any State, who acquire firearms from Federal firearms licensees by utilizing an intermediary." 137 Cong. Rec. S1369-01, at S1449 (Jan. 31, 1991).  Prior to its enactment, these aliens could obtain firearms from the unlicensed intermediary by making false statements, and they would face no legal penalty because, while Section 922(a)(6) prohibits the making of false statements to licensed firearms dealers, there is no analogous provision related to the making of false statements to non-licensees. See 137 Cong. Rec. at S1450.  Therefore, in an

effort to prevent these acquisitions, which frequently preceded smuggling of the firearms outside

of the United States, Congress enacted Section 922(a)(9) which generally prohibits the receipt of

firearms by any person who does not reside in a State.  While Dearth argues that because the

legislative history only discusses concerns of illegal firearms trafficking by aliens, the law is not

sufficiently narrowly tailored since it applies to both aliens and citizens (Pls.' Reply, Dkt. No. 28

at pp. 17-18), the Court finds that Congress could fairly determine that citizens also engage in

illegal firearms trafficking and that such trafficking by both aliens and citizens poses a serious

risk to public safety.

Section 922(b)(3) was also motivated by the substantial governmental interest of

protecting public safety and combatting violent crime.  During the congressional investigation

that preceded the enactment of the law, it was established that a large percentage of guns used in

crimes within many jurisdictions were purchased in neighboring states.  S. REP. NO. 89-1866, at

61-62.  In addition, the Congressional testimony "demonstrated the ease with which residents of

a particular State, which has laws regulating the purchase of firearms, can circumvent such laws

by procuring a firearm in a neighboring jurisdiction which has no such controls on the purchase

of firearms."  S. REP. NO. 89-1866, at 19.   Based on this testimony, Congress concluded that:

> The sale or other disposition of concealable weapons by importers,
> manufacturers, and dealers holding Federal licenses, to
> nonresidents of the State in which the licensee's place of business
> is located, has tended to make ineffective the laws, regulations, and
> ordinances in the several States and local jurisdictions regarding
> such firearms.

S. REP. NO. 89-1866, at 71.   Therefore, Congress sought to prohibit licensed firearms dealers

from selling firearms to individuals who do not reside in the same State as the dealer's place of

business in order to "deal with the serious problem of individuals going across State lines to

procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. REP. NO. 89-1866, at 19.

The Court now turns to the issue of the "fit" between the regulations and the government interests at stake. To the extent these statutes impose a burden on Dearth and those similarly situated persons who do not have a residence in *any* State, the laws burden a narrow class of U.S. citizens and other persons living within or visiting the country, evincing a fair degree of fit between the means used by the statutes and their intended purposes. Additionally, Congress could fairly conclude that a firearm sold to a person who has no residence in any State is more likely to "fall through the cracks" and potentially be illegally or dangerously used or transferred, since there is no state law that would regulate the firearm or the purchaser after the sale. And while an exception within Section 922(b)(3) allows a dealer to loan or rent firearm to someone who is not a resident of any State, it applies only for temporary use for lawful sporting purposes, so the firearm must be returned after its temporary use and is therefore much less likely to be illegally trafficked or used in a violent crime. Congress placed another exception within Section 922(b)(3) so that a dealer can sell a rifle or a shotgun to an out-of-state resident, but this exception does not allow a person to buy a firearm which she could not lawfully possess or obtain in her own State, because the sale must comply with both the laws of the dealer's State and the laws of the purchaser's State of residence. Furthermore, as stated above, Congress found that the sale of rifles and shotguns does not pose the same risk of illegal trafficking and use in violent crime as does the sale of handguns, which are concealable.

As Dearth argues repeatedly, the statutes are not perfectly tailored. If the Court had the power to write from a clean slate, the Court could certainly see, particularly with the benefit of experience and hindsight, how the regulatory scheme could be narrowed and improved. The

16

Court is particularly troubled by the fact that Section 922(a)(9) permits a person who does not

reside in any State to receive a firearm for lawful sporting purposes, while prohibiting receipt if

the sole purpose of receiving the firearm is self-defense.  Similarly, Section 922(b)(3) permits a

dealer to loan or rent a firearm to a person who does not reside in any State for temporary use for

lawful sporting purposes, while prohibiting the loan or rental if the sole purpose of the user is

self-defense.  This statutory regime arguably turns the Second Amendment on its head, as the

"the inherent right of self-defense has been central to the Second Amendment right," Heller, 554

U.S. at 628, while these two statutes seem to give the core purpose of self-defense less favorable

consideration than a more secondary purpose, use of a firearm for sporting purposes.  However,

this case must be decided based on its facts, and this particular lawsuit is an *as applied* challenge

by Dearth.  As stated above, Dearth is not left powerless to arm himself for self-protection,

because has the ability to bring his firearm from Canada with him when he visits the United

States.  Critically, Dearth concedes that "he would access [firearms] for lawful sporting purposes

as well as for other purposes, including self-defense, while visiting the United States."  (Pls.'

Sep. Statement of Undisputed Material Facts, Dkt. No. 23-2 at ¶ 6.)  Thus, Dearth clearly has the

ability to borrow or rent a firearm for lawful sporting purposes and then also use that firearm for

self-defense.  This would be a much different case if Dearth had none of those options.

Furthermore, the Court must also give due regard to the fact that if Congress did give favorable

consideration to sporting purposes, it did so because of its legitimate interest in safeguarding and

promoting interstate commerce, as this statutory regime allow hunters, firearm sports enthusiasts,

international tourists, and others who travel between states or who visit the United States from

other countries to purchase, borrow or rent firearms for lawful sporting activities within the

limitations set forth above.  See, e.g. Pub. L. No. 90-351, § 901(b), 82 Stat. at 226 (Congress

stated it did not wish to "place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity"); 137 Cong. Rec. S9087-02, S9091 (June 28, 1991) (Congress sought to avoid the "disastrous effect upon the international tourism that is associated with legitimate hunting by licensed persons for sporting purposes, in our Western States in particular," that would have resulted from a complete prohibition on receipt of firearms by non-residents).

In the end, the Constitution does not require perfection by Congress, nor does the Constitution permit the Court to legislate in Congress' stead. "[T]he requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." Heller II, 670 F.3d at 1258 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989)). While the question is not free from doubt, the Court holds that Sections 922(a)(9) and 922(b)(3) and their implementing regulations, as applied to Dearth, "are substantially related to an important governmental objective." Id. at 1258 (quoting Clark v. Jeter, 486 U.S. 456, 461 (1988)). Accordingly, the Court holds that the challenged laws do not violate Dearth's Second Amendment right to keep and bear arms.

### Right to Travel Claims

Dearth argues that he has a Fifth Amendment liberty interest in international travel that is unconstitutionally inhibited by the challenged laws. Dearth claims that his international travel right is violated by the laws challenged here because the laws condition the right to travel on the surrender of the ability to acquire firearms. Specifically, Dearth argues that Sections 922(a)(9)

and 922(b)(3) violate his right to travel because they require him to "surrender [his] ability to acquire firearms for non-sporting purposes, and surrender [his] ability to purchase firearms, as a condition of moving overseas."   (Pls.' Mot. at 22).   He maintains that a citizen's right to travel internationally is part of his liberty interest that is protected by the Due Process Clause of the Fifth Amendment.   Dearth contends that a citizen's ability to travel internationally is a fundamental right and, therefore, any restriction on that right is subject to strict scrutiny.

As the government correctly points out, these provisions do not prevent Dearth from travelling internationally and, therefore, they do not implicate any Fifth Amendment liberty interest in international travel.   There is nothing to suggest that the challenged statutes present either a direct or coincidental restriction on a U.S. citizen's ability to travel internationally.   The statutes merely require that Dearth establish residency in a State in order to purchase or acquire additional firearms for purposes other than sporting purposes.   The statutes place no direct restriction on Dearth's ability to travel within the United States or internationally.   These facts stand in stark contrast to the cases cited by Dearth involving more direct restrictions on travel. Compare Aptheker v. Secretary of State, 378 U.S. 500, 502 (1964) (denial of passport to members of Communist organizations); Lynd v. Rusk, 389 F.2d 940, 942-43 (D.C. Cir. 1967) (denial of passport to individuals who declined to provide assurances that they would refrain from travel to restricted areas); Hernandez v. Cremer, 913 F.2d 230, 232-33 (5th Cir. 1990) (United States citizen denied entry into the United States at the Mexico border).   It is equally clear that the challenged provisions also do not have an incidental effect on Dearth's right of international travel.   The provisions of Section 922(a)(9) and Section 922(b)(3) regulating the purchase of firearms by persons who are not residents of any State do not implicitly place any condition on Dearth's right to travel internationally.   Compare Woodward v. Rogers, 344 F.

Supp. 974, 988 (D.D.C. 1972), aff'd per curiam, 486 F.2d 1317 (D.C. Cir.1973) (table) (invalidating loyalty oath requirement for passports).

Even if the challenged laws had an incidental effect on Dearth's ability to travel internationally, it is well-settled that the right to international travel is not a fundamental right and may be regulated within the bounds of due process.  See Haig v. Agee, 453 U.S. 280, 306-07) (1981).  In Kent v. Dulles, 357 U.S. 116, 127 (1958), the Supreme Court did recognize the right to international travel as part of a liberty interest.  However, the Supreme Court subsequently stated that "the right of international travel has been considered to be no more than an aspect of the liberty protected by the Due Process Clause of the Fifth Amendment.  As such this right, the Court has held, can be regulated within the bounds of due process."  Haig, 453 U.S.at 307 (citations and internal quotation marks omitted).   Thus, the Court distinguished the *freedom* to travel outside of the United States from the *right* to travel within the United States; with the former being "subject to reasonable government regulation."  Id. at 306-07.  The District of Columbia Circuit has also noted this distinction.  Hutchins v. Dist. of Columbia, 188 F.3d 531, 537 (D.C. Cir. 1999) ("international travel is no more than an aspect of liberty that is subject to reasonable government regulation within the bounds of due process, whereas interstate travel is a fundamental right subject to a more exacting standard").

The challenged provisions do not have a direct impact on the freedom to travel internationally.  The provisions do not limit access to passports.  Nor do the provisions, as Dearth suggests, condition the right to travel internationally upon the relinquishment of another right.  For these reasons, the Court finds that rational basis review is the proper standard.  Under this level of scrutiny, the "constitutionality [of these provisions] does not depend on compelling

justifications." <u>Califano v. Aznavorian</u>, 439 U.S. 170, 178 (1978).  The provisions will pass constitutional muster if they are "rationally based."  <u>Id.</u>

As previously discussed, the challenged provisions pass constitutional muster under intermediate scrutiny and, therefore, they also easily survive rational basis review.  The provisions serve the substantial government interests of protecting public safety, combatting violent crime, and controlling the flow of firearms across state and international borders.  The provisions are undeniably rationally related to Congress' stated purpose, especially in light of Congress's explicit finding that "the sale or other disposition of concealable weapons . . . to non-residents of the State in which the licenses' place of business are located, has tended to make ineffective laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms."  P.L. 90-351 § 901(a) (1968).

### Equal Protection Claims

Dearth challenges Sections 922(a)(9) and (b)(3) as violative of his rights under the equal protection component of the Due Process Clause of the Fifth Amendment.[10]  Dearth alleges that the challenged laws deprive him of his right to equal protection in three ways:

> (1) by virtue of the fact that [he is] discriminated against in [his] exercise of a constitutional right on account of resident status; (2) by virtue of the fact that [he is] being discriminated against on account of residence status irrespective of whether a constitutional right is at stake; and (3) by virtue of the fact that Section 922(a)(9) and 27 CFR 478.29a allow non-resident Americans to use pre-possessed firearms for all reasons, but forbid the receipts of firearms received after said Americans' relinquishment of domestic residence except for sporting purposes.

(Compl. ¶¶ 30, 32).

---

[10]     The Supreme Court has interpreted the Due Process Clause of the Fifth Amendment to encompass the rights explicitly contained in the Equal Protection Clause of the Fourteenth Amendment. <u>Bolling v. Sharpe</u>, 347 U.S. 497, 498-99 (1954).

Equal protection claims are subject to a two-step analysis.  First, to establish an equal protection claim, Dearth must show that he was singled out and treated differently from others who were similarly situated.  Women Prisoners of D.C. Dep't of Corr. v. Dist. of Columbia, 93 F.3d 910, 924 (D.C. Cir. 1996).  To meet this burden, Dearth alleges that the challenged laws violate equal protection principles because they "classif[y] differently" law abiding Americans "who are otherwise identically situated."  (Pls.' Mot. at 26).  Presumably, Dearth is asserting that expatriate U.S. citizens, like Dearth, are similarly situated to U.S. citizens who reside in the United States.  However, Dearth has provided no support for his contention that expatriate U.S. citizens and U.S. citizens residing in the United States are similarly situated aside from the fact of common citizenship.  Consequently, Dearth has failed to demonstrate that he is similarly situated to U.S. citizens residing in the United States.

Even if Dearth could be considered to be similarly situated to resident U.S. citizens, his equal protection claim still fails because he cannot show that the government's action in enacting the challenged laws was irrational.  See Brandon v. Dist. of Columbia Bd. of Parole, 823 F.2d 644, 650 (D.C. Cir. 1987) ("[T]he government may avoid violating equal protection principles if it can demonstrate that its reasons for treating an individual differently bear some rational relationship to a legitimate state purpose.").  Because the challenged laws' classifications do not target a suspect class, and the Court has held that the challenged provisions do not violate either the Second or Fifth Amendments, Dearth's equal protection challenge is subject only to rational-basis review. See Locke v. Davey, 540 U.S. 712, 720 n. 3 (2004) (applying rational-basis review to equal protection claim challenging state scholarship program that did not violate Free Exercise Clause); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 54 (1983) (equal protection challenge to classification that does not affect fundamental rights rejected because

classification "rationally further[s] a legitimate state purpose."); <u>Johnson v. Robison</u>, 415 U.S. 361, 375 n. 14 (1974) (stating that, "since we hold ... that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test").  Under that standard, the Court must uphold the laws as long as there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." <u>Heller v. Doe</u>, 509 U.S. 312, 320 (1993). Because the government has met its burden under intermediate scrutiny—showing that the challenged laws are substantially related to the important governmental objectives of combating violent crime and stopping the illegal trafficking of firearms—these provisions readily pass muster under the rational-basis test.

## IV.    CONCLUSION

Based on the foregoing, the Court holds that Sections 922(a)(9) and 922(b)(3), and their implementing regulations do not violate Dearth's Second Amendment rights.  In addition, the challenged laws do not deprive Dearth of his right under the Fifth Amendment to equal protection under the law; nor do they violate Dearth's purported right to international travel under the Fifth Amendment.  Accordingly, the Court grants summary judgment in favor of the government on all six counts of the complaint.  A separate order accompanies this Memorandum Opinion.

**SO ORDERED.**

September 27, 2012                                     _____

                                                      Robert L. Wilkins
                                                      United States District Judge

<u>CERTIFICATE OF SERVICE</u>

On this, the 1st day of November, 2012, I served a copy of the foregoing Underlying Decision upon the following by electronic service. The document was filed electronically, generating a Notice of Electronic Filing, and counsel below has consented to electronic filing:

Anisha Dasgupta
Appellate Staff, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave, NW, Room 7533
Washington, D.C. 20530
(202) 514-5428

I declare under penalty of perjury that the foregoing is true and correct.

This the 1st day of November, 2012

/s/ Alan Gura
Alan Gura

Attorney for Appellants