No. 12-5305
ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

## In the United States Court of Appeals
## for the District of Columbia Circuit

═══════════════════════════

STEPHEN DEARTH, ET AL.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR.,

Defendant-Appellee.

═══════════════════════════

Appeal from a Judgment of the
United States District Court for the District of Columbia
The Hon. Robert L. Wilkins, District Judge
(Dist. Ct. No. 1:09-cv-00587-RLW)

─────────────────

APPELLANTS' BRIEF

─────────────────

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

February 8, 2012          *Counsel for Appellants*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A. *Parties and Amici*

The parties in the district court were plaintiffs Maxwell Hodgkins, Stephen Dearth, and The Second Amendment Foundation; and defendant Eric H. Holder, Jr. All parties below are parties before this Court in this appeal, other than Maxwell Hodgkins.

There were no amici below for either party. At present, there are no known amici parties appearing before this Court on this appeal.

## B. *Rulings Under Review*

The decision of the District Court for the District of Columbia, per the Hon. Robert L. Wilkins, entered September 27, 2012, granting Defendant-Appellee's motion for summary judgment and denying Plaintiffs-Appellants' motion for summary judgment. The decision is not currently reported, but appears at 2012 U.S. Dist. LEXIS 138697. The ruling under review and judgment being appealed are set forth in the Joint Appendix ("JA") at 172-96.

## C. Related Cases

This case has previously been before this Court, No. 10-5062, and the decision in those proceedings was published as *Dearth* v. *Holder*, 641 F.3d 499 (D.C. Cir. 2011).

Previously, Appellants litigated their claims against Appellee's predecessors-in-interest, but each case was dismissed without prejudice on venue grounds. Appellee's predecessors claimed the District of Columbia was the dispute's only possible venue. The related cases were:

*Dearth* v. *Gonzales*, U.S. Dist. Ct. Southern District of Ohio No. 06-cv-1012, *aff'd sub nom Dearth* v. *Mukasey*, 516 F.3d 413 (6th Cir. 2008).

*Hodgkins* v. *Gonzales*, U.S. Dist. Ct. Northern District of Texas No. 06-cv-2114, *aff'd sub nom Hodgkins* v. *Mukasey*, 271 Fed. Appx. 412 (5th Cir. 2008).

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

Jurisdictional Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statutes and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.   The Initial Lawsuits in Ohio and Texas. . . . . . . . . . . . . . . 5

    2.   Litigation in the District of Columbia. . . . . . . . . . . . . . . . 6

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    1.   Federal Restrictions on Expatriated Americans'
        Ability to Acquire Firearms. . . . . . . . . . . . . . . . . . . . . . 9

    2.   The Challenged Laws' Impact on Plaintiffs. . . . . . . . . . . . 10

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

I.   The Standard of Review in this Case is De Novo. . . . . . . . . . . . 19

II.  The Second Amendment Foundation Has Always
     Remained a Plaintiff In This Case. . . . . . . . . . . . . . . . . . . . . . . . 19

     A.  The Lower Court's Earlier Dismissal of SAF
         Cannot Be Law of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . 20

     B.  Collateral Estoppel Does Not Bar SAF's Claims. . . . . . . .  21

     C.  Reaching the Issue of SAF's Standing
         Remains Optional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

III. The Second Amendment Foundation Has Standing. . . . . . . . . . 25

     A.  SAF Has Associational Standing to Represent
         Its Members.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

     B.  SAF Has Standing Based On Its Own
         Organizational Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

IV.  The Second Amendment Secures A Fundamental Right
     to Acquire Firearms for Self-Defense. . . . . . . . . . . . . . . . . . .  28

V.   Barring Law-Abiding Citizens from Acquiring Firearms
     for Self-Defense Is Unconstitutional. . . . . . . . . . . . . . . . . . . . . 30

     A.  Section 922(a)(9) is Categorically Unconstitutional
         as an Interpretive Matter. . . . . . . . . . . . . . . . . . . . . . . . . 30

     B.  Section 922(a)(9) Cannot Survive Means-Ends Scrutiny.  . 33

VI.  Barring Firearms Sales to Otherwise Qualified
     Americans for Lack of Domestic Residence Violates
     the Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.    Laws Restricting the Purchase of Firearms
By Responsible, Law-Abiding Individuals
Are Subject to Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . 40

B.    Barring Law-Abiding, Responsible Americans from
Purchasing Firearms for Lack of Domestic Residence
Serves No Compelling Government Interest. . . . . . . . . . . 45

C.    Section 922(b)(3) Is Not Narrowly Tailored. . . . . . . . . . . . 48

VII.  The Alleged Availability of Firearms in Canada is
Irrelevant to a Claim that the Federal Government
Violates Second Amendment Rights Within the
United States. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

A.    Americans are Entitled to Exercise Constitutional
Rights Throughout the Territory of the United States. . . . 49

B.    The Availability of Other Arms Is Not a Defense
In Second Amendment Cases. . . . . . . . . . . . . . . . . . . . . . . . 51

C.    Canada, and Other Nations, Do Not Have
A Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VIII. Restricting the Firearms Rights of Expatriated Americans
Violates the Fundamental Right to International Travel. . . . . . 55

A.    American Citizens Enjoy A Fundamental Right to
International Travel, Including the Right to Reside
Overseas. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B.    Restrictions Upon the Right to International Travel
Are Subject to Strict Scrutiny Review. . . . . . . . . . . . . . . . 57

C.    Restricting the Domestic Firearms Rights of
       Expatriated Americans Does Not Narrowly
       Satisfy Any Interest in Regulating the Right to
       International Travel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IX.   By Forcing Individuals to Select from Among Their
       Constitutional Rights, the Challenged Provisions
       Violate the Unconstitutional Conditions Doctrine. . . . . . . . . .  60

X.    The Challenged Provisions Violate Plaintiffs'
       Right to Equal Protection. . . . . . . . . . . . . . . . . . . . . . . . . 64

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  66

TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
    50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*\*Apethaker* v. *Secretary of State*,
    378 U.S. 500 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 62, 63

*Banner* v. *United States*,
    428 F.3d 303 (D.C. Cir. 2005) (per curiam) . . . . . . . . . . . . . . . . 44

*Bolling* v. *Sharpe*,
    347 U.S. 497 (1954). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Buckley* v. *Valeo*,
    424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Bulluck* v. *Washington*,
    468 F.2d 1096 (D.C. Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Carey* v. *Pop. Serv. Int'l*,
    431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*,
    447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Consol. Edison Co.* v. *Bodman*,
    449 F.3d 1254 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*\*Crocker* v. *Piedmont Aviation, Inc.*,
    49 F.3d 735 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Authorities upon which we chiefly rely are marked with asterisks.

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 8, 19, 24

*Dearth* v. *Mukasey*,
516 F.3d 413 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Defenders of Wildlife* v. *Gutierrez*,
532 F.3d 913 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . 28, 32, 52, 53, 55

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . 25, 26, 43, 44, 49, 50

*Fletcher* v. *Haas*,
851 F. Supp. 2d 287 (D. Mass. 2012). . . . . . . . . . . . . . . . . . . . . . . 35

*Griswold* v. *Connecticut*,
381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Havens Realty Corp.* v. *Coleman*,
455 U.S. 363 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Heller* v. *District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . 38, 40-42

*Hernandez* v. *Cremer*,
913 F.2d 230 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Hodgkins* v. *Holder*,
677 F. Supp. 2d 202 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . 8

*Hodgkins* v. *Mukasey*,
271 Fed. Appx. 412 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . 6

*Hunt* v. *Wash. State Apple Adver. Comm'n*,
　　432 U.S. 333 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Kachalsky* v. *County of Westchester*,
　　701 F.3d 81 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Kent* v. *Dulles*,
　　357 U.S. 116 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*Lane* v. *Holder*, No.11-1847,
　　2012 U.S. App. LEXIS 26640 (4th Cir. Dec. 31, 2012). . . . . . . . . 27

*Lynd* v. *Rusk*,
　　389 F.2d 940 (D.C. Cir. 1967). . . . . . . . . . . . . . . . . . . . . . . . . . 58

*McDonald* v. *City of Chicago*,
　　130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Moore* v. *Madigan*,
　　702 F.3d 933 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Navegar, Inc.* v. *United States*,
　　103 F.3d 994 (D.C. Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*NRA of Am.* v. *BATFE*,
　　700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Parker* v. *District of Columbia*,
　　478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . 32, 42, 51

*Patsone* v. *Pennsylvania*,
　　232 U.S. 138 (1914). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*People* v. *Zerillo*,
　　189 N.W. 927 (Mich. 1922). . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Perry* v. *Sindermann*,
    408 U.S. 593 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Pharm. Care Mgmt. Ass'n* v. *District of Columbia*,
    522 F.3d 443 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Reliable Consultants, Inc.* v. *Earle*,
    517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Richmond Newspapers* v. *Virginia*,
    448 U.S. 555 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Romer* v. *Evans*,
    517 U.S. 620 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Sabri* v. *United States*,
    541 U.S. 600 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Saenz* v. *Roe*,
    526 U.S. 489 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Say* v. *Adams*, No. 3:07-CV-377-R,
    2008 U.S. Dist. LEXIS 20183 (W.D. Ky. Mar. 14, 2008) . . . . . . 35

\**Schad* v. *Mt. Ephraim*,
    452 U.S. 61 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Schneider* v. *Rusk*,
    377 U.S. 163 (1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Schneider* v. *State*,
    308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Schrader* v. *Holder*, No. 11-5352,
    2013 U.S. App. LEXIS 730(D.C. Cir. Jan. 23, 2013). . . . . . . . . . 44

*Second Amendment Foundation, Inc.* v. *Suttle*,
No. 8:11-CV-335 (D. Neb. Nov. 21, 2011) . . . . . . . . . . . . . . . . . . . . 35

*Sherley* v. *Sebelius*,
689 F.3d 776 (D.C. Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Simmons* v. *United States,*
390 U.S. 377 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Smith* v. *South Dakota,*
781 F. Supp. 2d 879 (D.S.D. 2011) . . . . . . . . . . . . . . . . . . . . . . . 35

*Springfield, Inc.* v. *Buckles,*
116 F. Supp. 2d 85 (D.D.C. 2000). . . . . . . . . . . . . . . . . . . . . . . . 31

*Springfield, Inc.* v. *Buckles,*
292 F.3d 813 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Stafford* v. *Briggs,*
444 U.S. 527 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Taylor* v. *Sturgell,*
553 U.S. 880 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United Food & Commercial Workers Union Local 751*
v. *Brown Group*, 517 U.S. 544 (1996). . . . . . . . . . . . . . . . . . . . . 25

*United States* v. *Bass,*
404 U.S. 336 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States* v. *Carpio-Leon,*
701 F.3d 974 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States* v. *Chester,*
628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States* v. *Decastro,*
    682 F.3d 160 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States* v. *Jackson,*
    390 U.S. 570 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60, 61, 63

*United States* v. *Marzzarella,*
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 43

*United States* v. *Masciandaro,*
    638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*United States* v. *Skoien,*
    614 F.3d 638 (7th Cir. 2010) (en banc). . . . . . . . . . . . . . . . . . . . 44

*United States* v. *Virginia,*
    518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States* v. *Williams,*
    616 F.3d 685 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Virginia* v. *Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Warth* v. *Seldin,*
    422 U.S. 490 (1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Williams* v. *Morgan,*
    478 F.3d 1316 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Woodward* v. *Rogers,*
    344 F. Supp. 974 (D.D.C. 1972). . . . . . . . . . . . . . . . . . . . . . . 58, 59

*Yamaha Corp. of America* v. *United States,*
    961 F.2d 245 (D.C. Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Zemel* v. *Rusk,*
     381 U.S. 1 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63


Statutes and Rules

18 U.S.C. § 922(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 45, 46

18 U.S.C. § 922(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a)(9). . . . . . . . . . . . . . . . 2-5, 9, 12-14, 30, 33, 35-37, 59

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . 2, 4, 5, 9, 12, 39, 41, 45, 46, 48, 59

18 U.S.C. § 922(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 922(g)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 922(g)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. § 924(a)(1)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 926A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

27 C.F.R. § 478.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 49

27 C.F.R. § 478.124(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

27 C.F.R. § 478.29a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

27 C.F.R. § 478.96. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 39

27 C.F.R. § 478.97. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

27 C.F.R. § 478.99. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1391. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

42 U.S.C. § 1973ff. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

D.C. Code § 7-2502.01(b)(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Haw. Rev. Stat. § 134-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Ky. R.S. § 237.110(4)(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

N.Y. Penal Law § 265.00(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Omaha Mun. Code § 20-253(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

S.D.C.L. § 23-7-7.1(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35


Other Authorities

58 D.C. Register No. 38, at 008240-008241 (Sept. 23, 2011),
      available at http://www.dcregs.dc.gov/Gateway/Notice
      Home.aspx?noticeid=1742040 (last visited Feb. 7, 2013) . . . . . . 41

Cert. Pet. No. 07-290. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

http://www.atf.gov/forms/download/atf-f-4473-1.pdf
      (last visited Feb. 5, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Judgment, No. 10-5062, April 15, 2011. . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Loan or Rental of Firearm Transcript*, available at
    http://www.atf.gov/training/firearms/ffl-learning
    -theater/episode-6.html (last visited Feb. 5, 2013). . . . . . . . . . . . 16

*Prohibited Firearms*, Royal Canadian Mounted Police, available at:
    http://www.rcmp-grc.gc.ca/cfp-pcaf/fs-fd/prohibited-
    prohibe-eng.htm (last visited Feb. 7, 2013). . . . . . . . . . . . . . . . . . 54

*Reciprocity with Other States*, Utah Dept. of Public Safety,
    http://publicsafety.utah.gov/bci/FAQother.html
    (last visited Feb. 5, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

S. Rep. No. 89-1866 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

THE WRITINGS OF THOMAS JEFFERSON
    (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Plaintiffs-Appellants Stephen Dearth and Second Amendment Foundation, Inc. ("SAF") ("Plaintiffs") seek declaratory and injunctive relief against enforcement of certain federal firearms laws that violate the United States Constitution. The District Court had subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343.

This Court has jurisdiction under 28 U.S.C. § 1291. On September 27, 2012, the District Court granted Defendant-Appellee's motion for summary judgment and denied Plaintiffs' motion for summary judgment. Plaintiffs noticed this appeal the same day. The appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF ISSUES

1. May the government forbid law-abiding, responsible American citizens, who are not disqualified from possessing firearms, from exercising their fundamental Second Amendment right to receive firearms for self-defense on account of foreign residence?

2. May the government forbid law-abiding, responsible American citizens, who are not disqualified from possessing firearms, from

exercising their fundamental Second Amendment right to purchase firearms on account of foreign residence?

3. May the government require Americans to choose between exercising their fundamental Second Amendment right to bear arms, and their fundamental Fifth Amendment right of international travel?

4. Does a membership organization whose members are impacted by particular federal criminal laws, and which expends resources as a result of these laws, have standing to challenge the laws' constitutionality?

## STATUTES AND REGULATIONS

An addendum contains the following:

18 U.S.C. §§ 922(a)(3), (a)(5), (a)(9), and (b)(3); and 27 C.F.R. §§ 478.11, 478.29a, 478.96, 478.97, 478.99, and 478.124(c)(1).[1]

## STATEMENT OF THE CASE

The government does not consider expatriated Americans to be dangerous. Americans who happen to live overseas may possess and

---

[1] All further statutory references are to Title 18 of the United States Code unless otherwise noted.

own firearms for any lawful purpose, as much as anyone. Yet the government bars responsible, law-abiding American adults from *receiving* firearms specifically for self-defense, even as it allows them to receive firearms for sport; and it has barred them generally from purchasing firearms, solely on account of their foreign residence—even where no state law bars their purchase or possession of firearms.

Congress did not intentionally create this legal landscape. In 1994, Congress surmised that foreign visitors might illegally smuggle arms overseas, yet it did not wish to deprive the American economy of foreign hunters' valuable tourist dollars. Thus emerged Section 922(a)(9), which makes it a crime for any person not residing within the United States to receive a firearm, unless such receipt is for a "sporting purpose"—a term excluding self-defense.

Stephen Dearth, a law-abiding, responsible American citizen fully qualified under federal law and the laws of all fifty states to possess firearms and to use them for self-defense—is thus prohibited from receiving firearms for that core Second Amendment purpose because he resides with his family in Winnipeg.

Separately, Section 922(b)(3) forbids individuals from purchasing firearms outside their state of residence, unless, in the case of long guns, the transaction complies with the laws of the purchaser's home state as well as the laws of the state where the transaction occurs. At least with respect to long guns, this provision advances a legitimate interest in assuring that individuals not circumvent the firearms transaction laws of their home states.

This provision is inapplicable to Dearth. He cannot violate his home state's firearm transfer laws, since he has no home state. Yet the provision's enforcement mechanism requires firearm purchasers to identify their state of residence—something Dearth cannot do—and thus acts to prohibit Dearth's otherwise legal firearm purchases.

Section 922(a)(9) is facially unconstitutional, as anyone who can responsibly receive firearms for sport should be able to use them for the Second Amendment's core self-defense interest, and no logical reason could support the notion that individuals receiving firearms for sport are more law-abiding than those receiving firearms for self-defense. The provision is also unconstitutional as-applied to law-abiding,

responsible adult American expatriates like Dearth, as is Section 922(b)(3), which simply does not contemplate the circumstances of an American citizen lacking a "home" state.

These provisions violate not only the Second Amendment, but also the Fifth Amendment's rights of international travel and equal protection. Following seven years of venue and standing disputes, the time has at last arrived to enter an injunction. The lower court should, again, be reversed.

1.    *The Initial Lawsuits in Ohio and Texas*

In November, 2006, Plaintiffs first challenged Sections 922(a)(9) and (b)(3) by filing suit in the United States District Court for the Southern District of Ohio. Dearth originally chose this forum because he primarily intended to exercise his rights in his hometown of Mount Vernon, Ohio and, mindful that Congress had established nationwide venue against the federal government in civil actions, see *Stafford* v. *Briggs*, 444 U.S. 527 (1980), he believed this to be a district where "a substantial part of the . . . omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(2). But the government moved to dismiss the case

for improper venue, and further requested that the litigation be transferred to the District of Columbia under 28 U.S.C. § 1404(a) on convenience grounds.

Ultimately, the government prevailed on its motion, though the district court granted Plaintiffs' request for dismissal without prejudice rather than transfer so that they could at least have an appealable order. That appeal was unsuccessful. *Dearth* v. *Mukasey*, 516 F.3d 413 (6th Cir. 2008).

Also in November, 2006, Plaintiff SAF and Maxwell Hodgkins, a native Texan residing in England and suffering the same disabilities, brought a similar lawsuit. Plaintiffs brought suit in the United States District Court for the Northern District of Texas, where Hodgkins sought to exercise Second Amendment rights while visiting the United States. That lawsuit, too, was dismissed without prejudice on venue grounds. *Hodgkins* v. *Mukasey*, 271 Fed. Appx. 412 (5th Cir. 2008).

2.     *Litigation in the District of Columbia*

Notably absent from the government's motions to transfer or dismiss the Ohio and Texas cases was any argument related to standing. As

Plaintiffs informed those courts to no avail, the government was merely forum shopping so that it could take advantage of this Court's unique pre-enforcement standing doctrine. See *Navegar, Inc.* v. *United States*, 103 F.3d 994 (D.C. Cir. 1997). And when Hodgkins, Dearth, and SAF refiled the litigation in the court below on March 27, 2009, the government did exactly that.

Plaintiffs responded that Dearth had standing independent of this Circuit's pre-enforcement standing requirements because he had already suffered an injury-in-fact—namely, that his two previous attempts to purchase firearms were thwarted by a federal enforcement scheme administered by Defendant. Moreover, Plaintiffs argued that the Supreme Court had rejected the elevated standing requirements *Navegar* described. Finally, Plaintiffs urged that the government could not challenge standing, as it successfully established venue here under a statute requiring that any transfer be to a district "in which [the case] might have been brought." 28 U.S.C. § 1404(a).

The lower court granted the government's motion to dismiss, labeling Dearth's denied attempts to purchase firearms as "past

injuries alone," *Hodgkins* v. *Holder*, 677 F. Supp. 2d 202, 203 (D.D.C. 2010), and then characterizing Dearth's claim as a pre-enforcement challenge barred by *Navegar*, *id.* at 204-05. The court observed that *Navegar*'s application was especially problematic in this case, effectively preventing Dearth's dispute from being heard on the merits by an Article III court outside of the criminal context. *Id.* at 205. Nevertheless, it found the *Navegar* line of cases to be on-point, and concluded that it had no choice but to "faithfully apply" them. *Id.* The lower court also concluded that SAF had neither organizational nor associational standing. *Id.* at 206.

This Court reversed. *Dearth* v. *Holder*, 641 F.3d 499 (D.C. Cir. 2011). Finding that Dearth had sustained an injury-in-fact and faced an on-going disability, this Court did not reach SAF's standing arguments.[2]

On remand, the lower court denied Plaintiffs' motion for summary judgment, and granted Defendant's cross-motion for summary judgment. The lower court asserted that its earlier dismissal of SAF

---

[2]During the course of the proceedings, Hodgkins re-established residency in the United States and thus abandoned the litigation.

8

was somehow law of the case, and it ruled against Dearth on the

merits. JA 172-96. Plaintiffs immediately noticed this appeal. JA 197.

STATEMENT OF FACTS

1.  *Federal Restrictions on Expatriated Americans'*
    *Ability to Acquire Firearms.*

"It shall be unlawful – for any person . . . who does not reside in any

State to receive any firearms unless such receipt is for lawful sporting

purposes." 18 U.S.C. § 922(a)(9); 27 C.F.R. § 478.29a.[3] A violation of

this section is punishable by fine and/or imprisonment for up to five

years. 18 U.S.C. § 924(a)(1)(D). "An individual resides in a State if he or

she is present in a State with the intention of making a home in that

State." 27 C.F.R. § 478.11. But an individual may have multiple states

of residence. *Id.* at Example 2.

Section 922(b)(3), and 27 C.F.R. §§ 478.96 and 478.99, bar firearms

dealers from selling firearms to individuals who do not reside within

the state in which the dealer's place of business is located. An exception

allows a dealer to sell rifles and shotguns to residents of states where

---

[3]"Receive" and "possess" have different meaning throughout the
Gun Control Act. *United States* v. *Bass*, 404 U.S. 336, 342-43 (1971).

the dealer does not maintain a place of business, as long as the transaction would be legal "in both states." *Id.*

All firearms purchasers within the United States who do not possess a Federal Firearms License, meaning, virtually all ordinary civilian consumers of firearms, must complete "Form 4473, Firearms Transaction Record Part I – Over-The-Counter, OMB 1140-0020," administered under Defendant's authority, in order to purchase a firearm. 27 C.F.R. § 478.124. The form's Question 13 provides, "What is your State of residence (if any)? _____" See http://www.atf.gov/forms/download/atf-f-4473-1.pdf (last visited Feb. 5, 2013). Failure to complete Form 4473, including Question 13, voids the transaction.

2. *The Challenged Laws' Impact on Plaintiffs*

Stephen Dearth is a natural-born American citizen who resides in Canada and does not maintain a residence within the United States. JA 32, ¶1. Although Dearth resides abroad, he has several friends and relatives in the United States whom he enjoys visiting, and whom he intends to continue visiting on a regular basis. JA 32, ¶3. Dearth intends to purchase firearms within the United States, which he would

store securely at his relatives' home in Mount Vernon, Ohio. *Id.* He intends to access firearms for a variety of purposes while visiting the United States, including self-defense and lawful sporting purposes. *Id*.

Dearth does not face any of the typical disqualifying barriers under the federal gun control laws. JA 32, ¶2; *cf.* 18 U.S.C. § 922(g) (defining categories of persons prohibited from possessing firearms). Moreover, Dearth holds a Utah permit to publicly carry a handgun, which is recognized in numerous states. JA 32, ¶2; *Reciprocity with Other States*, Utah Dept. of Public Safety, http://publicsafety.utah.gov/bci/FAQother.html (last visited Feb. 5, 2013).[4]

The Second Amendment Foundation, Inc. ("SAF"), is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. JA 34, ¶2. SAF has over 650,000 members and supporters nationwide. *Id.* The purposes of SAF include education, research, publishing and legal

---

[4]Many states do not require a license to openly carry a handgun for self-defense, and some do not require a license to carry handguns openly or concealed. In addition to a patchwork of reciprocity agreements respecting other states' handgun carry permits, states that license handgun carrying typically license non-residents as well.

action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control. *Id.*

Many of SAF's members and supporters purchase handguns for traditional lawful purposes, including self-defense. JA 34, ¶3. They also enjoy overseas travel, and on occasion reside overseas for an indefinite amount of time, while still returning to the United States on visits during which they enjoy exercising their Second Amendment rights. For example, Stephen Dearth and Maxwell Hodgkins are SAF members. JA 34, ¶4. Owing to SAF's mission, SAF's resources are taxed by inquiries into the operation and consequences of federal firearms restrictions based on residence and travel. JA 35, ¶5.

In January of 2006, unaware of Sections 922(a)(9) and (b)(3), Dearth attempted to purchase a firearm from a dealer within the United States. JA 33, ¶4. However, he could not provide a response to Question 13 on Form 4473, and advised the dealer that he does not reside in any State. *Id.* On account of  Dearth's foreign residence and inability to answer Question 13, the transaction was terminated. *Id.* Dearth subsequently spoke with an official at the Federal Bureau of

Investigations, who confirmed that Dearth could not adequately complete Form 4473, and could not purchase a firearm because he lacked a domestic residence. *Id.* In June of 2007, Dearth again attempted to purchase a firearm within the United States. JA 33, ¶5. Dearth truthfully advised the seller that he did not reside in any State, which again prevented the effectuation of his firearms purchase. *Id.*

Dearth reasonably fears criminal penalties were he to provide false state residence information on a Form 4473 in order to purchase a firearm, and cannot purchase a firearm at retail if he truthfully declines to provide a state of residence on a Form 4473. JA 33, ¶6.

The lower court's colloquy with Defendant's counsel revealed the plain manner in which these provisions function:

> THE COURT: So what about my hypothetical? Mr. Dearth comes to the U.S., he visits with his friend, he says, "I really would like to have a gun for self-defense while I'm visiting in the U.S. during the month of October," and his friend says "Okay, I'll give you my Glock semiautomatic handgun to use and possess while you're here, and you just have to give it back to me before you leave town, or leave the country." Let's start with 922(a)(9). Can that take place?

> MR. RIESS: No, Your Honor. Based on the plain text of the statute, it prohibits any person who doesn't reside in any state from receiving a firearm, unless the receipt is for lawful sporting purposes.

THE COURT: So if Mr. Dearth said the same thing as far as, "I want to have a gun for self-defense purposes," and his friend says, "Okay, here's my 12-gauge shotgun. I use it for skeet shooting, but it's a perfectly good self-defense gun, so you can take that and keep it for the month of October while you're in town," can that be done?

MR. RIESS: No. If the purpose is not for lawful sporting purposes, then the plain text of the statute (a)(9) would bar it.

JA 202, T. 37, l.22 - JA 203, T. 38, l. 17.

THE COURT: So if in my hypothetical Mr. Dearth said, "You know, September 11th is tomorrow, and I'm just kind of fearful of something happening on September 11th, so just for the day can I borrow your shotgun? And you use it for sporting purposes, but I want it for self-defense purposes; I'll give it back to you the morning of the 12th," you say that that would be a violation of 922(a)(9)?

MR. RIESS: Yes, Your Honor, under the plain text of the statute...

JA 203, T. 38, l. 25 - JA 204, T. 39, l. 8.

At one point, the government suggested Dearth could not exercise his right to self-defense unless he also expressed an interest in sport:

THE COURT: Suppose he didn't [possess guns in Canada]. Or suppose he just forgot and just didn't bring them with him, and so he's going to be visiting family here and wants to possess a gun for self-defense while he's here. What are his options?

MR. RIESS: His options are he can rent a gun from a licensed dealer for sporting purposes, and then use that gun for self-defense.

THE COURT: So he's supposed to lie and say, "I have a sporting purpose that I intend to use it for," when he really doesn't?

14

MR. RIESS: No, Your Honor. But his options would be a rental from a licensed dealer or a loan from a friend for sporting purposes, and then to be able to use that gun for self-defense.

THE COURT: Well, how is anyone to know that it's for lawful sporting purposes just because it is possible for that gun to be used for lawful sporting purposes?

MR. RIESS: Because the statute specifically says that the receipt has to be for that purpose. I suppose if it came up in a prosecution, there would have to be some evidence that the receipt was for hunting or sporting.

THE COURT: And if the evidence was that Mr. Dearth said, "I want it for self-defense," and his friend said, "Look, I'll loan you my shotgun, but you really want it for sporting purposes," wink, nod, and hands it over, and Mr. Dearth says, "Okay, I guess for the record I have to say that, but I really want it for self-defense," you're saying that's compliance with the statute?

MR. RIESS: No, Your Honor, I don't think the law could be evaded, as you say, with a wink and a nod.

JA 204, T. 39, l. 16 - JA 205, T. 40, l. 20. Although the government may not consider some defensive firearms to have a sporting purpose, the lower court would later accept the logic that Dearth should aver a sporting interest and then use the firearm for self-defense. "Dearth clearly has the ability to borrow or rent a firearm for lawful sporting purposes and then also use that firearm for self-defense." JA 188.

As the government advises gun dealers, "if you have any reason to believe that the customer might use the loan or rental for any use other than sporting purposes, it's unlawful to transfer the firearm." *Loan or Rental of Firearm Transcript*, available at http://www.atf.gov/training/firearms/ffl-learning-theater/episode-6.html (last visited Feb. 5, 2013).

> THE COURT: Then what options does a person have if their true purpose isn't for lawful sporting purpose?
>
> MR. RIESS: The options that they have are to purchase a gun, or already have them *in the country in which they reside . . .*

JA 205, T. 40, l. 21-24 (emphasis added).

## SUMMARY OF ARGUMENT

Few laws are as obviously unconstitutional as the challenged provisions. The Second Amendment secures a fundamental individual right to keep and bear arms for self-defense. While the government may disarm dangerous or irresponsible individuals whose possession of guns would lie at or beyond the Second Amendment's fringes, or prevent the possession or use of arms for improper purposes, here the government largely, perhaps exclusively, targets only the self-defense interest that  lies at the Second Amendment's core. It disarms plainly

16

law-abiding, responsible Americans, largely and specifically to the extent they would exercise their right to bear arms for self-defense.

The notion that individuals seeking guns for self-defense, as opposed to hunting, are thereby predisposed to smuggling those guns overseas, or are more easily capable of doing so, is nonsensical. Equally specious is the notion that fundamental rights may be curtailed in this country, if they might be exercised overseas.

Moreover, the Fifth Amendment secures for all Americans the fundamental right of international travel. Restricting the Second Amendment rights of individuals who choose to reside overseas impermissibly burdens that right, as Americans cannot be forced to choose among their fundamental rights.

And because the government improperly classifies individuals in the exercise of fundamental constitutional rights, it also violates the Fifth Amendment's guarantee of equal protection. Indeed, the challenged laws would fail even a rational-basis level of scrutiny. Not only is it irrational to classify expatriates differently from other law-abiding citizens, but the government also differentiates between Americans

who purchased guns prior to leaving the country, who are unencumbered in their access and use of their firearms, and those who did not make such preparations, who are almost completely disarmed.

Before reaching the case's merits, this Court may need to again consider, even if briefly, the issue of standing. Although one opinion on standing from this Court, per case, should ordinarily suffice, and the government below conceded the most obvious basis for SAF's standing, the lower court's opinion rests on the baseless assertion that Dearth remains the only plaintiff in the case. Subtracting SAF, the lower court limited the action by alluding to the Canadian law governing Dearth's residence, as though that were relevant.

Of course the enjoyment of constitutional rights in the United States does not depend on what foreign governments permit on their soil. But the lower court's predicate for reaching a position where that argument might even hypothetically make a difference is itself illusory. This Court never affirmed SAF's dismissal, which just as plainly, SAF never ceased challenging. Hanging the outcome below on a law-of-the-case assertion was untenable.

The judgment should again be reversed, this time, with directions to enter the judgment to which Plaintiffs are entitled as a matter of law.

ARGUMENT

## I. THE STANDARD OF REVIEW IS *DE NOVO*.

"As with all summary judgment dispositions, we review the district court's denial of appellants' motion for summary judgment and grant of appellees' cross motion for the same *de novo*." *Defenders of Wildlife* v. *Gutierrez*, 532 F.3d 913, 918 (D.C. Cir. 2008) (citation omitted).

## II. THE SECOND AMENDMENT FOUNDATION HAS ALWAYS REMAINED A PLAINTIFF IN THIS CASE.

This Court "reversed" the lower court's previous judgment dismissing the case for lack of standing. Judgment, No. 10-5062, April 15, 2011. Determining that Dearth has standing, this Court found no "need" to address SAF's arguments that it, too, has standing. *Dearth*, 641 F.3d at 503 n.***.

Had the lower court reiterated its (erroneous) reasoning for dismissing SAF, that would have been one thing. But this was quite another:

It seems, therefore, that while the Circuit Court reversed the trial court's prior ruling that Dearth did not have standing to bring this challenge, the Circuit did not disturb the trial court's ruling that the SAF did not have standing. *Crocker* v. *Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) (explaining that under the law-of-the-case doctrine, "a court involved in later phases of a lawsuit should not re-open questions decided ... by that court or a higher one in earlier phases").

JA 177 n.4 (parallel citation omitted).

A. The Lower Court's Earlier Dismissal of SAF Cannot Be Law of the Case.

*Crocker* does not remotely support the lower court's approach to this Court's previous opinion. "[L]aw-of-the-case doctrine holds that *decisions rendered on the first appeal* should not be revisited on later trips to the appellate court." *Crocker*, 49 F.3d at 739 (emphasis added) (citation omitted). "What identifies this as true law-of-the-case preclusion is that the first appeals court has affirmatively decided the issue, be it explicitly or by necessary implication." *Id.* (citation omitted); *Sherley* v. *Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012). The first appeal here cannot be read as having reached SAF's standing.

And while the doctrine may extend, again as a prudential matter, to "prior rulings of the *trial* court that could have been but were not

challenged on an earlier appeal," *Crocker*, 49 F.3d at 739, this Court's statement that it did not "need" to reach SAF's standing arguments should have signaled to the lower court that those arguments were presented. Indeed, SAF vigorously contested its dismissal in the previous appeal. See Appellants' Br., No. 10-5062, at 45-48; Reply Br., No. 10-5062, at 14-16. The fourth issue presented here, that of SAF's standing, supra at 2, repeats verbatim an issue presented in the previous appeal. Appellants' Br., No. 10-5062, at 2.

Before dismissing a party on waiver grounds, a court should inquire as to the arguments raised, or not, by that party. SAF obviously preserved its objections to dismissal.

## B. Collateral Estoppel Does Not Bar SAF's Claims.

The government below framed the issue of SAF's previous appeal as one of collateral estoppel, although only with respect to SAF's organizational standing. The government conceded SAF's associational or representational standing. Def. Summ. Judgment Br., 11/21/11, at 43-44 (seeking judgment "to the extent that Plaintiff SAF's claims are premised on organizational standing to sue on its own behalf, rather

than representational standing..."); it could hardly argue otherwise considering the outcome with respect to SAF member Dearth.[5] As SAF has representational standing, the purpose of arguing over collateral estoppel with respect to its organizational standing is unclear.

Nonetheless, considering some of the elaborate reasoning employed by the government and by the lower court, on standing and other issues, brief discussion of collateral estoppel may be prudent. The collateral estoppel doctrine's "objective is 'judicial finality,'" *Consol. Edison Co.* v. *Bodman*, 449 F.3d 1254, 1258 (D.C. Cir. 2006) (citation omitted), which, on the question of SAF's standing, was never achieved. Collateral estoppel requires a "final judgment," *id.* (citation omitted), but the only judgment offered here was reversed. Parties are only bound by a judgment when they "had a full and fair opportunity to

_____

[5]The government noted Dearth was the only specifically identified expatriated SAF member, *id.* at 44 n.36, but it also declined consent to amend the complaint to add another Plaintiff, a matter Plaintiffs dropped to avoid further delays in this long-running case.
    Notably, collateral estoppel is inapplicable where a case presents solely legal issues and the plaintiff is an association—which can effectively return to court by having another member bring suit, defeating the judicial economy concerns that the doctrine is supposed to advance. *Pharm. Care Mgmt. Ass'n* v. *District of Columbia*, 522 F.3d 443, 447 (D.C. Cir. 2008).

litigate" their claim, *Taylor* v. *Sturgell*, 553 U.S. 880, 892 (2008) (citation omitted), but SAF's litigation of its standing claim was terminated by this Court's determination that there was no need to explore the subject.

Moreover, "[c]ollateral estoppel is generally inappropriate when the issue is one of law and there has been a change in the legal context after the first decision." *Pharm. Care Mgmt. Ass'n*, 522 F.3d at 447 (citation omitted). The "change in the legal context" after the lower court's first judgment is obvious: this Court's reversal of that judgment.

And "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Yamaha Corp. of America* v. *United States*, 961 F.2d 245, 254 (D.C. Cir. 1992). A party cannot lose a case in the district court, obtain a reversal on appeal, and then on remand be collaterally estopped by the vacated judgment it successfully appealed because the appellate court did not "need" to reach the district court's reasoning for dismissing it. The essence of the government's collateral estoppel theory is that it won some sort of victory in the last appeal. It did not.

C.    Reaching the Issue of SAF's Standing Remains Optional.

The lower court's dismissal of SAF was erroneous and should be reversed. Yet that does not necessarily mean that the Court should reach the standing issue. The government conceded SAF's associational standing, and this Court correctly intuited that "SAF raises no issue not also raised by Dearth." *Dearth*, 641 F.3d at 503 n.***. Dearth, and other SAF members, enjoy the same constitutional rights inside the United States, regardless of where they might reside overseas.

But the District Court saw things differently. After dismissing SAF and its membership at large, which includes individuals who may travel and reside in countries where guns are largely forbidden (e.g., SAF member and former Plaintiff Maxwell Hodgkins), the lower court denied relief in part based on Dearth's particular circumstances—the (erroneous) assertion that Dearth should simply exercise his Second Amendment rights in Canada. JA 188. Dismissing SAF thus made a "difference in the case." *NB* v. *Dist. Of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012).

It should not have. But merely as a matter of caution—and emphatically not conceding that the laws of an expatriate's country of residence could impact the constitutional merits here—SAF again argues that it has standing.

III.   THE SECOND AMENDMENT FOUNDATION HAS STANDING.

A.   SAF Has Associational Standing to Represent Its Members.

The parties cannot stipulate to standing, but the government's concession below that SAF has associational standing was correct. Considering SAF's challenge to Chicago's gun range prohibition, the Seventh Circuit was satisfied that SAF

> ha[s] many members who reside in Chicago and easily meet[s] the requirements for associational standing: (1) [its] members would otherwise have standing to sue in their own right; (2) the interests the association[] seek[s] to protect are germane to [its] organizational purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual association members in the lawsuit.

*Ezell* v. *City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) (citing *United Food & Commercial Workers Union Local 751* v. *Brown Group*, 517 U.S. 544, 553 (1996); *Hunt* v. *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (other citation omitted).

Likewise, the Fifth Circuit recently upheld the National Rifle Association's standing to challenge the government's prohibition on handgun sales to its 18-20 year old members. *NRA of Am.* v. *BATFE*, 700 F.3d 185, 192 n.5 (5th Cir. 2012).

The same concepts plainly apply here. First, Dearth and former plaintiff Hodgkins are SAF members. JA 34; see also Appellant's Br., No. 10-5062, at 47 (discussing the individual standing of "Dearth and *other* SAF members") (emphasis added); Reply Br., No. 10-5062, at 16. And in any event, as it was plain in *Ezell* that SAF's Chicago members would wish to access gun ranges, it is equally obvious that SAF's members may wish to exercise their rights to keep and bear arms and to relocate, at times, overseas. The interests SAF seeks to protect here are plainly germane to its organizational purposes, and no individual member needs to participate in the lawsuit to resolve what are, essentially, legal questions.

B.    SAF Has Standing Based On Its Own Organizational Injury.

"There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate

whatever rights and immunities the association itself may enjoy."
*Warth* v. *Seldin*, 422 U.S. 490, 511 (1975). When an organization is
forced to spend resources, devoting its time and energy to dealing with
certain conduct, it has standing to challenge that conduct. *Havens
Realty Corp.* v. *Coleman*, 455 U.S. 363 (1982).

SAF educates, researches, and publishes about gun control and its
consequences. It has to educate its members, and the public, about the
government's enforcement of gun laws. When people have questions
about the government's firearms policies, they turn to SAF. The
government's enforcement of the challenged provisions thus directly
impacts the organization. These activities are necessary to fulfill SAF's
mission to serve, educate, and inform the public about gun control
policies, and thus go beyond addressing a mere "setback to the
organization's abstract social interests." *Id.* at 379. SAF has been forced
to expend financial, administrative, and other resources to "identify
and counteract" the government's discriminatory behavior. *Id.*; but see
*Lane* v. *Holder*, No.11-1847, 2012 U.S. App. LEXIS 26640 (4th Cir. Dec.
31, 2012).

In any event, there is no need to reach the organizational standing issues, as associational standing is plainly established. And again, there is no need to consider SAF's standing, because as this Court correctly determined, SAF's presence should not change the outcome.

IV. THE SECOND AMENDMENT SECURES A FUNDAMENTAL RIGHT TO ACQUIRE FIREARMS FOR SELF-DEFENSE.

This much is now settled law: the Second Amendment secures a fundamental right to possess functional firearms for self-defense. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008); *McDonald* v. *City of Chicago*, 130 S. Ct. 3020 (2010). The Supreme Court believed the concept important enough to declare it over and over again: self-defense is the "*central component* of the [Second Amendment] right itself." *Heller*, 554 U.S. at 599 (emphasis original); "the inherent right of self-defense has been central to the Second Amendment right," *id.* at 628; the Second Amendment's "core lawful purpose [is] self-defense," *id.* at 630.

Because there is a right to keep and bear firearms, there is, necessarily, a right to acquire them. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though

not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). "The right to keep arms, necessarily involves the right to purchase them . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871). A complete ban on gun commerce would violate the Second Amendment right at its core. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

"Our citizens have always been free to make, *vend* and export arms. It is the constant occupation and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph, ed., 1830). The government can no more ban the sale of protected guns than it can ban the sale of protected books, *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); contraceptives, *Carey* v. *Pop. Serv. Int'l*, 431 U.S. 678 (1977); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), or perhaps the sale of sex toys, *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738 (5th Cir. 2008); but see *Williams* v. *Morgan*, 478 F.3d 1316 (11th Cir. 2007).

The government seeks to minimize the issue by placing the possession cart before the acquisition horse. But a right to keep and bear arms, without the right to *acquire* arms, is meaningless.

V. BARRING LAW-ABIDING CITIZENS FROM ACQUIRING FIREARMS FOR SELF-DEFENSE IS UNCONSTITUTIONAL.

A. Section 922(a)(9) is Categorically Unconstitutional as an Interpretive Matter.

There is no squaring the Second Amendment's guarantee of the right to acquire arms *for self-defense* with Section 922(a)(9), barring non-residents from "receiv[ing] any firearms unless such receipt is for lawful sporting purposes."

The lower court acknowledged that this provision, favoring sport over self-defense, "arguably turns the Second Amendment on its head." JA 188. But the lower court erred in holding that it "must also give due regard to the fact that if Congress did give favorable consideration to sporting purposes, it did so because of its legitimate interest in safeguarding and promoting interstate commerce." *Id.* It is regrettable to consider that deference to Congress's power to regulate interstate

commerce might merit greater consideration than a fundamental, enumerated right in the Bill of Rights.

The term "sporting purpose" is undefined, but "legislative history indicates that 'sporting purposes' refers to target shooting and hunting." *Springfield, Inc.* v. *Buckles*, 116 F. Supp. 2d 85, 90 (D.D.C. 2000), *aff'd*, 292 F.3d 813 (D.C. Cir. 2002). As used elsewhere in the Gun Control Act, the term "sporting purpose" "comprehends only particular uses of a firearm that have attained general recognition as having a 'sporting purpose,' and only activities that are traditional sports." *Springfield*, 292 F.3d at 818 (citation and internal quotation marks omitted). The term is construed narrowly, excluding various popular shooting activities, including plinking and practical shooting. *Id.* at 818-19. Plainly, whatever recreational or competitive activities fall within the Act's definition of "sporting purpose," self-defense is not among them.

*Heller* notably declined to employ any specific level of means-ends scrutiny in striking down Washington, D.C.'s complete ban on the possession of functional firearms within the home, which "makes it

impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 554 U.S. at 630.

Initial identification of whether a regulation directly conflicts with a "core protection" of the right, without resort to any type of means-ends scrutiny, also resolved Heller's challenge to a requirement that he obtain an unavailable permit to move a handgun inside his home.

> It is sufficient for us to conclude that just as the District may not flatly ban the keeping of a handgun in the home, obviously it may not prevent it from being moved throughout one's house. Such a restriction would negate the lawful use upon which the right was premised–i.e, self-defense.

*Parker* v. *District of Columbia,* 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*.

The Supreme Court endorsed this reasoning. Having already found that Heller enjoyed the right to have a handgun at home for self-defense, the Court held that the city lacked discretion to refuse issuance of the home-carry permit. *Heller*, 554 U.S. at 635. Even courts taking a dubiously narrow view of the Second Amendment acknowledge

> the rather unremarkable proposition that where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history and tradition —it is an exercise in futility to apply means-ends scrutiny.

*Kachalsky* v. *County of Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012), *cert. petition pending*, No. 12-845 (filed Jan. 8, 2013).

Section 922(a)(9) on its face proscribes conduct that lies within the Second Amendment's protection. It cannot survive judicial review.

B.     Section 922(a)(9) Cannot Survive Means-Ends Scrutiny.

Even were the Court to analyze Section 922(a)(9) under a means-ends level of scrutiny, the analysis would end quickly under any standard of review for the simple lack of any conceivable governmental interest in restricting firearms use to a "sporting purpose." The very existence of self-defense as a core traditional aspect of rights secured by the Second Amendment bars the government from having any interest in abridging the use of firearms for self-defense.

Assuming for the sake of argument the government's public safety interest, Section 922(a)(9) fails even rational basis review. If Plaintiffs cannot be entrusted with firearms for reasons of public safety, they should be categorically barred from accessing firearms. But no logical reason might be imagined to suppose that Plaintiffs are perfectly safe while engaging in "sporting" activity with a firearm, but pose risks if

they are *not* engaging in "sporting" activity. To the contrary: firearms sports inherently involve shooting; but guns possessed for self-defense are unlikely to be fired, except in case of emergency.

Nor is there reason to suppose that such distinctions would be related to domestic residence. Indeed, the government does not forbid the continued possession, *for any purpose*, of guns acquired by individuals prior to their relinquishment of domestic residence.

The government below asserted that all nonresidents should be barred from purchasing firearms, because some aliens might illegally export firearms. Def. Summ. Judgment Br., 11/21/11, at 12. Yet these incipient arms smugglers *are* allowed to acquire weapons for "sporting purposes." If the idea is that aliens might safely be able to have firearms "in the time bounded context of 'a loan or rental of a firearm,'" *id.* at 33 (quoting Section 922(a)(9)), why cannot aliens borrow or rent a firearm for self-defense? Are aliens who hunt less likely to smuggle their borrowed or rented firearms than aliens who wish to exercise the right to keep and bear arms for self-defense? This is not explained.[6]

---

[6]Aliens visiting our country are generally thought to enjoy constitutional rights. Aliens cannot have their worship or speech

And the self-defense acquisition prohibition reaches well-beyond nonresident aliens.

As Section 922(a)(9) would fail rational basis review, its inability to meet any form of heightened scrutiny is a given. The provision dates to 1994, and there is no legal tradition of restricting otherwise lawful receipt of firearms to sporting purposes. Nor, apart from Washington, D.C.'s functional firearms ban struck down in *Heller*, does American legal tradition include any historical antecedent forbidding all use of firearms for self-defense. The lower court "[had] no trouble holding that

---

curtailed, of be deprived of due process, in ways that are unacceptable with respect to American citizens. While courts have declined to extend Second Amendment rights to *illegal* aliens, see, e.g. *United States* v. *Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012), courts routinely strike down alienage-based firearms restrictions. *Fletcher* v. *Haas*, 851 F. Supp. 2d 287 (D. Mass. 2012); *Second Amendment Foundation, Inc.* v. *Suttle*, No. 8:11-CV-335 (D. Neb. Nov. 21, 2011) (enjoining Omaha Mun. Code § 20-253(9), barring aliens from registering handguns); *Smith* v. *South Dakota*, 781 F. Supp. 2d 879 (D.S.D. 2011) (striking down S.D.C.L. § 23-7-7.1(8)'s requirement of U.S. citizenship to have concealed handgun license); *Say* v. *Adams*, No. 3:07-CV-377-R, 2008 U.S. Dist. LEXIS 20183 (W.D. Ky. Mar. 14, 2008) (striking down citizenship requirement of Ky. R.S. § 237.110(4)(b)); *People* v. *Zerillo*, 189 N.W. 927 (Mich. 1922); cf. *Patsone* v. *Pennsylvania*, 232 U.S. 138, 143 (1914) (reviewing firearm alienage restriction, "pistols . . . may be supposed to be needed occasionally for self-defence").

these restrictions evince more than a de minimis effect on Dearth's Second Amendment right." JA 181.

Accordingly, the only appropriate standard by which to test Section 922(a)(9), were one required, would be strict scrutiny—which it would plainly fail. And even under intermediate scrutiny, barring all nonresidents from accessing a fundamental right's central purpose because *some* nonresidents *might* be smugglers, fails to "reasonable fit" any important governmental interests.

Not that it should matter, but the government failed to submit any evidence establishing any relationship between residence and smuggling. It is not at all obvious why a nonresident might have an easier time smuggling something out of the United States than a resident. Nor is it obvious why stringent export control laws and border policing are insufficient to bar the illegal export of firearms—not just by aliens and visiting expatriates, but by everyone.

Nor has the government established a relationship between the receipt of firearms for self-defense, and illegal smuggling. Plainly the overwhelming majority of firearms acquired for non-sporting, e.g., self-

defense purposes, are not intended for smuggling. A closer relationship doubtless exists between smuggling and the purchase of luggage.

Indeed, the only evidence the government offered raises more questions than it answers. The government's witness sought to identify trafficking cases by examining *Section 922(g)(5)* prosecutions, not Section 922(a)(9) prosecutions. He did not declare to have searched for Section 922(a)(9) prosecutions. JA 169-70. It is unknown how many trafficking cases involve Section 922(a)(9), or why that provision is needed to prevent smuggling, if the government could readily point to smuggling prosecutions under Section 922(g)(5).

In any event, the data itself is self-defeating. Over a ten-year period, the government convicted only 143 nonresident aliens of gun trafficking, of whom only 119—less than one per month—saw prison time. JA 171. This is a very thin reed upon which to enact Section 922(a)(9)'s extraordinary self-defense ban.

Even intermediate scrutiny requires much, much more from governmental defendants. Reversing the District Court's decision upholding Washington, D.C.'s novel firearm registration requirements,

this Court advised that "the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) (*"Heller II"*). The Fourth Circuit reversed a decision upholding Section 922(g)(9)'s firearm prohibition leveled at domestic violence misdemeanants where, while there was little doubt the provision was constitutional, the government failed to make its case:

> The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal.

*United States* v. *Chester*, 628 F.3d 673, 683 (4th Cir. 2010).

Here, even the reasons offered are not plausible, and no evidence purports to link the government's interest in preventing smuggling to the acquisition of firearms for self-defense rather than sport, or to residence, or to any combination of the two.

## VI. BARRING FIREARMS SALES TO OTHERWISE QUALIFIED AMERICANS FOR LACK OF DOMESTIC RESIDENCE VIOLATES THE SECOND AMENDMENT.

Consumers may purchase rifles or shotguns across state lines provided that the transaction is legal "in both such states." Section 922(b)(3). Sellers are presumed to know, and required to comply with, the relevant state laws of purchasers' home states. *Id.*; 27 C.F.R. § 478.96(c)(2). Requiring individuals to disclose a home state of residence enables the dealer, and the government, to ensure the transaction complies with valid state and local laws.

But the issue here is different—whether the state disclosure requirement can be enforced against nonresidents, consequently imposing a complete ban on their purchase of firearms.

Because disclosure of a state of residence does not, without more, conflict with the constitutional guarantee, and does not otherwise require the use of specific categorical tests (e.g., the common use test for protected arms), application of this provision is examined under a means-ends level of scrutiny.

Where laws can be said to regulate the right to arms, but do not literally conflict with the Second Amendment's core or trigger a specific test, this Court follows a two-step analytical approach. "We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny." *Heller II*, 670 F.3d at 1252.

The appropriate standard here is strict scrutiny. But applying residence disclosure requirements to nonresidents cannot survive any level of scrutiny.

A. Laws Restricting the Purchase of Firearms By Responsible, Law-Abiding Individuals Are Subject to Strict Scrutiny.

"With respect to the first step, *Heller* tells us 'longstanding' regulations are 'presumptively lawful,'" but "[a] plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right." *Id.* at 1253.

The lower court claimed that "[t]he government points out that there have been state laws for over 100 years that have banned the possession and/or purchase of firearms by non-residents," JA 180 (citing

40

government's brief), describing these laws as "requiring a purchaser or possessor of firearms to be a State resident or U.S. resident." *Id.* Respectfully, that is not correct. The lower court should have examined the laws, JA 153-61, not their description by the government. Mostly, the cited provisions related to handgun *carry* permits. Very few states imposed residence restrictions on handgun purchases, no state imposed residence restrictions on the purchase of all firearms, and no state imposed residency restrictions on firearm possession generally.[7] Because Section 922(b)(3) reaches the purchase of all firearms, it would be considered, at least in part, novel. *Heller II*, 670 F.3d at 1255.[8]

---

[7]Eight of the thirteen "early laws" Defendant cited—from the District of Columbia, Indiana, Maine, Massachusetts, Montana, New Jersey, Rhode Island and West Virginia—relate solely to licenses to *carry* handguns. Connecticut's cited law related also a requirement that handgun dealers be licensed, which is likewise irrelevant. New York, Michigan and Missouri licensed the purchase of handguns or similar concealable arms in addition to licensing their carriage. North Carolina came closest to the lower court's description as its purchase license requirement extended to pump-action shotguns.

[8]Ironically, laws requiring police pre-approval for handgun purchases obviate Section 922(b)(3)'s rationale of advancing compliance with home state gun laws. Out-of-state dealers can honor police authorizations to transfer handguns much as they do for long arms; localities which favor strict gun laws, but not gun stores, would prefer that they do. See 58 D.C. Register No. 38, at 008240-008241 (Sept. 23,

But this dispute is irrelevant. The lower court correctly "[had] no trouble holding that these restrictions evince more than a de minimis effect on Dearth's Second Amendment right." JA 181. "[T]he presumption of validity has been sufficiently rebutted." JA 182.

Moving to the second step of Second Amendment means-ends review, no single standard of review applies in all Second Amendment cases. "As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Heller II*, 670 F.3d at 1257 (citations omitted). "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Parker*, 478 F.3d at 399. "[A]s has been the experience under the First Amendment, we might expect that courts will employ different types of scrutiny in assessing burdens on Second Amendment rights, depending on the character of the Second

---

2011), available at http://www.dcregs.dc.gov/Gateway/NoticeHome. aspx?noticeid= 1742040 (last visited Feb. 7, 2013) (eliminating D.C. interstate handgun sales prohibition).

Amendment question presented." *United States* v. *Masciandaro,* 638 F.3d 458, 470 (4th Cir. 2011); *cf. Marzzarella*, 614 F.3d at 96; *United States* v. *Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (declining to "adopt a level of scrutiny applicable to every disarmament challenge").

"Borrowing from the Court's First Amendment doctrine, the rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Ezell*, 651 F.3d at 703 (citations omitted).

> Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context. First, a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end. Second, laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id.* at 708; cf. *Cent. Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*, 447 U.S. 557, 563 n.5 (1980) (First Amendment: intermediate standard of review may apply to an enumerated right under circumstances where the right's exercise is "of less constitutional moment").

Accordingly, while strict scrutiny is not utilized where Second Amendment claimants are deemed non-law-abiding, *Schrader* v. *Holder*, No. 11-5352, 2013 U.S. App. LEXIS 730, at *23 (D.C. Cir. Jan. 23, 2013), "we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny." *Masciandaro*, 638 F.3d at 470; cf. *Banner* v. *United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) (per curiam) (strict scrutiny "is warranted if the restriction 'jeopardizes exercise of a fundamental right'") (citation omitted). For example, the Seventh Circuit applied intermediate scrutiny in reviewing the constitutionality of the federal firearms prohibition directed at perpetrators of domestic violence, *United States* v. *Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc), but enjoining Chicago's ban on the operation and use of gun ranges, that court concluded that "a more rigorous showing than that applied in *Skoien* should be required, if not quite 'strict scrutiny.'" *Ezell*, 651 F.3d at 708; *Moore* v. *Madigan*, 702 F.3d 933, __, 2013 U.S. App. LEXIS 25264, at *20-*21 (7th Cir. 2012).

Little doubt should exist that the correct standard for evaluating Plaintiffs' 922(b)(3) challenge is strict scrutiny. The section substantially impacts the core rights of responsible, law-abiding citizens to obtain any sort of firearm, and to use it in self-defense.

B.    Barring Law-Abiding, Responsible Americans from Purchasing Firearms for Lack of Domestic Residence Serves No Compelling Government Interest.

Despite allowing Dearth to acquire firearms for some purposes, and to do whatever he might otherwise lawfully do with pre-possessed firearms, Section 922(b)(3) operates to prohibit Dearth from purchasing new firearms for any purpose. This prohibition serves no purpose, let alone a compelling one.

It is important to recall the actual federal interest asserted by Congress in enacting Section 922(b)(3): the "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess *in their own State* and without the knowledge of *their* local authorities." S. Rep. No. 89-1866, at 19 (1966) (emphasis added); *United States* v. *Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) ("[t]he evident purpose of [Section 922(a)(3)] is to stop

circumvention of state laws regulating gun possession; it does so by requiring *state residents* to comply with conditions of sale and similar requirements in *their home state*") (citation omitted) (emphasis added).[9]

In any event, expatriated Americans have no home state laws to circumvent. Authorities in any locality where Dearth might purchase firearms might be concerned with firearms transactions occurring within their jurisdiction. But no other local authorities would care about Dearth's firearms transactions—not anymore than they might care about any other distant transaction not involving their residents.

Perhaps recognizing this essential problem, Defendant invented a new excuse for applying Section 922(b)(3) to expatriated Americans:

> as "stateless" individuals not subject to § 922(a)(3) [they could] transport these firearms to any other U.S. State. But it is this specific problem—"the flow of firearms from loose control to tight-control states"—that Congress aimed to redress in enacting the challenged provisions.

Def. Summ. Judgment Br., 11/21/11, at 30-31.

Alas, even under intermediate scrutiny, the government's "justification must be genuine, not hypothesized or invented post hoc in

---

[9] The 1986 amendments to Section 922(b)(3) largely superceded this rationale by allowing for interstate long gun sales.

response to litigation." *United States* v. *Virginia*, 518 U.S. 515, 533 (1996). There is no evidence that Congress ever considered Section 922(b)(3)'s application to expatriated Americans. Form 4473 seeks a state of residence.

More problematic for the government's theory, no federal law bars the interstate transportation of firearms into a state where an individual does *not* reside. Indeed, Section 926A guarantees the right of safe passage among the States with firearms.

Every day, Americans freely transport their firearms into states where they do not live—for hunting, for self-defense, and for other purposes. Virtually all states allow non-residents to possess at least some firearms while visiting, to say nothing of the broad array of reciprocity agreements by which states recognize each others' handgun carry permits. Subject only to rare registration requirements,[10] Dearth can possess at least some firearms in every state. New York's regulatory system for "firearms," for example, excludes most rifles and

---

[10]See, e.g. Haw. Rev. Stat. § 134-3(a) (persons bringing firearms to state must register within three days of arrival at place of business, residence or sojourn).

47

shotguns. N.Y. Penal Law § 265.00(3). Even the District of Columbia's famously strict gun registration laws exempt "any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction." D.C. Code § 7-2502.01(b)(3).

It is irrational to argue that because Dearth might need a special license to possess handguns in two or three jurisdictions, he should be barred from purchasing all firearms everywhere. This sort of logic could justify a total national handgun ban, as after all, nothing prevents a lawful handgun purchaser anywhere in America from transporting that handgun into Chicago. And of course, the logic of the government's post-hoc interstate trafficking theory falls apart, since (a) Dearth can rent or borrow guns for sporting purposes throughout the United States, and (b) Dearth might import guns from overseas, and is not thereafter limited in where he might take them.

C.     Section 922(b)(3) Is Not Narrowly Tailored.

The government has numerous options to fully maintain and advance the purposes of Section 922(b)(3) without trampling on the

Second Amendment rights of nonresidents. It can treat nonresidents as

residents of the state in which they are purchasing firearms, just as it

handles Americans who maintain homes in multiple states. See 27

C.F.R. § 478.11, "State of residence," Example 2.[11] It can require proof

of overseas residence, or have consular officials certify the residence

status of overseas Americans. Cf. 42 U.S.C. § 1973ff. And it can simply

allow expatriates to declare their overseas residence on Question 13.

VII. THE ALLEGED AVAILABILITY OF FIREARMS IN CANADA IS
IRRELEVANT TO A CLAIM THAT THE FEDERAL GOVERNMENT
VIOLATES SECOND AMENDMENT RIGHTS WITHIN THE
UNITED STATES.

A.  Americans are Entitled to Exercise Constitutional Rights
Throughout the Territory of the United States.

"[O]ne is not to have the exercise of his liberty of expression in

appropriate places abridged on the plea that it may be exercised in

some other place." *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981)

(quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939)). In *Ezell*, the

district court denied a motion to preliminarily enjoin Chicago's gun

---

[11]A Washington, D.C. resident with a second home in Vermont,
which has practically no gun laws, can purchase firearms as a
Vermonter. This would seem to be of greater concern to the District
than an American living in Canada buying a gun in Minnesota.

range ban, theorizing that plaintiffs who sought to use gun ranges were only harmed by the added expense of traveling outside the city to do so. The Seventh Circuit reversed. "This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption." *Ezell*, 651 F.3d at 697.

Invoking the rule of *Schad* and *Schneider*, the Seventh Circuit explained:

> The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*Id.*

At least in *Ezell*, the defendant argued that the Plaintiffs should exercise their constitutional rights somewhere else in the country. Here, the government is telling an American citizen that he should go exercise his Second Amendment right to buy a gun... in *Canada*, which has nothing like the Second Amendment.[12] The government would not

---

[12]Ironically, Canada is still nominally governed by the crown whose infringement of the right to bear arms, among other injustices,

seriously be heard arguing that it could ban American citizens who live

overseas from buying books, on the theory that they can buy their

books overseas and import them. The argument is no more sensible

when applied to firearms.

B.    The Availability of Other Arms Is Not a Defense
      In Second Amendment Cases.

The government's argument that Dearth has available to him other

firearms is irrelevant. Even if other arms are available to Dearth in

Canada, this Court and the Supreme Court have both rejected the

notion that in a Second Amendment case, the availability of some arms

negates a claim to other arms.

The District of Columbia raised this sort of argument in defense of

its handgun ban, but this Court dismissed the claim as "frivolous."

*Parker*, 478 F.3d at 400. "It could be similarly contended that all

firearms may be banned so long as sabers were permitted. Once it is

determined – as we have done – that handguns are 'Arms' referred to in

_____

prompted the American Revolution. The Framers could scarcely have
imagined that the government they founded would bar a law-abiding
American from receiving guns, and direct him to seek protection of his
Second Amendment rights in Canada.

the Second Amendment, it is not open to the District to ban them." *Id.* (citation omitted).

Undeterred, District of Columbia officials presented the Supreme Court with the following question on certiorari: "Whether the Second Amendment forbids the District of Columbia from banning private possession of handguns while allowing possession of rifles and shotguns." Cert. Pet. No. 07-290. Heller successfully challenged this question as not accurately reflecting the issues in the case, and the Supreme Court adopted a very different "Question Presented" along the lines proposed by Heller, namely, whether the city's laws violated the Second Amendment.

On the merits, the Supreme Court rejected the alternative arms argument. "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. The Supreme Court then listed various reasons why a handgun might be

more suitable for home self-defense than a long arm, and concluded, "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.*

Here, the firearms that Dearth might theoretically bring to the United States from Canada might be protected by the Second Amendment. But the availability of such other firearms does not mitigate the fact that Dearth is excluded from the entire domestic firearms market. Defendant's assertion that some "sporting" arms are useful for self-defense is irrelevant, because the Second Amendment also protects Dearth's ability to use and possess firearms that do not meet the government's ideas of what is suitable for sport—even if the government were correct in that assessment.

C. Canada, and Other Nations, Do Not Have A Second Amendment.

The United States was not founded along ethnic, religious, linguistic, or tribal grounds. Rather, the United States was founded on a set of legal principles that found expression in the Constitution and, almost immediately, in its Bill of Rights. For better or (likely) worse, no other

nation secures all that is contained in the first ten amendments—including the right to keep and bear arms. Canada is relatively free and on the whole enlightened, but as with all other countries, many of its government's practices would be unconstitutional here—and that is as true for gun rights as it is for other rights.

A full exposition of Canadian firearms laws is unnecessary. Even if Defendant allowed Dearth to import firearms into the United States without regard to their "sporting" characteristics, it is readily apparent that Canada does not allow Dearth (or anyone else) to acquire many firearms whose possession and use is protected by the Second Amendment. For example, Canada prohibits all .25 and .32 caliber handguns, as well as all handguns with a barrel length of 105mm or less, which are exceedingly common self-defense handguns in the United States. See *Prohibited Firearms*, Royal Canadian Mounted Police, available at: http://www.rcmp-grc.gc.ca/cfp-pcaf/fs-fd/prohibited-prohibe-eng.htm (last visited Feb. 7, 2013). *Heller* specifically noted the compact and lightweight characteristics of handguns as a reason for

their traditional popularity in America and hence, their protection by the Second Amendment. *Heller*, 554 U.S. at 629.

And while Canada does not secure gun rights to the same extent they are secured here, the situation for expatriates living in other nations is worse still. Former plaintiff Maxwell Hodgkins lived in a country where handguns are generally banned. So do many expatriated Americans who cannot be expected to import their Second Amendment rights when visiting the United States.

VIII. RESTRICTING THE FIREARMS RIGHTS OF EXPATRIATED AMERICANS VIOLATES THE FUNDAMENTAL RIGHT TO INTERNATIONAL TRAVEL.

A. American Citizens Enjoy A Fundamental Right to International Travel, Including the Right to Reside Overseas.

"The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent* v. *Dulles*, 357 U.S. 116, 125 (1958).

> Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

*Id.* at 126 (citations omitted).

In *Kent*, the Secretary of State purported to exercise his discretion to deny plaintiffs' passport applications, based on their communist sympathies. The Supreme Court, recognizing a critical constitutional right had been implicated, refused to accept that Congress had granted the Secretary such broad discretion to grant or deny passport applications.

"[T]he right of exit is a personal right included within the word 'liberty' as used in the Fifth Amendment. If that 'liberty' is to be regulated, it must be pursuant to the law-making functions of the Congress. And if that power is delegated, the standards must be adequate to pass scrutiny by the accepted tests." *Id.* at 529. The Supreme Court observed that historically, passports had been denied only to those who were not citizens of or sufficiently loyal to the United States, or to those fleeing the criminal justice system. Accordingly, the Court refused to accept that without more, the executive branch was authorized by Congress to deny passports for other reasons.

Inherent in "the freedom of movement" overseas is the freedom to remain overseas for any length of time, even to reside overseas

indefinitely. In *Schneider* v. *Rusk*, 377 U.S. 163 (1964), the Supreme

Court struck down an act purporting to denaturalize once-naturalized

American citizens who thereafter resided in their nation of origin:

> The discrimination aimed at naturalized citizens drastically limits their *rights to live and work abroad* in a way that other citizens may . . . Living abroad . . . is no badge of lack of allegiance and in no way evidences a voluntary renunciation of nationality and allegiance. It may indeed be compelled by family, business, or other legitimate reasons.

*Id.* at 168-69 (emphasis added). The international travel right has no

time limit. It necessarily includes the right to live and work overseas

for any length of time. The government may not arbitrarily restrict the

comings and goings of American citizens or frustrate their choice of

residence.

B.    Restrictions Upon the Right to International Travel
      Are Subject to Strict Scrutiny Review.

"Where activities of enjoyment, natural and often necessary to the

well-being of an American citizen, such as travel, are involved, we will

construe narrowly all delegated powers that curtail or dilute them."

*Kent*, 357 U.S. at 129 (citations omitted); *Hernandez* v. *Cremer*, 913

F.2d 230, 237 (5th Cir. 1990). "[S]tatutory limitations [of the right to

travel] will be strictly construed." *Lynd* v. *Rusk*, 389 F.2d 940, 945

(D.C. Cir. 1967); see also *Apethaker* v. *Secretary of State*, 378 U.S. 500

(1964) (strict scrutiny invalidates ban on application or use of passports

by communists). Overbreadth doctrine also secures the international

travel right. *Sabri* v. *United States*, 541 U.S. 600, 609-10 (2004).

C.  Restricting the Domestic Firearms Rights of Expatriated
    Americans Does Not Narrowly Satisfy Any Interest in
    Regulating the Right to International Travel.

Courts are sensitive to even coincidental infringements of the right

of international travel. This Court summarily affirmed, without

opinion, a decision striking down a requirement that citizens pledge a

loyalty oath as a condition of obtaining a passport as a violation of the

international travel right. *Woodward* v. *Rogers*, 344 F. Supp. 974

(D.D.C. 1972), *aff'd*, 486 F.2d 1317 (D.C. Cir. 1973). The loyalty oath

requirement was struck down despite the court's skepticism of, and

refusal to consider, the plaintiff's First Amendment objections.

*Woodward*, 344 F. Supp. at 989. The court found that the oath's only

practical function was "to prohibit foreign travel by those persons who

find a public affirmation of loyalty repugnant to their integrity and

conscience. No serious national purpose is served by singling out those people and curtailing their Fifth Amendment right to travel." *Woodward,* 344 F. Supp. at 988.

Likewise, laws conditioning a citizen's fundamental right of international travel upon surrendering the ability to acquire firearms serve "no serious national purpose," even in the absence of a Second Amendment right to keep and bear arms. The mere intrusion upon the right to travel, in a manner that cannot satisfy strict scrutiny, renders such laws unenforceable.

Under this established standard, sections 922(a)(9) and 922(b)(3) violate Plaintiffs' right to travel. Plaintiffs are told they must surrender their ability to acquire firearms for non-sporting purposes, and surrender completely their ability to purchase firearms, as a condition of moving overseas. Like the loyalty oath struck down in *Woodward*, such restrictions on the right to travel serve "no serious national purpose," let alone in a manner that is narrowly tailored and admitting of no less restrictive alternatives.

IX. BY FORCING INDIVIDUALS TO SELECT FROM AMONG THEIR
CONSTITUTIONAL RIGHTS, THE CHALLENGED PROVISIONS VIOLATE
THE UNCONSTITUTIONAL CONDITIONS DOCTRINE.

The government may not impose conditions upon the exercise of

rights, or the receipt of benefits, that it could not impose directly. The

unconstitutional conditions doctrine is sufficiently broad so as to forbid

the government from demanding people forfeit rights in exchange for

benefits, even where there is no entitlement to the benefit in the first

instance. See, e.g. *Perry* v. *Sindermann*, 408 U.S. 593 (1972) (public

employment cannot be conditioned on forfeiture of First Amendment

rights); *Saenz* v. *Roe*, 526 U.S. 489 (1999) (welfare benefits cannot be

conditioned on forfeiture of interstate travel right).

The unconstitutional conditions doctrine is sufficiently broad to

forbid the government from merely discouraging, even inadvertently,

the exercise of core constitutional rights. In *United States* v. *Jackson*,

390 U.S. 570 (1968), the Supreme Court held unconstitutional a

provision which directed that a defendant could only be sentenced to

death upon a jury's recommendation. The provision's effect discouraged

defendants from exercising their Fifth Amendment right to enter a not

guilty plea, and their Sixth Amendment right to trial by jury. A defendant who insisted upon the benefit of these rights did so at the additional risk of hanging, a condition that would tend to encourage coercive guilty pleas and forfeiture of the jury trial right. That the statute had a benign ameliorative goal rather than a punitive one made no difference:

> Whatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights. The question is not whether the chilling effect is 'incidental' rather than intentional; the question is whether that effect is unnecessary and therefore excessive.

*Id.* at 582 (citations omitted).

Perhaps nowhere is the unconstitutional conditions doctrine more clearly implicated than in those situations where the government encourages individuals to choose from among their constitutional rights. Where an individual ordinarily enjoys two constitutional rights, the government cannot demand that the exercise of one right be conditioned upon the discouragement or forfeiture of the other. People are entitled to *all* of their constitutional rights, and may freely exercise them in any combination as they see fit.

An excellent example of such an unconstitutional condition is described in *Simmons* v. *United States,* 390 U.S. 377 (1968). In *Simmons*, the Supreme Court held that a criminal defendant who wishes to assert Fourth Amendment rights in challenging the admissibility of evidence cannot be expected to do so at the risk that such potentially self-incriminating testimony might be used against him later at trial.

> Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.

*Id.* at 394.

*Apethaker* provides an even more relevant example of an unconstitutional condition between two constitutional rights. In striking down that portion of the Subversive Activities Control Act, forbidding international travel on account of one's association with communist organizations, the Supreme Court specifically rejected the argument that plaintiffs had voluntarily forfeited their right to travel by choosing to exercise their right of free association:

The restrictive effect of the legislation cannot be gainsaid by emphasizing, as the Government seems to do, that a member of a [communist] organization could recapture his freedom to travel by simply in good faith abandoning his membership in the organization. Since freedom of association is itself guaranteed in the First Amendment, restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association.

*Apethaker*, 378 U.S. at 507 (footnote omitted); compare *Zemel* v. *Rusk*, 381 U.S. 1, 16 (1965) (ban on travel to Cuba, for legitimate national security reasons, does not violate First Amendment where "appellant is not being forced to choose between membership in an organization and freedom to travel."); accord *Jackson*, 390 U.S. at 583 ("A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right").

   *Apethaker* is directly on-point as applied to the facts of this case. Plaintiffs cannot, without more, have their right to travel overseas conditioned upon abandonment of their Second Amendment rights. Conversely, Plaintiffs cannot, without more, have their Second Amendment right to keep and bear arms conditioned upon forfeiting their right of international travel, which includes the right to live

overseas. The condition itself is unconstitutional, unless each infringement on the right to travel and the right to keep and bear arms is itself justified under the high levels of scrutiny by which restrictions on such rights are to be scrutinized.

That the challenged laws would condition the exercise of one of these rights upon the forfeiture of the other does not ameliorate their unconstitutionality. Rather, such conditioning has the opposite effect. The conditional relationship is itself unconstitutional.

X.     THE CHALLENGED PROVISIONS VIOLATE PLAINTIFFS'
       RIGHT TO EQUAL PROTECTION.

The Fifth Amendment's Due Process Clause has long been understood to bind the federal government to standards of equal protection. *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954); *Bulluck* v. *Washington*, 468 F.2d 1096, 1100 n.9 (D.C. Cir. 1972). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." *Buckley* v. *Valeo*, 424 U.S. 1, 93 (1976) (citations omitted). Equal protection analysis demands that heightened scrutiny be applied in cases which burden fundamental rights or target suspect classes. *Romer* v. *Evans*, 517 U.S. 620, 621 (1996).

Plaintiffs do not contend that Americans living abroad constitute a suspect class for purposes of equal protection analysis. However, it is plainly clear that the challenged laws burden two fundamental rights: the Fifth Amendment right of international travel, and the Second Amendment right to keep and bear arms. Responsible, law abiding Americans who are otherwise identically situated are classified differently in their exercise of one of these rights only on account of exercising the other fundamental right.

Plaintiffs acknowledge that equal protection analysis may not be reached where specific, substantive rights analysis is available. However, the government has consistently taken the position that no substantive rights are implicated, which would leave equal protection principles in play.

There is no need to reiterate the brief in full. Plaintiffs submit, preferring to err on the side of caution, that the irrational and arbitrary classifications detailed here would violate the Fifth Amendment's equal protection principles even were the government correct (and it is not) about the absence of fundamental arms and travel rights.

CONCLUSION

If the right to bear arms means anything, it means that law-abiding, responsible adults may receive and purchase guns for self-defense inside the United States. And if the right to international travel means anything, it means Americans are free to come and go without discarding their rights at the border.

The judgment should be reversed with instructions to enter judgment for the Plaintiffs.

Dated:   February 8, 2013     Respectfully submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

By:   /s/ Alan Gura_____
Alan Gura

*Counsel for Appellants*

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,594 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

/s/ Alan Gura
Alan Gura

## CERTIFICATE OF SERVICE

I certify that on this 8th day of February, 2013,I filed the foregoing Appellants' Brief electronically with the Clerk of the Court using the CM/ECF System. I further certify that on this day I will submit the required paper copies to the Court via Federal Express. I further certify that counsel for Defendant-Appellee is a registered CM/ECF user and will be served via the CM/ECF system

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 8th day of February, 2013.

/s/ Alan Gura
Alan Gura
Counsel for Plaintiffs-Appellants

# Statutory Addendum

18 U.S.C. § 922(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-2

27 C.F.R. § 478.11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-3

27 C.F.R. § 478.29a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-4

27 C.F.R. § 478.96. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-4

27 C.F.R. § 478.97. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-5

27 C.F.R. § 478.99. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-6

27 CFR § 478.124(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-6

**18 U.S.C. § 922(a)**:

(a)   It shall be unlawful-- * * *

   (3)   for any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides (or if the person is a corporation or other business entity, the State where it maintains a place of business) any firearm purchased or otherwise obtained by such person outside that State, except that this paragraph (A) shall not preclude any person who lawfully acquires a firearm by bequest or intestate succession in a State other than his State of residence from transporting the firearm into or receiving it in that State, if it is lawful for such person to purchase or possess such firearm in that State, (B) shall not apply to the transportation or receipt of a firearm obtained in conformity with subsection (b)(3) of this section, and (C) shall not apply to the transportation of any firearm acquired in any State prior to the effective date of this chapter [effective Dec. 16, 1968];

   (5)   for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B)

the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

(9)     for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes

**18 U.S.C. § 922(b)(3)**:

(b)     It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver-- * * *

(3)     any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph

(A)     shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and

(B)     shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

**27 C.F.R. § 478.11**:

\*\*\*

State of residence. The State in which an individual resides. An individual resides in a State if he or she is present in a State with the intention of making a home in that State. If an individual is on active duty as a member of the Armed Forces, the individual's State of residence is the State in which his or her permanent duty station is located, as stated in 18 U.S.C. 921(b). The following are examples that illustrate this definition:

Example 1. A maintains a home in State X. A travels to State Y on a hunting, fishing, business, or other type of trip. A does not become a resident of State Y by reason of such trip.

Example 2. A maintains a home in State X and a home in State Y. A resides in State X except for weekends or the summer months of the year and in State Y for the weekends or the summer months of the year. During the time that A actually resides in State X, A is a resident of State X, and during the time that A actually resides in State Y, A is a resident of State Y.

Example 3. A, an alien, travels to the United States on a three-week vacation to State X. A does not have a state of residence in State X because A does not have the intention of making a home in State X while on vacation. This is true regardless of the length of the vacation.

Example 4. A, an alien, travels to the United States to work for three years in State X. A rents a home in State X, moves his personal possessions into the home, and his family resides with him in the home. A intends to reside in State X during the 3-year period of his employment. A is a resident of State X.

\*\*\*

**27 C.F.R. § 478.29a**:

No person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State shall receive any firearms unless such receipt is for lawful sporting purposes

**27 C.F.R. § 478.96**:

(a) The provisions of this section shall apply when a firearm is purchased by or delivered to a person not otherwise prohibited by the Act from purchasing or receiving it.

(b) A licensed importer, licensed manufacturer, or licensed dealer may sell a firearm that is not subject to the provisions of § 478.102(a) to a nonlicensee who does not appear in person at the licensee's business premises if the nonlicensee is a resident of the same State in which the licensee's business premises are located, and the nonlicensee furnishes to the licensee the firearms transaction record, Form 4473, required by § 478.124. The nonlicensee shall attach to such record a true copy of any permit or other information required pursuant to any statute of the State and published ordinance applicable to the locality in which he resides. The licensee shall prior to shipment or delivery of the firearm, forward by registered or certified mail (return receipt requested) a copy of the record, Form 4473, to the chief law enforcement officer named on such record, and delay shipment or delivery of the firearm for a period of at least 7 days following receipt by the licensee of the return receipt evidencing delivery of the copy of the record to such chief law enforcement officer, or the return of the copy of the record to him due to the refusal of such chief law enforcement officer to accept same in accordance with U.S. Postal Service regulations. The original Form 4473, and evidence of receipt or rejection of delivery of the copy of the Form 4473 sent to the chief law enforcement officer shall be retained by the licensee as a part of the records required of him to be kept under the provisions of Subpart H of this part.

(c)(1) A licensed importer, licensed manufacturer, or licensed dealer may sell or deliver a rifle or shotgun, and a licensed collector may sell or deliver a rifle or shotgun that is a curio or relic to a nonlicensed resident of a State other than the State in which the licensee's place of business is located if --

(i) The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii) The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 478.102;

(iii) The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 478.124; and

(iv) The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

(2) For purposes of paragraph (c) of this section, any licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

**27 C.F.R. § 478.97**:

   (a) A licensee may lend or rent a firearm to any person for temporary use off the premises of the licensee for lawful sporting purposes: Provided, That the delivery of the firearm to such person is not prohibited by § 478.99(b) or § 478.99(c), the licensee complies with the requirements of § 478.102, and the licensee records such loan or rental in the records required to be kept by him under Subpart H of this part.

(b) A club, association, or similar organization temporarily furnishing firearms (whether by loan, rental, or otherwise) to participants in a skeet, trap, target, or similar shooting activity for use at the time and place such activity is held does not, unattended by other circumstances, cause such club, association, or similar organization to be engaged in the business of a dealer in firearms or as engaging in firearms transactions. Therefore, licensing and recordkeeping requirements contained in this part pertaining to firearms transactions would not apply to this temporary furnishing of firearms for use on premises on which such an activity is conducted.

**27 C.F.R. § 478.99**:

(a) Interstate sales or deliveries. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: Provided, That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c) are fully met, and (2) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes (see § 478.97).

**27 CFR § 478.124(c)(1)**:

Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located, the licensed importer, licensed manufacturer, or licensed dealer so transferring the firearm shall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the

transferee; the transferee's country of citizenship; the transferee's INS-issued alien number or admission number; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce.