**[NOT YET SCHEDULED FOR ORAL ARGUMENT]**

No. 12-5305

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STEPHEN DEARTH and the SECOND AMENDMENT FOUNDATION, INC.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR., Attorney General of the United States,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**BRIEF FOR THE APPELLEE**

STUART F. DELERY
  *Principal Deputy Assistant Attorney General*

RONALD C. MACHEN JR.
  *United States Attorney*

MARK B. STERN
  (202) 514-5089

MICHAEL S. RAAB
  (202) 514-4053

ANISHA S. DASGUPTA
  (202) 514-5428
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7320*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C. 20530*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici.

The named plaintiffs-appellants are Stephen Dearth and the Second Amendment Foundation, Inc.  The defendant-appellee is Eric Holder, Jr., Attorney General of the United States.  There have been no amici curiae.  Maxwell Hodgkins was a plaintiff in earlier district court proceedings in this case but is no longer a party to this action.

### B.    Rulings Under Review.

The ruling under review is a Memorandum Opinion of the United States District Court for the District of Columbia, which granted defendant-appellee's motion for summary judgment.  *Dearth v. Holder*, No. 09-587 (D.D.C. Sept. 27, 2012) (Wilkins, J.).

### C.    Related Cases.

This case was previously before this Court.  The docket number was 10-5062. The Court's decision is published as *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011).

Plaintiffs have brought similar suits in the Southern District of Ohio, *Dearth v. Gonzales*, No. 06-1012, 2007 WL 1100426 (S.D. Ohio Apr. 10, 2007) (dismissing suit for lack of venue), *appeal dismissed sub. nom. Dearth v. Mukasey*, 516 F.3d 413 (6th Cir. 2008); and the Northern District of Texas, *Hodgkins v. Gonzales*, No. 06-2114 (N.D.

Tex. Aug. 15, 2007) (dismissing suit for lack of venue), *appeal dismissed sub. nom.*

*Hodgkins v. Mukasey*, 271 Fed. App'x 412 (5th Cir. 2008).

/s/Anisha S. Dasgupta
ANISHA S. DASGUPTA
ATTORNEY FOR APPELLEE

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

GLOSSARY

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUES.......................................................................1

PERTINENT STATUTES AND REGULATIONS ..........................................1

STATEMENT OF THE CASE .........................................................................1

STATEMENT OF FACTS................................................................................2

    A.    Statutory and Regulatory Background ................................2

    B.    Factual Background .............................................................9

    C.    Prior Proceedings..............................................................11

SUMMARY OF ARGUMENT.......................................................................14

STANDARD OF REVIEW ............................................................................17

ARGUMENT ..................................................................................................17

    I.    The Challenged Federal Laws Do Not Violate The
        Second Amendment ..........................................................17

        A.    Plaintiffs' Claims Concern Conduct Outside The Scope
            Of The Second Amendment..........................................17

        B.    Even If Plaintiffs' Claims Implicate The Second
            Amendment Rights Of A Non-Resident U.S. Citizen
            Such As Dearth, The Challenged Federal Laws
            Are Constitutional...........................................................24

II.     The Challenged Federal Laws Do Not Violate The Fifth
        Amendment Rights Of Non-Resident U.S. Citizens
        Such As Dearth .............................................................................34

        A.     The Challenged Laws Do Not Infringe Any Fifth
               Amendment Liberty Interest In International Travel ...................34

        B.     Applying The Challenged Provisions To Non-Resident
               U.S. Citizens Such As Dearth Does Not Violate The
               Equal Protection Component Of The Fifth Amendment ...........35

CONCLUSION ...................................................................................................37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                                  **Page**

*Aptheker v. Secretary of State*, 378 U.S. 500 (1964) .......................................... 34, 35

*Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989)............................. 25, 26

*Califano v. Aznavorian*, 439 U.S. 170 (1978) .................................................35

*Clark v. Jeter*, 486 U.S. 456 (1988) ...................................................... 16, 24

*Coalition for Common Sense in Government*,
     -- F.3d --, 2013 WL 45880 (D.C. Cir. Jan. 4, 2013) .......................................17

*Comcast Corp. v. FCC*, 579 F.3d 1 (D.C. Cir. 2009) ........................................36

*Dearth v. Gonzales*, 2007 WL 1100426 (S.D. Ohio April 10, 2007)................................23

*Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011)........................................ 11, 12, 14, 36

*\*District of Columbia v. Heller*, 554 U.S. 570 (2008)....................................2, 19, 20, 21

*Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*,
     28 F.3d 1268 (D.C. Cir. 1994) .....................................................36

*Haig v. Agee*, 453 U.S. 280 (1981) .......................................................34

*\*Heller v. District of Columbia*,
     670 F.3d 1244 (D.C. Cir. 2011) ...........................................12, 16, 20, 21, 24, 25, 33, 34

*Hodgkins v. Holder*,
     677 F. Supp. 2d 202 (D.D.C. 2010), *rev'd sub. nom.*
     *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011)............................................11

*Hutchins v. District of Columbia*, 188 F.3d 531 (D.C. Cir. 1999) ..................................34, 35

_____

\* Authorities chiefly relied upon are marked with an asterisk.

*J&G Sales, Ltd. v. Truscott*, 473 F.3d 1043 (9th Cir. 2007) ..................................................31

*Kent v. Dulles*, 357 U.S. 116 (1958) .......................................................................34

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ......................................................36

*MacNutt v. Police Comm'r of Boston*,
    572 N.E.2d 577 (Mass. App. Ct. 1991 ........................................................22

*People ex rel. Darling v. Warden of City Prison*,
    139 N.Y.S. 277 (N.Y. App. Div. 1913) ......................................................21

*Pickett v. State*,
    179 S.E.2d 303 (Ga. App. 1970) ..............................................................22

*Ry. Labor Executives' Ass'n v. United States*,
    987 F.2d 806 (D.C. Cir. 1993) ................................................................36

*Schall v. Martin*, 467 U.S. 253 (1984)...............................................17, 24, 30

*Schenck v. Pro-Choice Network of Western New York*,
    519 U.S. 357 (1997) ..........................................................................30, 31

*Schwanda v. Bonney*, 418 A.2d 163 (Me. 1980)......................................22

*Springfield, Inc. v. Buckles*,
    116 F. Supp. 2d 85 (D.D.C. 2000), *aff'd*, 292 F.3d 813 (D.C. Cir. 2002) .....................9

*State v. Sima*,
    361 A.2d 58 (N.J. Super. Ct. App. Div. 1976) ...........................................22

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) .............................. 19, 20

*United States v. Salerno*, 481 U.S. 739 (1987)......................................30

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)................................16, 31, 34

*West Virginia Judicial Inquiry Comm'n v. Dostert*,
    271 S.E.2d 427 (W. Va. 1980)................................................................22

iv

**Federal statutes:**

18 U.S.C. § 922(a)(5) ............................................................ 4, 6, 16, 27, 29, 30

18 U.S.C. § 922(a)(5)(A) ...................................................................... 4

18 U.S.C. § 922(a)(5)(B) ............................................................ 4, 8, 15, 18

18 U.S.C. § 922(a)(6) ............................................................................ 5, 28

18 U.S.C. § 922(a)(9) ........................... 1, 6, 8, 10, 14, 15, 16, 17, 18, 28, 29

18 U.S.C. § 922(b)(3) ........................... 1, 4, 6, 10, 14, 16, 17, 27, 29, 30

18 U.S.C. § 922(b)(3)(A) ...................................................................... 5

18 U.S.C. § 922(b)(3)(B) ............................................................ 5, 8, 15, 18

18 U.S.C. § 925(d)(3) ............................................................................ 9, 15, 18

18 U.S.C. § 925(d)(4) ............................................................................ 9, 15, 18

18 U.S.C. § 926(a) ............................................................................ 6

18 U.S.C. § 926A ............................................................................ 30

26 U.S.C. § 5845(a) ............................................................................ 9

28 U.S.C. § 1291 ............................................................................ 1

28 U.S.C. § 1331 ............................................................................ 1

Pub. L. No. 90-351, 82 Stat. 197 (1968) .................................. 2, 4, 16, 25, 26, 28

Pub. L. No. 90-618, 82 Stat. 1213 (1968) .................................. 2, 28, 33

Pub. L. No. 103-322, 108 Stat. 1796 (1994) .................................. 6, 28

**State statutes:**

25 Me. Rev. Stat. Ann. § 2031 (1980) ...................................................................22

Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 ...........................................21

Act of July 11, 1919, 1919 Ill. Laws 431 ...........................................................22

Act of July 3, 1925, 1925 Ill. Laws 339 .............................................................22

Act of June 18, 1967, 1967 Mo. Laws 675 .........................................................23

Act of July 1, 1968, 1968 Mich. Acts 511 ..........................................................23

Act of May 21, 1975, 1975 R.I. Pub. Laws 738 .................................................23

Ala. Code § 13A-11-58(a) ...................................................................................22

Ark. Code Ann. § 5-73-125(a) .............................................................................22

Burns' Ind. Stat. Ann. § 10-4738(1) (1972 supp.) ..............................................22

D.C. Code Ann. § 22-3206 (1967) .......................................................................22

Ga. Code Ann. § 10-1-101 ...................................................................................22

Ga. Code Ann. § 26-2903 (1970) .........................................................................23

Mass. Gen. Laws ch. 140, § 131 (1972) ..............................................................22

Minn. Stat. § 624.71 .......................................................................................22, 23

Mont. Crim. Code § 94-8-210(1) (1973) .............................................................23

Mont. Crim. Code § 94-8-214(4) (1973) .............................................................23

N.C. Gen. Stat. § 14-402 (1999) ..........................................................................22

N.C. Gen. Stat. § 14-403 (1999) ..........................................................................22

N.J. Stat. Ann. § 2A:151-44 (1976) .....................................................................22

N.Y. Penal Law § 172.1897 (1910) ...................................................21

N.Y. Penal Law § 265.05(5) (1968)..................................................22

Ohio Rev. Code Ann. § 2923.22........................................................23

Ohio Rev. Code Ann. § 2923.22(B)...................................................23

Va. Code § 18.2-308.2:2(C)...............................................................23

W. Va. Code § 61-7-2..........................................................................22

**Regulations:**

27 C.F.R. § 478.11 ................................................................................7

27 C.F.R. § 478.29a .......................................... 1, 6, 8, 10, 14, 15, 18, 28

27 C.F.R. § 478.96 ...........................................................1, 6, 10, 14

27 C.F.R. § 478.99 .....................................1, 5, 8, 10, 14, 15, 18

27 C.F.R. § 478.115 .............................................................................9

27 C.F.R. § 478.115(a) ...............................................................9, 15, 18

27 C.F.R. § 478.115(d)(1) ...........................................................9, 15, 18

27 C.F.R. § 478.124 .....................................................................1, 10, 14

27 C.F.R. § 478.124(a) .......................................................................6

27 C.F.R. § 478.124(c)........................................................................7

27 C.F.R. § 478.124(c)(1)....................................................................7

27 C.F.R. § 478.124(d)........................................................................7

27 C.F.R. § 478.124(e)........................................................................7

28 C.F.R. § 0.130(a)(1)........................................................................6

**Legislative Materials:**

114 Cong. Rec. 21767 (1968)................................................................................30

114 Cong. Rec. 27134 (1968)................................................................................33

131 Cong. Rec. 18169 (1985)................................................................................30

131 Cong. Rec. 18201 (1985)................................................................................31

134 Cong. Rec. 12309 (1988)............................................................................ 5, 27

137 Cong. Rec. 2743 (1991)..........................................................................5, 6, 28

137 Cong. Rec. 17089 (1991)........................................................................ 28, 29

H.R. Rep. No. 90-1577 (1968)....................................................................... 2, 4, 16

H.R. Rep. No. 90-1577 (1968)........................................................................ 27, 33

S. Rep. No. 88-1340 (1964)..................................................................................25

S. Rep. No. 89-1866 (1966)..........................................................2, 3, 15, 25, 26, 29

S. Rep. No. 90-1097 (1968)........................................................3, 4, 15, 25, 26, 27

**Other Authorities:**

ATF Factoring Criteria for Weapons, *available at*
    www.atf.gov/forms/download/atf-f-5330-5.pdf
    (last visited March 5, 2013) ............................................................... 9, 19

ATF Rul. 94-1, 94-2, 95-3, *available at*
    http://www.atf.gov/regulations-rulings/rulings/
    (last visited March 6, 2013) ......................................................................9

Bureau of Justice Statistics, Selected Findings, Guns Used in
    Crime (July 1995)................................................................................32

Diana Washington Valdez, *Firearms in Mexico Have Ties to El Paso,*

El Paso Times, Dec. 14, 2008, 2008 WLNR 24011948.................................................32

*Leader of International Firearms Trafficking Network Sentenced to 32 Years in Prison*,
    U.S. Federal News, May 5, 2009, 2009 WLNR 8517185 (Westlaw).........................32

Naxiely Lopez, *15 High-Powered Rifles Seized After Traffic Stop*,
    The Monitor (McAllen, Texas), Jan. 13, 2011, 2011 WLNR 709786......................32

Naxiely Lopez, *Man Sentenced for Straw Purchase of Guns*, The Monitor
    (McAllen, Texas), Jan. 5, 2011, 2011 WLNR 264059 .......................................32

*Prison Term Set for Gun Smuggler*, San Antonio Express-News, Aug. 27, 2009,
    2009 WLNR 16829243 ...............................................................................32

Rafael Romo, *American Citizen in Mexican Custody on Arms-Trafficking Allegation*,
    Sept. 6, 2011, http://www.borderlandbeat.com/2011/09/american-
    citizen-in-mexican-custody-on.html (last visited March 5, 2013) ..............................32

*Three Sentenced for Involvement in a 100+ Firearm Straw Purchase and Export Ring*,
    Dec. 20, 2011, http://www.justice.gov/usao/txs/1News/Releases/
    2011%20December/111220%20Bravo-Hernandez.html
    (last visited March 5, 2013) ......................................................................32

# GLOSSARY

ATF          Bureau of Alcohol, Tobacco, Firearms and Explosives

JA           Joint Appendix

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331. Joint Appendix ("JA") 10. On September 27, 2012, the district court granted defendant's motion for summary judgment and plaintiffs filed a notice of appeal. JA 194, 197. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the Second Amendment, the Due Process Clause of the Fifth Amendment, and the equal protection component of the Fifth Amendment permit Congress to restrict transfers of firearms to expatriate Americans visiting the United States because they lack a U.S. State of residence.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

Plaintiffs—Stephen Dearth, a U.S. citizen residing in Canada, and the Second Amendment Foundation, Inc.—bring this pre-enforcement challenge to the constitutionality of a federal criminal statute restricting interstate, non-resident transfers of firearms, 18 U.S.C. § 922(a)(9), (b)(3), and to federal regulations implementing that statute, 27 C.F.R. §§ 478.29a, 478.96, 478.99, 478.124. JA 14-18. The district court held that the Second Amendment and the equal protection component of the Fifth Amendment do not prohibit Congress from placing these limits on firearm transfers, and further held that the challenged laws do not infringe

Dearth's Fifth Amendment liberty interest in international travel. JA 194. The court accordingly entered summary judgment for defendant. *Ibid.* This appeal followed.

## STATEMENT OF FACTS

### A. Statutory and Regulatory Background.

1. Congress has "impos[ed] conditions and qualifications on the commercial sale of arms," *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008), as part of its regulation of interstate commerce in firearms. Congress enacted the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197 ("Omnibus Crime Control Act"), following a multi-year investigation of violent crime that revealed "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (1966). Later in the same year, Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, the "principal purpose" of which was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968).

The evidence before Congress showed that that "the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business" permitted dealers and purchasers to circumvent

State and local laws. S. Rep. 89-1866, at 3. Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors," which "take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute." *Id.* at 59. Massachusetts authorities testified "that 87 percent of the 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring States." S. Rep. No. 90-1097, at 77 (1968). Michigan authorities testified that "90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by purchases [in] neighboring Ohio, where controls on firearms are minimal." *Ibid.* In New Jersey, "of 1,815 arrests for the illegal carrying of concealed weapons (handguns) only 15 of the guns involved had been purchased legally" in New Jersey. S. Rep. No. 89-1866, at 62. In New York City, an investigation of "2,676 deliveries of concealable firearms by common carrier" revealed that "1,439 deliveries * * * were consigned to persons who would not have been authorized to receive them under the laws of the State of New York." *Id.* at 57.

The evidence thus demonstrated that "interstate, nonresident purchases of firearms" pose serious challenges to "the laws of our States and their political subdivisions." S. Rep. No. 90-1097, at 77. Congress found "that only through

3

adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225.

To that end, Congress included in both the Omnibus Crime Control Act and the Gun Control Act statutory provisions "designed to prevent the avoidance of state and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." H.R. Rep. No. 90-1577, at 14; *see also* S. Rep. No. 90-1097, at 114 (1968). These provisions include 18 U.S.C. § 922(a)(5) and (b)(3), which generally restrict firearm transfers to persons outside the transferor's State of residence—or if the transferor is a federal licensee, the licensee's State of business. Section 922(a)(5) makes it unlawful for any person other than a federal firearms licensee to transfer "any firearm to any person (other than [another federal firearms licensee]) who the transferor knows or has reasonable cause to believe does not reside in * * * the State in which the transferor resides," *ibid.*, unless the transfer is a "loan or rental * * * for temporary use for lawful sporting purposes," *id.* § 922(a)(5)(B). [1] Section 922(b)(3) makes it unlawful for a federal firearms licensee "to sell or deliver * * * * any firearm

---

[1] This restriction does not apply to bequests made to an individual "who is permitted to acquire or possess a firearm under the law of the State of his residence," *id.* § 922(a)(5)(A).

4

to any person who the licensee knows or has reasonable cause to believe does not reside in * * * the State in which the licensee's place of business is located," *ibid.*, unless the transfer is a "loan or rental of a firearm * * * for temporary use for lawful sporting purposes," *id.* § 922(b)(3)(B).[2]

Experience revealed potential ambiguities in this language that permitted some sellers and buyers to evade the statute's requirements. Testifying before Congress, law enforcement authorities noted that the language of Section 922(a)(5) "[r]ead literally, * * * may make it impossible to prosecute an individual who delivers a firearm to an alien or other person, such as a transient, who does not reside in 'any State.'" 134 Cong. Rec. 12309 (1988). Congress also identified the emergence of a "law enforcement problem posed by aliens legally in the United States, but not residing in any State" who were acquiring firearms from non licensees and then "smuggl[ing] the weapons out of the country." 137 Cong. Rec. 2743 (1991). Such persons faced no legal penalty for making false statements about their residence because Section 922 prohibits the making of false statements to licensed dealers, 18 U.S.C. § 922(a)(6), but contains no analogous prohibition on the making of false statements to non-licensees.

---

[2] The restriction "[does] not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." *Id.* § 922(b)(3)(A). *See also* 27 C.F.R. § 478.99 (same).

*See* 137 Cong. Rec. 2743 (noting that such acquisitions "[did] not violate any specific portion of the [Gun Control] Act").

Congress addressed both of these concerns by enacting Section 922(a)(9), which restricts firearm transfers to those without a residence in the United States and focuses on the actions of the recipient of the firearm rather than the those of the transferor. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110514, 108 Stat. 1796, 2019. Section 922(a)(9) makes it unlawful "for any person, other than a [federal firearms licensee], who does not reside *in any State* to receive any firearms unless such receipt is for lawful sporting purposes." 18 U.S.C. § 922(a)(9) (emphasis added); *see also* 27 C.F.R. § 478.29a (same).

2. The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") is authorized to issue "such rules and regulations as are necessary to carry out" title 18's provisions relating to firearms, 18 U.S.C. § 926(a); 28 C.F.R. § 0.130(a)(1), including Congress's restrictions on interstate, nonresident purchases of firearms, *e.g.*, 18 U.S.C. § 922(a)(5), (a)(9), (b)(3). ATF's regulations provide that federal firearms licensees "shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any [unlicensed transferee] unless the licensee records the transaction on a firearms transaction record, Form 4473." 27 C.F.R. § 478.124(a); *see also* 27 C.F.R. § 478.96 (imposing same restrictions with respect to mail order sales). The Form 4473 establishes the transferee's identity as well as his or her eligibility to possess a firearm

6

by documenting details including "the transferee's name, sex, residence address," "date and place of birth," "country of citizenship," "State of residence," and the transferee's certification that he or she "is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." 27 C.F.R. § 478.124(c)(1) (emphasis added).[3]

ATF has also promulgated regulations defining an individual's "State of residence." The regulations provide that "[a]n individual resides in a State if he or she is present in a State with the intention of making a home in that State." 27 C.F.R. § 478.11. ATF has explained that "temporary travel, such as short-term stays, vacations, or other transient acts in a State are not sufficient to establish a State of residence because the individual demonstrates no intention of making a home in that State." JA 39 (ATF Ruling 2010-6 at 2).

Individuals who reside in different homes during different parts of the year may have more than one State of residence. 27 C.F.R. § 478.11 (explaining with

---

[3] *See also* 27 C.F.R. § 478.124(d) (requiring completion of a Form 4473 prior to "an over-the-counter transfer of a shotgun or rifle * * * to a nonlicensee who is not a resident of the State in which the licensee's business premises is located"); *id.* § 478.124(e) (same, with respect to "transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee's business premises is located, * * * [but] is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes"); *id.* § 478.124(c) (same, for an "over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located").

7

respect to a person who "maintains a home in State X and a home in State Y" that "[d]uring the time that [such a person] actually resides in State X, [he or she] is a resident of State X, and during the time that [he or she] actually resides in State Y, [he or she] is a resident of State Y"). Thus, "during the period of time the person actually resides in a particular State," such a person may "purchase a firearm in that State." JA 39.

"The same reasoning applies to citizens of the United States who reside temporarily outside of the country for extended periods of time, but who also maintain residency in a particular State." *Ibid.* A U.S citizen who "temporarily resides outside of the country, but also has the intention of making a home in a particular State, * * * is a resident of the State during the time he or she actually resides in that State." *Ibid.* "In acquiring a firearm, the individual must demonstrate to the transferor-licensee that he or she is a resident of the State by presenting valid identification documents * * * [that] include, but are not limited to, driver's licenses, voter registration, tax records, or vehicle registration." *Id.* at 40.

3. Under this regulatory framework, a U.S. citizen who permanently resides abroad and does not maintain a residence in a particular State may borrow or rent a firearm "for temporary use for lawful sporting purposes," and may use that firearm for sporting purposes and for self-protection. 18 U.S.C. § 922(a)(5)(B), (a)(9), (b)(3)(B); 27 C.F.R. §§ 478.29a, 478.99. In addition, a non-resident U.S. citizen may

8

bring back into the United States any firearms and ammunition "previously taken out of the United States * * * by [such] person." 18 U.S.C. § 925(d)(4); 27 C.F.R. § 478.115(a). A non-resident U.S. citizen may also bring firearms and ammunition into the United States "for legitimate hunting or lawful sporting purposes" and may use these firearms and ammunition for sporting purposes and for self-protection. 27 C.F.R. § 478.115(d)(1).[4] The types of firearms "generally recognized as particularly suitable for or readily adaptable to sporting purposes," 18 U.S.C. § 925(d)(3), include almost all foreign made handguns and most U.S. made handguns. JA 202.[5]

**B. Factual Background.**

This is a pre-enforcement suit for declaratory and injunctive relief brought by Stephen Dearth and the Second Amendment Foundation, Inc., "on behalf of itself

---

[4] Federal law requires ATF to authorize the importation of a firearm "of a type that does not fall within the definition of a firearm [in 26 U.S.C. § 5845(a)] and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms." 18 U.S.C. § 925(d)(3). No import permit is required if "such firearms and such ammunition as remains following such shooting activity are to be taken back out of the territorial limits of the United States by such person upon conclusion of the shooting activity." 27 C.F.R. § 478.115.

[5] "'The Gun Control Act does not define what a 'sporting purpose' is, but 'legislative history indicates that "sporting purposes" refers to target shooting and hunting.'" JA 181 n.6 (quoting *Springfield, Inc. v. Buckles*, 116 F. Supp. 2d 85, 90 (D.D.C. 2000), *aff'd*, 292 F.3d 813 (D.C. Cir. 2002)). *See also* ATF Factoring Criteria for Weapons, *available at* www.atf.gov/forms/download/atf-f-5330-5.pdf (last visited March 5, 2013); ATF Rul. 94-1, 94-2, 95-3, *available at* http://www.atf.gov/regulations-rulings/rulings/ (last visited March 6, 2013).

and its members." JA 10.[6]  Plaintiffs challenge the constitutionality of a federal criminal statute restricting interstate, non-resident transfers of firearms, 18 U.S.C. § 922(a)(9), (b)(3), and ATF regulations implementing that statute, 27 C.F.R. §§ 478.29a, 478.96, 478.99, 478.124.  *See* JA 14-18.  They contend that the Second Amendment, equal protection component of the Fifth Amendment, and due process clause of the Fifth Amendment prohibit the challenged provisions as applied to U.S. citizens without a residence in the United States.  JA 14-18.

Dearth is a U.S. citizen who resides exclusively in Canada, where he legally owns firearms that he may bring with him when he visits the United States.  JA 175, 183, 207.  He is not disqualified from possessing firearms under federal law, "holds a valid Utah permit to publicly carry a handgun, which is recognized in numerous states," and wishes to "purchase firearms within the United States, which he would store securely at his relatives' home in Mount Vernon, Ohio, and which he would access for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States."  JA 29, 32, 164.

The Second Amendment Foundation, Inc. "is a non-profit membership organization that focuses on education, research, publication, and legal actions regarding the Second Amendment's right to bear arms."  JA 176.

---

[6] Also named as a plaintiff in the complaint is Maxwell Hodgkins, who "re-established residency in the United States" during the proceedings (Pl. Br. 8 n.2), and was dismissed from the suit on July 22, 2010, *see* JA 3.

**C. Prior Proceedings.**

1. In 2010, the district court dismissed this suit for lack of standing.  *Hodgkins v. Holder*, 677 F. Supp. 2d 202 (D.D.C. 2010), *rev'd sub. nom. Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011).  The court stated that Dearth's prior unsuccessful attempts to purchase a firearm did not present a live controversy and that his only potential basis for injury was "the threat of future enforcement," which he could not establish because "[d]omestic firearm merchants are legally obligated to refuse sale to citizens who reside abroad" such that Dearth would "never be in a position to be threatened with prosecution."  677 F. Supp. 2d at 204-05.  The court further stated that the Second Amendment Foundation's failure to show that any of "its members would otherwise have standing to sue in their own right" defeated its ability to sue in a representative capacity.  *Id.* at 206.  The court concluded that the Foundation could not establish standing to sue on its own behalf merely by alleging that its "purposes * * * include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control," JA 10.  *See* 677 F. Supp. 2d at 206.

2. In 2011, this Court reversed the district court's judgment and remanded for further proceedings.  *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011).  The Court concluded that the federal laws' ongoing prohibition on Dearth's purchase of a firearm anywhere in the United States established an ongoing injury sufficient to

11

support Dearth's standing to sue, *id.* at 502, such that the Court "need not consider whether Dearth has pre-enforcement standing," *id.* at 503 n.*.  Additionally, the Court concluded that "because the [Second Amendment Foundation] raises no issue not also raised by Dearth" the Court did not need to "decide whether [the Foundation] has standing." *Ibid.*

3. On remand, the district court granted the government's motion for summary judgment, concluding that "Sections 922(a)(9) and 922(b)(3), and their implementing regulations do not violate Dearth's Second Amendment rights," "do not deprive Dearth of his right under the Fifth Amendment to equal protection under the law," and do not "violate Dearth's purported right to international travel under the Fifth Amendment."  JA 194.  The court determined that the challenged laws, while foreclosing certain methods of acquiring firearms, JA 181, "do not 'severely limit the possession of firearms by Dearth'" and thus must be sustained against a Second Amendment challenge if they "satisfy intermediate scrutiny," JA 185 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) ("*Heller II*")).  The court noted that "counsel for Dearth conceded that Dearth owns firearms in Canada and that there is no legal impediment to him bringing one of those firearms with him when visits the United States."  JA 183; *see also* JA 199-200, 207.  The court further noted that federal law permits Dearth to "rent or borrow a firearm for lawful sporting

purposes," including "many handguns—the classic self-defense weapon," and that Dearth may "also use the firearm for self-defense purposes." JA 183.

The district court next concluded that, as applied to American citizens without a U.S. residence, Section 922(a)(9) and Section 922(b)(3) satisfy intermediate scrutiny. The court observed that Congress enacted these laws to "protect[] public safety and combat[] violent crime" and especially to address specific types of firearms offenses identified during its investigations of violent crime. JA 185-86. The court concluded that Congress's objectives would be achieved less effectively absent the federal laws' restrictions on interstate, non-resident transfers of firearms and that the narrowness of the burden imposed by those laws "evinc[es] a fair degree of fit between the means used by the statutes and their intended purposes." JA 187. The court noted in particular that the laws do not leave a person in Dearth's circumstances "powerless to arm himself for self-protection." JA 188.

The court observed that because Section 922(a)(9) and Section 922(b)(3) satisfy intermediate scrutiny, they also easily satisfy the rational basis standard applicable to Dearth's claim that these laws unconstitutionally inhibit his undertaking of international travel. The court noted that laws "merely requir[ing] that Dearth establish residency in a State in order to purchase or acquire additional firearms for purposes other than sporting purposes," JA 190, "do not have a direct impact on the freedom to travel internationally" or "condition the right to travel internationally

13

upon the relinquishment of another right," JA 191.  The court further concluded that Dearth had not established that the laws deprive him of equal protection because "Dearth has failed to demonstrate that he is similarly situated to U.S. citizens residing in the United States" and "[e]ven if Dearth could be considered to be similarly situated to resident U.S. citizens, * * * he cannot show that the government's action in enacting the challenged laws was irrational."  JA 193.[7]

## SUMMARY OF ARGUMENT

Plaintiffs seek preenforcement review of a federal criminal statute restricting interstate, non-resident transfers of firearms, 18 U.S.C. § 922(a)(9), (b)(3), and federal regulations implementing that statute, 27 C.F.R. §§ 478.29a, 478.96, 478.99, 478.124. They contend that the Second Amendment, the Due Process Clause of the Fifth Amendment, and the equal protection component of the Fifth Amendment do not permit Congress to restrict transfers of firearms to expatriate Americans who lack a U.S. State of residence.  The district court properly rejected those arguments.

Plaintiffs recognize that the challenged laws do not restrict the ownership or possession of firearms by non-resident U.S. citizens.  They acknowledge that Stephen Dearth, the individual plaintiff in this case, already owns firearms in Canada, including

---

[7] The district court declined to revisit whether the Second Amendment Foundation has standing to bring this suit (JA 176 n.4), noting this Court's statement in the earlier appeal that "because the [Second Amendment Foundation] raises no issue not also raised by Dearth" it is unnecessary to "decide whether [the Foundation] has standing," 641 F.3d at 503 n.*.

14

handguns appropriate for self-defense, and that there is no legal impediment to his bringing one of those firearms with him to the United States. Federal law permits expatriate Americans visiting the United States to bring firearms, including handguns, appropriate for self-defense. 18 U.S.C. § 925(d)(3), (4); 27 C.F.R. § 478.115(a), (d)(1). Federal law also allows these persons to borrow or rent such firearms for lawful sporting purposes while visiting the United States, permitting even persons do not already have access to firearms in their home countries to acquire handguns that may also be used for self-defense. 18 U.S.C. § 922(a)(5)(B), (a)(9), (b)(3)(B); 27 C.F.R. §§ 478.29a, 478.99. Thus, even if plaintiffs' invocation of the Second Amendment could be squared with the long history of state restrictions on the purchase or possession of firearms by non-residents, plaintiffs fail to identify any respect in which the challenged restrictions implicate a Second Amendment right.

Even if plaintiffs' claims implicate a Second Amendment interest, the challenged laws readily withstand heightened scrutiny. A multi-year investigation into violent crime revealed to Congress that "the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business" permitted dealers and purchasers to circumvent State and local firearms laws. S. Rep. No. 89-1866, at 3. The evidence demonstrated that "interstate, nonresident purchases of firearms" pose serious challenges to "the laws of our States and their political subdivisions," S. Rep. No. 90-1097, at 77.

15

Congress found "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225. Congress accordingly enacted statutory provisions "designed to prevent the avoidance of state and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." H.R. Rep. No. 90-1577, at 15. These provisions include 18 U.S.C. § 922(a)(5), (a)(9), and (b)(3), which generally restrict interstate, non-resident firearm transfers unless the transfer is a "loan or rental * * * for temporary use for lawful sporting purposes."

The challenged laws allow non-residents to acquire firearms that may be used for sporting purposes and self-defense but also "assist the States effectively to regulate firearms traffic within their borders," H.R. Rep. No. 90-1577, at 6. If expatriate Americans visiting the United States were not subject to these laws, Congress's goal of addressing specific types of firearms offenses identified during its investigations of violent crime "would be achieved less effectively," *Ward v. Rock Against Racism,* 491 U.S. 781, 782-83 (1989). Congress's application of the challenged laws to non-resident U.S. citizens is thus at least "'substantially related,'" *Heller II*, 670 F.3d at 1258 (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)), to its "legitimate and compelling state

16

interest in protecting the community from crime," *Schall v. Martin*, 467 U.S. 253, 264 (1984) (internal quotation marks omitted).  Plaintiffs' Second Amendment claims thus fail, as do plaintiffs' claims that the challenged laws are an unreasonable regulation of their Fifth Amendment liberty interest in international travel, and irrationally distinguish non-resident U.S. citizens from those who have a U.S. State of residence.

## STANDARD OF REVIEW

The district court's grant of summary judgment is subject to de novo review. *Coalition for Common Sense in Government*, -- F.3d --, 2013 WL 45880, *4 (D.C. Cir. Jan. 4, 2013).

## ARGUMENT

### I. The Challenged Federal Laws Do Not Violate The Second Amendment.

#### A. Plaintiffs' Claims Concern Conduct Outside The Scope Of The Second Amendment.

Plaintiffs challenge the constitutionality of § 922(a)(9), which prohibits "any person, other than a [federal firearms licensee], who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes," and § 922(b)(3), which makes it unlawful for a federal firearms licensee "to sell or deliver * * * * any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in * * * the State in which the licensee's place of business is

17

located" unless the transfer is a "loan or rental of a firearm * * * for temporary use for lawful sporting purposes."

Plaintiffs acknowledge that Dearth, like other U.S. citizens without a residence in the United States, may "possess and own firearms for any lawful purpose, as much as anyone." (Pl. Br. 2-3). Indeed, Dearth "owns firearms in Canada and * * * there is no legal impediment to him bringing one of those firearms with him when visits the United States." JA 183, 207. These firearms include Dearth's handguns. (Pl. Br. 53, JA 207). Dearth may bring back into the United States any firearms and ammunition "previously taken out of the United States or a possession by [him]." 18 U.S.C. § 925(d)(4); 27 C.F.R. § 478.115(a). He may bring in firearms and ammunition "for legitimate hunting or lawful sporting purposes" and may use these firearms and ammunition for sporting purposes and for self-protection. 27 C.F.R. § 478.115(d)(1); *see also* 18 U.S.C. § 925(d)(3). And, while visiting, he may borrow or rent a firearm "for temporary use for lawful sporting purposes" and use that firearm for sporting purposes and for self-protection. 18 U.S.C. § 922(a)(5)(B), (a)(9), (b)(3)(B); 27 C.F.R. §§ 478.29a, 478.99. The types of firearms "generally recognized as particularly suitable for or readily adaptable to sporting purposes," 18 U.S.C. § 925(d)(3), include almost all foreign made handguns and most U.S. made handguns, "including the Glock * * * the most popular handgun for self-defense," JA 202; *id.* at 183 (noting plaintiffs' acknowledgement that "many handguns—the classic self-

18

defense weapon—also have lawful sporting purposes"); *see also* ATF Factoring Criteria for Weapons, *available at* www.atf.gov/forms/download/atf-f-5330-5.pdf.

**1.** Plaintiffs identify no respect in which the challenged restrictions implicate a Second Amendment right. They plainly do not infringe on "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635. The Supreme Court in *Heller* made clear that "nothing in [its] opinion should be taken to cast doubt on * * * laws imposing conditions and qualifications on the commercial sale of arms," which the Court described as "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. As the district court in this case correctly observed, "the right to purchase a firearm" cannot be "synonymous" with "the right to possess a firearm for self-defense * * * given the distinction between the regulation of firearms possession and the regulation of commercial firearms sales that was made by the Supreme Court in *Heller* and recognized by [this Court] in *Heller II*." JA 184 (emphasis omitted); *see Heller*, 554 U.S. at 626-27 & n.26 (noting that "the right secured by the Second Amendment is not unlimited" and that even an individual's ability to carry a firearm for self-defense may lawfully be regulated in at least certain spaces outside the home).

A "law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *United States v. Decastro*, 682 F.3d 160, 168 (2d

19

Cir. 2012).  And application of the federal laws to expatriate Americans visiting the United States, JA 14-18, does not implicate "self-defense in the home—the 'core lawful purpose' protected by the Second Amendment."  *Heller II*, 670 F.3d at 1255 (quoting *Heller*, 554 U.S. at 630)).

Plaintiffs thus cannot show that the challenged federal laws burden the Second Amendment rights of expatriate Americans as a matter of law.  They have also failed to show as a matter of fact that these laws burden Dearth's Second Amendment rights.  Plaintiffs acknowledge that Dearth "owns firearms in Canada and that there is no legal impediment to him bringing one of those firearms with him when visits the United States."  JA 183, 207.  And they further acknowledge (Pl. Br. 53, JA 207) that Dearth's firearms include handguns appropriate for self-defense.  Plaintiffs also have not shown that the federal laws prevent Dearth from achieving his stated objective of accessing firearms "for lawful sporting purposes as well as for other purposes, including self-defense, while visiting the United States."  JA 32; *see also* JA 11.  As the district court correctly explained, federal law permits "Dearth [to] rent or borrow a firearm, * * * and also [to] use the firearm for self-defense purposes," and the firearms that Dearth may rent or borrow under federal law "includ[e] many handguns—the classic self-defense weapon."  JA 183.

    **2.**  Plaintiffs' invocation of the Second Amendment is also without ground in historical practice.  As this Court has emphasized, "*Heller* tells us 'longstanding'

20

regulations * * * are presumed not to burden conduct within the scope of the Second Amendment." *Heller II*, 670 F.3d at 1253 (quoting 554 U.S. at 626-27 & n.26). "This is a reasonable presumption because a regulation that * * * has long been accepted by the public[] is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment." *Ibid.*

Plaintiffs make no attempt to square their invocation of the Second Amendment with the long history of state restrictions on the purchase or possession of firearms by non-residents. *See Heller II*, 670 F.3d at 1253 ("*Heller* considered 'prohibitions on the possession of firearms by felons' to be 'longstanding' although states did not start to enact them until the early 20th century."). Between 1909 and 1939, at least thirteen States and the District of Columbia enacted laws restricting the possession, acquisition, or carrying of one or more types of firearms to State residents.[8] These States continued to require State residency (or residency in a U.S.

---

[8] West Virginia (1909), Georgia and New York (1910), Montana and North Carolina (1919), Missouri (1921), Massachusetts (1922), Connecticut (1923), New Jersey (1924), Indiana (1925), Michigan and Rhode Island (1927), District of Columbia (1932), and Maine (1939).  JA 153-161; *see also* Act of Aug. 12, 1910, No. 432, 1910 Ga. Laws 134 ("[I]t shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the Ordinary of the respective counties in which the party resides* * *"); *People ex rel. Darling v. Warden of City Prison,* 139 N.Y.S. 277, 280 (N.Y. App. Div. 1913) (citing N.Y. Penal Law § 172.1897 (1910) ("No person not a resident of the United States, shall have or carry firearms or dangerous weapons in any public

State) until at least 1968, when federal law established a nationwide State residency requirement.[9]  Even after federal law established a nationwide State residency requirement, a number of States continue to restrict purchases of at least certain types of firearms by persons residing outside the State or contiguous States.[10]  These States

---

place at any time.  This section shall not apply to the regular and ordinary transportation of firearms as merchandise, nor to sheriffs, policemen or to other duly appointed peace officers, nor to duly authorized military or civil organizations when parading, nor to the members thereof when going to and from the places of meeting of their respective organizations.")).  During the same period, Illinois enacted laws limiting the carrying of concealed handguns to State residents.  Act of July 11, 1919, § 4, 1919 Ill. Laws 431, 432 ("It shall be unlawful for any person to carry concealed upon his person, any pistol, revolver, or other firearm, without a written license therefor * * *It shall be the duty of chief police officers in cities, and of justices of the peace and police magistrates elsewhere in the State* * *to issue a license to any citizen of the State of Illinois to carry concealed a pistol or revolver.").

[9] *See* D.C. Code Ann. § 22-3206 (1967); *Pickett v. State*, 179 S.E.2d 303, 304 (Ga. App. 1970) (citing 1970 text of Ga. Code Ann. § 26-2903); Burns' Ind. Stat. Ann. § 10-4738(1) (1972 Supp.); *Schwanda v. Bonney*, 418 A.2d 163, 164 (Me. 1980) (quoting 1980 text of 25 Me. Rev. Stat. Ann. § 2031); *MacNutt v. Police Comm'r of Boston*, 572 N.E.2d 577, 579 (Mass. App. Ct. 1991) (quoting 1972 text of Mass. Gen. Laws ch. 140, § 131); Act of July 1, 1968, 1968 Mich. Acts 511, 512; Act of June 18, 1967, 1967 Mo. Laws 675; Mont. Crim. Code §§ 94-8-210(1), 94-8-214(4) (1973); *State v. Sima*, 361 A.2d 58, 60 (N.J. Super. Ct. App. Div. 1976) (quoting 1976 text of N.J. Stat. Ann. § 2A:151-44); N.Y. Penal Law § 265.05(5) (1968); N.C. Gen. Stat. §§ 14-402, 14-403 (1999); Act of May 21, 1975, 1975 R.I. Pub. Laws 738, 741, 744-45; *West Virginia Judicial Inquiry Comm'n v. Dostert*, 271 S.E.2d 427, 430 n.5 (W. Va. 1980) (quoting 1980 text of W. Va. Code § 61-7-2).  In 1925, Illinois replaced its licensing statute—including its requirement of State residency for a license to carry a concealed firearm—with a statute banning (with limited exceptions) all concealed carrying of firearms.  Act of July 3, 1925, §§ 4, 9, 1925 Ill. Laws 339, 340-41.

[10] *See* Ala. Code § 13A-11-58(a) (limiting the "[s]ale of firearms or ammunition to residents of other states" to "rifles, shotguns, and ammunition * * * to a resident of any state where the sale of the firearms and ammunition is legal"); Ark. Code Ann. § 5-73-125(a) (providing with respect to "[i[nterstate sale" that "[t]he sale of shotguns

22

include Ohio, where Dearth has declared he "primarily intend[s] to exercise his rights" (Pl. Br. 5), but which restricts "[p]ermitted interstate transactions in firearms" to sales of "a rifle, shotgun, or ammunition" to residents of the contiguous States of "Indiana, Kentucky, Michigan, Pennsylvania, [and] West Virginia," Ohio Rev. Code Ann. § 2923.22, and would therefore independently bar Dearth from purchasing firearms. Also among these States is Minnesota, which similarly limits non-resident purchases of firearms to "resident[s] of a contiguous state," Minn. Stat. § 624.71, and thus would independently bar the attempted purchase that formed the basis for Dearth's earlier challenge to § 922(a)(9) and (b)(3), *see Dearth v. Gonzales*, 2007 WL 1100426, at *1 (S.D. Ohio April 10, 2007).

---

and rifles and ammunition in this state to residents of other states is authorized under regulations" issued under the Gun Control Act of 1968); Ga. Code Ann. § 10-1-101 (providing with respect to "[p]urchase in state by residents of other states" that "[r]esidents of any state of the United States may purchase rifles and shotguns in the State of Georgia, provided such residents conform to applicable provisions of statutes and regulations of the United States, of the State of Georgia, and of the state in which such persons reside"); Ohio Rev. Code Ann. § 2923.22(B) ("Any resident of Indiana, Kentucky, Michigan, Pennsylvania, or West Virginia, age eighteen or over, and not prohibited by [Ohio law] or the laws of his domicile or the United States from acquiring or using firearms, may purchase or obtain a rifle, shotgun, or ammunition therefor in Ohio."); Minn. Stat. § 624.71 ("Notwithstanding any other law to the contrary, it shall be lawful for any federally licensed importer, manufacturer, dealer, or collector to sell and deliver firearms and ammunition to a resident of a contiguous state in any instance where such sale and delivery is lawful under the federal Gun Control Act of 1968 (Public Law 90-618)."); Va. Code § 18.2-308.2:2(C) (providing with respect to firearm transfers "to any person who is not a resident of Virginia" that "[n]o dealer shall sell, rent, trade or transfer from his inventory any firearm, except when the transaction involves a rifle or a shotgun* * *").

23

### B. Even If Plaintiffs' Claims Implicate The Second Amendment Rights Of A Non-Resident U.S. Citizen Such As Dearth, The Challenged Federal Laws Are Constitutional.

Assuming that plaintiffs have identified any Second Amendment interest, the challenged restrictions are reviewed under an intermediate scrutiny standard, under which a law satisfies intermediate scrutiny if it is "'substantially related to an important governmental objective.'" *Heller II*, 670 F.3d at 1258 (quoting *Clark*, 486 U.S. at 461). This Court, when evaluating a District of Columbia firearms law that did not prohibit the possession of handguns and did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting," stated that "[a]lthough we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment," even assuming that the Second Amendment was implicated, "we are reasonably certain the prohibitions do not impose a substantial burden upon that right." *Id.* at 1262. This Court accordingly determined that the law should be evaluated under no more than intermediate scrutiny. *Ibid.*

Congress enacted § 922(a)(9) and (b)(3) to promote the government's "legitimate and compelling state interest in protecting the community from crime," *Schall*, 467 U.S. at 264 (internal quotation marks omitted), and applying those provisions to all persons without a U.S. residence, including expatriate Americans visiting the United States, "'employs * * * a means narrowly tailored to achieve the

24

desired objective,'" *Heller II*, 670 F.3d at 1258 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (ellipsis omitted)).

**1.** Based on a multi-year inquiry into violent crime that included "field investigation and public hearings," S. Rep. No. 88-1340, at 1 (1964), Congress found that "there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power,'" Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. at 225. Congress's investigations revealed "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19. The investigation established that "[n]ot only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention." *Id.* at 3.

Massachusetts authorities testified "that 87 percent of the 4,506 crime guns misused in that State were purchased outside of Massachusetts in neighboring States." S. Rep. No. 90-1097, at 77. Michigan authorities testified that "90 out of every 100 crime guns confiscated in Detroit are not purchased and registered in Michigan and that the prime source of these crime guns is by purchases [in] neighboring Ohio,

25

where controls on firearms are minimal." *Ibid.* In New Jersey, "of 1,815 arrests for the illegal carrying of concealed weapons (handguns) only 15 of the guns involved had been purchased legally" in New Jersey. S. Rep. No. 89-1866, at 62. In New York City, an investigation of "2,676 deliveries of concealable firearms by common carrier" revealed that "1,439 deliveries * * * were consigned to persons who would not have been authorized to receive them under the laws of the State of New York." *Id.* at 57. Law enforcement officers from New York City, Los Angeles, St. Louis, Chicago, Philadelphia, and Atlanta provided Congress with "statistics documenting the misuse of firearms by juveniles and minors," which "take on added significance when one considers the fact that in each of the jurisdictions referred to the lawful acquisition of concealable firearms by these persons was prohibited by statute." *Id.* at 59.

The evidence showed that "interstate, nonresident purchases of firearms" pose serious challenges to "the laws of our States and their political subdivisions." S. Rep. No. 90-1097, at 77. Congress accordingly found "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225. Congress therefore enacted the Omnibus Crime Control Act, Pub. L. No. 90-351, 82 Stat. 197 (1968). Later that year, Congress enacted the Gun Control Act of 1968,

Pub. L. No. 90-618, 82 Stat. 1213 (1968), the "principal purpose" of which was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders."  H.R. Rep. No. 90-1577, at 6 (1968); *see also* Pub. L. No. 90-618, Title I, 82 Stat. 1213 ("State firearms control assistance").

Congress included in both the Omnibus Crime Control Act and the Gun Control Act statutory provisions "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one."  H. Rep. No. 90-1577, at 14; *see also* S. Rep. No. 90-1097, at 114 (1968).  These provisions include 18 U.S.C. § 922(a)(5), which generally restricts firearm transfers to a person "who the transferor knows or has reasonable cause to believe does not reside in * * *  the State in which the transferor resides," and 922(b)(3), which generally restricts the sale of firearms by a federally licensed seller "to any person who the licensee knows or has reasonable cause to believe does not reside in * * * the State in which the licensee's place of business is located."

Subsequently, law enforcement authorities noted that the language of Section 925(a)(5), "[r]ead literally, * * *  may make it impossible to prosecute an individual who delivers a firearm to an alien or other person, such as a transient, who does not reside in 'any State.'"  134 Cong. Rec. 12309.  Congress also identified the emergence of a "law enforcement problem posed by aliens legally in the United States, but not

27

residing in any State" who were acquiring firearms from non-licensees and then "smuggl[ing] the weapons out of the country." 137 Cong. Rec. 2743 (1991). Such persons faced no legal penalty for making false statements about their residence because Section 922 prohibits the making of false statements to licensed dealers, 18 U.S.C. § 922(a)(6), but contains no analogous prohibition on the making of false statements to non-licensees. *See* 137 Cong. Rec. 2743 (noting that such acquisitions "[did] not violate any specific portion of the [Gun Control] Act").

Congress addressed both of these concerns by enacting Section 922(a)(9), which restricts firearm transfers to those without a residence in the United States, but focuses on the actions of the recipient rather than the transferor. *See* Pub. L. No. 103-322, § 110514, 108 Stat at 2019. Section 922(a)(9) makes it generally unlawful for "any person, other than a [federal firearms licensee], who does not reside in any State to receive any firearms * * *" 18 U.S.C. § 922(a)(9); *see also* 27 C.F.R. § 478.29a (same).

In enacting these statutes, Congress aimed "to cope with the conditions referred to in [its statutory findings]," not "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity." Pub. L. No. 90-351, 82 Stat. at 226; *see also* Pub. L. No. 90-618, 82 Stat. at 1213-14; 137 Cong. Rec.

28

17089 (1991) (noting Congress's concern to avoid "restrict[ing] legal tourists in the country, for the specific purpose of hunting, from acquiring a firearm for that purpose").  To that end, Congress included provisions creating an exception for transfers where a non-resident sought a firearm "for lawful sporting purposes."  *See* 18 U.S.C. § 922(a)(5), (a)(9), (b)(3).

Congress had valid reasons for concluding that persons acquiring a firearm in connection with a "lawful sporting" activity are better positioned to use that firearm knowledgeably and responsibly than persons who do not engage in any hunting or target shooting.  As Congress's investigations showed, persons participating in "competitive shooting, * * * [and] informal skeet, trap, and target shooting" became "familiar with firearms and skilled in their use."  S. Rep. No. 89-1866, at 8-9; *see also ibid.* (citing a study establishing that Army's "civilian marksmanship program * * * contributes significantly to the development of rifle marksmanship proficiency and confidence in the ability to use a rifle effectively * * *" (quotation marks omitted, first ellipsis in original)).

Moreover, Congress tailored the exception to avoid contributing to the interstate flow of firearms from States with relatively laxer firearms laws to those with more restrictive firearms regulations.  Instead of permitting non-residents to *purchase* firearms for lawful sporting purposes, Congress provided that a non-resident's "receipt * * * for lawful sporting purposes," 18 U.S.C. § 922(a)(9), would occur only

29

in the time-bounded context of "the *loan or rental* of a firearm * * * for *temporary* use for lawful sporting purposes," *id.* § 922(a)(5), (b)(3) (emphasis added). Congress noted that "[o]wners should know to whom they have temporarily transferred a firearm–both to protect their property interest and to avoid being held responsible for its misuse." 114 Cong. Rec. 21767 (1968). Another federal provision, 18 U.S.C. § 926A, narrows any effect that these interstate purchase restrictions may have on the self-defense rights of non-residents who wish to access firearms but have no interest in hunting or target shooting, without "invalidat[ing] State and local laws regarding firearm possession," 131 Cong. Rec. 18169 (1985). That provision permits "any person who is not otherwise prohibited * * * from transporting, shipping, or receiving a firearm * * * to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm." *Id.* § 926A. The provision does not "hamper law enforcement efforts," 131 Cong. Rec. 18169, because "during such transportation the firearm [must be] unloaded, and neither the firearm nor any ammunition being transported [must be] readily accessible * * *." 18 U.S.C. § 926A.

**2.** The government's interest "in protecting the community from crime" is "legitimate and compelling." *Schall*, 467 U.S. at 264 (internal quotation marks omitted); *see also United States v. Salerno*, 481 U.S. 739, 750 (1987) ("[T]he Government's general interest in preventing crime is compelling"); *Schenck v. Pro-*

30

*Choice Network of Western New York*, 519 U.S. 357, 376 (1997) (recognizing the "significant governmental interest in public safety"). And Congress plainly enacted § 922(a)(5), (a)(9), and (b)(3) to "protect[] public safety and combat[] violent crime" and especially to address specific types of firearms offenses identified during its investigations of violent crime. JA 185-86.

If expatriate Americans visiting the United States were not subject to the challenged federal laws, these objectives "would be achieved less effectively," *Ward,* 491 U.S. at 782-83. The shortcomings of plaintiffs' proposed alternatives (Pl. Br. 49) provide ample illustration. Requiring persons purchasing a firearm for use in the United States to have a U.S. State of residence facilitates firearm tracing in the event that the firearm is subsequently implicated in a law enforcement investigation. *See J&G Sales, Ltd. v. Truscott*, 473 F.3d 1043, 1045-46 (9th Cir. 2007); 131 Cong. Rec. 18201 (1985) (purchaser's address information "help[s] to trace weapons * * * used to commit crimes").[11]  "[P]roof of overseas residence, or hav[ing] consular officials certify * * * residence status" (Pl. Br. 49), does not ensure a person's availability to submit to questioning by U.S. or an individual State's authorities. Because a firearm

---

[11]  *See also*  http://www.atf.gov/publications/factsheets/factsheet-national-tracing-center.html ("ATF processes more than 300,000 crime-gun trace requests for thousands of domestic and international law enforcement agencies each year.") (last visited March 5, 2013).

may be misused by a person other than the original purchaser,[12] the strength of this concern does not depend on the likelihood that expatriate Americans will themselves commit firearms offenses while visiting the United States.[13]

Verifying that a purchase complies with the laws of a person's State of residence ensures that person's possession and use of firearm complies with the laws

---

[12] *See, e.g.,* Bureau of Justice Statistics, Selected Findings, Guns Used in Crime at 3 (July 1995) (reporting, based on victim survey results, an estimated "341,000 incidents of firearm theft from private citizens annually from 1987 to 1992," and noting that "[b]ecause the survey does not ask how many guns were stolen, the number of guns stolen probably exceeds the number of incidents of gun theft").

[13] Firearms trafficking by expatriate Americans is a law enforcement concern, however. *See Leader of International Firearms Trafficking Network Sentenced to 32 Years in Prison*, U.S. Federal News, May 5, 2009, 2009 WLNR 8517185 (Westlaw) (U.S. citizen living in Canada admitted to smuggling approximately 500 firearms into Canada); *Three Sentenced for Involvement in a 100+ Firearm Straw Purchase and Export Ring*, Dec. 20, 2011 (two U.S. citizens residing in Mexico sentenced for smuggling 36 firearms from the United States to Mexico), http://www.justice.gov/usao/txs/1News/Releases/ 2011%20December/111220%20Bravo-Hernandez.html (last visited March 5, 2013); Rafael Romo, *American Citizen in Mexican Custody on Arms-Trafficking Allegation*, Sept. 6, 2011 (U.S. citizen residing in Mazatlan, Mexico arrested for purchasing weapons in United States, then smuggling the weapons to Mexico), http://www.borderlandbeat.com/2011/09/american-citizen-in-mexican-custody- on.html (last visited March 5, 2013); Naxiely Lopez, *15 High-Powered Rifles Seized After Traffic Stop*, The Monitor (McAllen, Texas), Jan. 13, 2011, 2011 WLNR 709786 (two U.S. citizens living in Mexico arrested for attempting to smuggle 15 AK-47 rifles into Mexico); Naxiely Lopez, *Man Sentenced for Straw Purchase of Guns*, The Monitor (McAllen, Texas), Jan. 5, 2011, 2011 WLNR 264059 (U.S. citizen living in Mexico bought nine AK-47 type rifles and four pistols to smuggle to Mexico); *Prison Term Set for Gun Smuggler*, San Antonio Express-News, Aug. 27, 2009, 2009 WLNR 16829243 (U.S. citizen residing in Mexico convicted for attempting to smuggle converted semi-automatic machine gun, AK-47 rifle, and 3000 rounds of ammunition into Mexico); Diana Washington Valdez, *Firearms in Mexico Have Ties to El Paso*, El Paso Times, Dec. 14, 2008, 2008 WLNR 24011948 (U.S. citizen residing in Mexico indicted for smuggling weapons to Mexico).

of the jurisdiction where that firearm will be predominantly used.  *See, e.g.*, H. R. Rep. No. 90-1577, at 14 (Section 922(a)(5) and Section 922(b)(3) were "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one"); 114 Cong. Rec. 27134 (1968) (noting importance of "subject[ing] the transaction to the regulatory jurisdiction of the State which has an interest in who and what type of person possesses firearms within its borders").  "[T]reat[ing] nonresidents as residents of the state in which they are purchasing firearms" (Pl. Br. 49), would allow non-residents to purchase firearms from the State with the least restrictive laws even if that is not the place of intended predominant use.  This would shift the burden of ensuring compliance with the law of the State where the firearm will be predominantly used, transferring that burden from the seller and purchaser of the firearm to the law enforcement authorities of that State.  Such an outcome cannot be squared with Congress's "principal purpose" of "assist[ing] the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6; *see also see also* Pub. L. No. 90-618, Title I, 82 Stat. 1213 ("State firearms control assistance").

The fit between application of the challenged laws to expatriate Americans and Congress's "important interests" is thus more than "reasonable." *Heller II*, 670 F.3d at 1262.  As discussed above, *see supra* Part I.A., plaintiffs cannot show as a matter of law that the challenged federal laws prevent expatriate Americans visiting the United

33

States from accessing firearms appropriate for self-defense. And they also cannot show as a matter of fact that Dearth is unable to access such firearms while visiting the United States. *See supra* Part I.A. Instead, plaintiffs object (Pl. Br. 45) that Congress provided only certain means for non-residents to acquire firearms that may be used for self-defense, and foreclosed others. But the narrowness of any burden imposed demonstrates the tightness of the fit between the challenged laws and Congress's compelling objectives. "[T]he requirement of narrow tailoring is satisfied" because the challenged laws "promote[] a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Ward*, 491 U.S. at 782-83; *see also Heller II*, 670 F.3d at 1258.

## II. The Challenged Federal Laws Do Not Violate The Fifth Amendment Rights Of Non-Resident U.S. Citizens Such As Dearth.

### A. The Challenged Laws Do Not Infringe Any Fifth Amendment Liberty Interest In International Travel.

The Supreme Court has explained that "the right of international travel * * * [is] no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment," *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quotation marks omitted), "that is subject to reasonable government regulation within the bounds of due process," *Hutchins v. District of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999) (en banc); *see also id.* at n.2 (noting that "[*Kent v. Dulles*, 357 U.S. 116 (1958)] and *Aptheker v.*

*Secretary of State*, 378 U.S. 500 (1964) could * * * be viewed primarily as First Amendment cases"). As the district court correctly noted, the federal laws challenged here "merely require that Dearth establish residency in a State in order to purchase or acquire additional firearms for purposes other than sporting purposes," and thus "place no direct restriction on Dearth's ability to travel within the United States or internationally." JA 190. The laws also do not "implicitly place any condition on Dearth's right to travel internationally," *ibid.*, but "[e]ven if the challenged laws had an incidental effect," *id.* 191, they do not implicate any fundamental right, *see Hutchins*, 188 F.3d at 537. Accordingly "[u]nless the limitation imposed by Congress is wholly irrational, it is constitutional in spite of [any] incidental effect on international travel." *Califano v. Aznavorian,* 439 U.S. 170, 177 (1978).

Sections 922(a)(5), (a)(9), and (b)(3) satisfy heightened scrutiny analysis, *see supra* Part I.B, and therefore also easily satisfy rational basis review. And because these laws do not deny any Second Amendment rights or Fifth Amendment liberty interests to non-resident U.S. citizens such as Dearth, they do not implicate the unconstitutional conditions doctrine.

**B. Applying The Challenged Provisions To Non-Resident U.S. Citizens Such As Dearth Does Not Violate The Equal Protection Component Of The Fifth Amendment.**

"Plaintiffs do not contend that Americans living abroad constitute a suspect class for purposes of equal protection analysis," and they recognize that "equal

protection analysis may not be reached where specific, substantive rights analysis is available." (Pl. Br. 65). The substance of their equal protection claim is that the challenged laws impose "irrational and arbitrary classifications" that "would violate the Fifth Amendment's equal protection principles even were the government correct * * * about the absence of fundamental arms and travel rights." *Ibid.* That claim fails because, as discussed above, *see supra* Part I.B., Congress had valid reasons for concluding that persons without a U.S. State of residence were not similarly situated to persons residing in a particular State for purposes of the law enforcement concerns underlying Sections 922(a)(5), (a)(9), and (b)(3).[14]

---

[14] As this Court previously noted, "because the [Second Amendment Foundation] raises no issue not also raised by Dearth," this Court need not "decide whether it has standing." *Dearth*, 641 F.3d at 503 n.*; *see also* Pl. Br. 28 ("[T]here is no need to consider SAF's standing, because as this Court correctly determined, [the Foundation's] presence should not change the outcome."). We note, however, that the Fourth Circuit has correctly held that the Foundation lacked standing in analogous circumstances. *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (Article III standing not established by Foundation's claim that "[it] has been injured because its resources are taxed by inquiries into the operation and consequences of interstate handgun transfer provisions" (quotation marks omitted) because this "diversion of resources * * * 'results not from any actions taken by the defendant, but rather from the organization's own budgetary choices'" (quoting *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (brackets omitted)). In any event, because the district court determined that the Foundation's standing was not properly before it and therefore declined to consider that issue, *see* JA 176 n.4, a remand for fact-finding would be appropriate if this Court concludes that the Foundation's participation would "'make[] [a] difference to the merits of the case,'" *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) (quoting *Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

STUART F. DELERY
*Principal Deputy Assistant Attorney General*

RONALD C. MACHEN JR.
*United States Attorney*

MARK B. STERN
(202) 514-5089

MICHAEL S. RAAB
(202) 514-4053
/s/ Anisha S. Dasgupta
ANISHA S. DASGUPTA
(202) 514-5428
*Attorneys, Appellate Staff*
*Civil Division, Room 7320*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C.  20530*

March 11, 2013

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(A)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Garamond, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,800 words, excluding the parts of the brief exempted under Rule 32(a)(7)(B)(iii), according to the count of Microsoft Word.


 /s/ Anisha S. Dasgupta
ANISHA S. DASGUPTA
ATTORNEY FOR APPELLEE

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2013, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system, which constitutes service on all parties under the Court's rules.

I further certify that I will cause 8 paper copies of this brief to be filed with the Court.

/s/ Anisha S. Dasgupta
ANISHA S. DASGUPTA
ATTORNEY FOR APPELLEE

# ADDENDUM

# ADDENDUM CONTENTS

18 U.S.C. § 922(a)(5) ............................................................................ A-1

18 U.S.C. § 922(a)(9) ............................................................................ A-1

18 U.S.C. § 922(b)(3) ............................................................................ A-1

18 U.S.C. § 925(d) ................................................................................. A-2

18 U.S.C. § 926A .................................................................................. A-3

27 C.F.R. § 478.29a .............................................................................. A-3

27 C.F.R. § 478.96 ................................................................................ A-3

27 C.F.R. § 478.99(a) ........................................................................... A-4

27 C.F.R. § 478.115 .............................................................................. A-5

27 C.F.R. § 478.124 .............................................................................. A-6

**18 U.S.C.**

### § 922 – Unlawful Acts

(a) It shall be unlawful --

\* \* \* \*

(5) for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

\* \* \* \*

(9) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.

(b) It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver--

\* \* \* \*

(3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws

A-1

and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes;

* * * *

### § 925(d) – Exceptions

The Attorney General shall authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if the firearm or ammunition--

(1) is being imported or brought in for scientific or research purposes, or is for use in connection with competition or training pursuant to chapter 401 of title 10;

(2) is an unserviceable firearm, other than a machinegun as defined in section 5845(b) of the Internal Revenue Code of 1986 (not readily restorable to firing condition), imported or brought in as a curio or museum piece;

(3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1986 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms, except in any case where the Attorney General has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled; or

(4) was previously taken out of the United States or a possession by the person who is bringing in the firearm or ammunition.

The Attorney General shall permit the conditional importation or bringing in of a firearm or ammunition for examination and testing in connection with the making of a determination as to whether the importation or bringing in of such firearm or ammunition will be allowed under this subsection.

## § 926A – Interstate transportation of firearms

Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any ammunition being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided,* That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or ammunition shall be contained in a locked container other than the glove compartment or console.

## 27 C.F.R.

### § 478.29a – Acquisition of firearms by nonresidents.

No person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State shall receive any firearms unless such receipt is for lawful sporting purposes.

### § 478.96 – Out-of-State and mail order sales.

(a) The provisions of this section shall apply when a firearm is purchased by or delivered to a person not otherwise prohibited by the Act from purchasing or receiving it.

(b) A licensed importer, licensed manufacturer, or licensed dealer may sell a firearm that is not subject to the provisions of § 478.102(a) to a nonlicensee who does not appear in person at the licensee's business premises if the nonlicensee is a resident of the same State in which the firearms transaction record, Form 4473, required by § 478.124. The nonlicensee shall attach to such record a true copy of any permit or other information required pursuant to any statute of the State and published ordinance applicable to the locality in which he resides. The licensee shall prior to shipment or delivery of the firearm, forward by registered or certified mail (return receipt requested) a copy of the record, Form 4473, to the chief law enforcement officer named on such record, and delay shipment or delivery of the firearm for a period of at least 7 days following receipt by the licensee of the return receipt

A-3

evidencing delivery of the copy of the record to such chief law enforcement officer, or the return of the copy of the record to him due to the refusal of such chief law enforcement officer to accept same in accordance with U.S. Postal Service regulations. The original Form 4473, and evidence of receipt or rejection of delivery of the copy of the Form 4473 sent to the chief law enforcement officer shall be retained by the licensee as apart of the records required of him to be kept under the provisions of Subpart H of this part.

(c)(1) A licensed importer, licensed manufacturer, or licensed dealer may sell or deliver a rifle or shotgun, and a licensed collector may sell or deliver a rifle or shotgun that is a curio or relic to a nonlicensed resident of a State other than the State in which the licensee's place of business is located if—

(i) The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii) The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 478.102;

(iii) The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 478.124; and

(iv) The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

(2) For purposes of paragraph (c) of this section, any licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

### § 478.99(a) – Certain prohibited sales or deliveries.

Interstate sales or deliveries. A licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in (or if a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business or activity is located: *Provided*, That the foregoing provisions of this paragraph (1) shall not apply to the sale or delivery of a rifle or shotgun (curio or relic, in the case of a licensed collector) to a resident of a State other than the State in which the licensee's place of business or collection premises is located if the requirements of § 478.96(c)

A-4

are fully met, and (2) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes (see § 478.97).

## § 478.115 – Exempt importation.

(a) Firearms and ammunition may be brought into the United States or any possession thereof by any person who can establish to the satisfaction of Customs that such firearm or ammunition was previously taken out of the United States or any possession thereof by such person. Registration on Customs Form 4457 or on any other registration document available for this purpose may be completed before departure from the United States at any U.S. customhouse or any office of a Director of Industry Operations. A bill of sale or other commercial document showing transfer of the firearm or ammunition in the United States to such person also may be used to establish proof that the firearm or ammunition was taken out of the United States by such person. Firearms and ammunition furnished under the provisions of section 925(a)(3) of the Act to military members of the U.S. Armed Forces on active duty outside of the United States also may be imported into the United States or any possession thereof by such military members upon establishing to the satisfaction of Customs that such firearms and ammunition were so obtained.

\* \* \* \*

(d) Firearms and ammunition are not imported into the United States, and the provisions of this subpart shall not apply, when such firearms and ammunition are brought into the United States by:

(1) A nonresident of the United States for legitimate hunting or lawful sporting purposes, and such firearms and such ammunition as remains following such shooting activity are to be taken back out of the territorial limits of the United States by such person upon conclusion of the shooting activity;

(2) Foreign military personnel on official assignment to the United States who bring such firearms or ammunition into the United States for their exclusive use while on official duty in the United States, and such firearms and unexpended ammunition are taken back out of the territorial limits of the United States by such foreign military personnel when they leave the United States;

(3) Official representatives of foreign governments who are accredited to the U.S. Government or are en route to or from other countries to which accredited, and such firearms and unexpended ammunition are taken back out of the territorial limits

of the United States by such official representatives of foreign governments when they leave the United States;

(4) Officials of foreign governments and distinguished foreign visitors who have been so designated by the Department of State, and such firearms and unexpended ammunition are taken back out of the territorial limits of the United States by such officials of foreign governments and distinguished foreign visitors when they leave the United States; and

(5) Foreign law enforcement officers of friendly foreign governments entering the United States on official law enforcement business, and such firearms and unexpended ammunition are taken back out of the territorial limits of the United States by such foreign law enforcement officers when they leave the United States.

(e) Notwithstanding the provisions of paragraphs (d)(1), (2), (3), (4) and (5) of this section, the Secretary of the Treasury or his delegate may in the interest of public safety and necessity require a permit for the importation or bringing into the United States of any firearms or ammunition.

## § 478.124 – Firearms transaction record.

(a) A licensed importer, licensed manufacturer, or licensed dealer shall not sell or otherwise dispose, temporarily or permanently, of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473: *Provided*, That a firearms transaction record, Form 4473, shall not be required to record the disposition made of a firearm delivered to a licensee for the sole purpose of repair or customizing when such firearm or a replacement firearm is returned to the person from whom received.

(b) A licensed manufacturer, licensed importer, or licensed dealer shall retain in alphabetical (by name of purchaser), chronological (by date of disposition), or numerical (by transaction serial number) order, and as a part of the required records, each Form 4473 obtained in the course of transferring custody of the firearms.

(c)(1) Prior to making an over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located, the licensed importer, licensed manufacturer, or licensed dealer so transferring the firearm shall obtain a Form 4473 from the transferee showing the transferee's name, sex, residence address (including county or similar political subdivision), date and place of birth; height, weight and race of the transferee; the transferee's country of citizenship; the transferee's INS-issued alien number or

admission number; the transferee's State of residence; and certification by the transferee that the transferee is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce.

* * * *

(3) After the transferee has executed the Form 4473, the licensee:

(i) Shall verify the identity of the transferee by examining the identification document (as defined in § 478.11) presented, and shall note on the Form 4473 the type of identification used;

* * * *

(iv) Shall comply with the requirements of § 478.102 and record on the form the date on which the licensee contacted the NICS, as well as any response provided by the system, including any identification number provided by the system.

* * * *

(d) Prior to making an over-the-counter transfer of a shotgun or rifle under the provisions contained in § 478.96(c) to a nonlicensee who is not a resident of the State in which the licensee's business premises is located, the licensee so transferring the shotgun or rifle, and such transferee, shall comply with the requirements of paragraph (c) of this section. Examples of acceptable documentation include utility bills or a lease agreement. The licensee shall note on the form the documentation used.

(e) Prior to making a transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee's business premises is located, and such nonlicensee is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes, the licensed importer, licensed manufacturer, or licensed dealer so furnishing the firearm, and such transferee, shall comply with the provisions of paragraph (c) of this section.

* * * *

A-7