No. 12-5305

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

### In the United States Court of Appeals
### for the District of Columbia Circuit

===============================

STEPHEN DEARTH, ET AL.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR.,

Defendant-Appellee.

===============================

Appeal from a Judgment of the
United States District Court for the District of Columbia
The Hon. Robert L. Wilkins, District Judge
(Dist. Ct. No. 1:09-cv-00587-RLW)

―――――――――――――

REPLY BRIEF

―――――――――――――

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street
Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

April 8, 2013                    *Counsel for Appellants*

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES

A.    *Parties and Amici*

The parties in the district court were plaintiffs Maxwell

Hodgkins, Stephen Dearth, and The Second Amendment Foundation;

and defendant Eric H. Holder, Jr. All parties below are parties before

this Court in this appeal, other than Maxwell Hodgkins.

There were no amici below for either party. At present, there are

no known amici parties appearing before this Court on this appeal.

B.    *Rulings Under Review*

The decision of the District Court for the District of Columbia, per

the Hon. Robert L. Wilkins, entered September 27, 2012, granting

Defendant-Appellee's motion for summary judgment and denying

Plaintiffs-Appellants' motion for summary judgment. The decision is

not currently reported, but appears at 2012 U.S. Dist. LEXIS 138697.

The ruling under review and judgment being appealed are set forth in

the Joint Appendix ("JA") at 172-96.

i

C.   *Related Cases*

This case has previously been before this Court, No. 10-5062, and the decision in those proceedings was published as *Dearth* v. *Holder*, 641 F.3d 499 (D.C. Cir. 2011).

Previously, Appellants litigated their claims against Appellee's predecessors-in-interest, but each case was dismissed without prejudice on venue grounds. Appellee's predecessors claimed the District of Columbia was the dispute's only possible venue. The related cases were:

*Dearth* v. *Gonzales*, U.S. Dist. Ct. Southern District of Ohio No. 06-cv-1012, *aff'd sub nom Dearth* v. *Mukasey*, 516 F.3d 413 (6th Cir. 2008).

*Hodgkins* v. *Gonzales*, U.S. Dist. Ct. Northern District of Texas No. 06-cv-2114, *aff'd sub nom Hodgkins* v. *Mukasey*, 271 Fed. Appx. 412 (5th Cir. 2008).

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . .  i

Corporate Disclosure Statement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

I.     REMANDING THE CASE ON STANDING WOULD BE POINTLESS. . . . . .  4

II.    REDRESSABILITY IS NOT AT ISSUE.  . . . . . . . . . . . . . . . . . . . . . . .  6

III.   THE SECOND AMENDMENT SECURES THE RIGHT
       TO ACQUIRE ARMS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

IV.    THE CHALLENGED PROVISIONS ARE NOT PRESUMPTIVELY
       CONSTITUTIONAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

V.     THE CHALLENGED PROVISIONS WOULD FAIL ANY LEVEL OF
       SCRUTINY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

VI.    THERE IS, IN FACT, A FUNDAMENTAL RIGHT TO TRAVEL,
       WHICH THE GOVERNMENT VIOLATES. . . . . . . . . . . . . . . . . . . . . . .  19

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

iv

# TABLE OF AUTHORITIES

Cases

*Aptheker* v. *Secretary of State*,
378 U.S. 500 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

*Califano* v. *Aznavorian*,
439 U.S 170 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

\*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . 6

\*District of Columbia* v. *Heller*,
554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Donovan* v. *United States Postal Service*,
530 F. Supp. 894 (D.D.C. 1981) . . . . . . . . . . . . . . . . . . . . . . . 10

\*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Haig* v. *Agee*,
453 U.S. 280 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Heller* v. *District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . 11, 12, 14

*Hernandez* v. *Cremer*,
913 F.2d 230 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hutchins* v. *District of Columbia*,
188 F.3d 531 (D.C. Cir. 1999) (en banc). . . . . . . . . . . . . . . . 20, 21

*Authorities upon which we chiefly rely are marked with asterisks.

v

*Kent* v. *Dulles*,
   357 U.S. 116 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21, 22

*Lane* v. *Holder*,
   703 F.3d 668 (4th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 14

*New Hampshire* v. *Maine*,
   532 U.S. 742 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*NRA of Am.* v. *BATFE*,
   700 F.3d 185 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Parker* v. *District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Regan* v. *Wald*,
   468 U.S. 222 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sabri* v. *United States*,
   541 U.S. 600 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States* v. *Marzzarella*,
   614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Va. Dep't of Med. Assistance Servs.* v. *United States HHS*,
   678 F.3d 918 (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Vartelas* v. *Holder*,
   132 S. Ct. 1479 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Zemel* v. *Rusk*,
   381 U.S. 1 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

vi

Statutes and Rules

18 U.S.C. § 922(a)(9). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

18 U.S.C. § 922(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17, 18

18 U.S.C. § 926A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.01(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ohio Rev. Code Ann. § 2923.22 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pub. L. No. 90-351,
    Title IV, § 901(a)(3), 82 Stat. at 225. . . . . . . . . . . . . . . . . . . . . . 18

Other Authorities

Amendments of Act, May 19, 1986, 18 U.S.C. § 922. . . . . . . . . . . . . . 14

H.R. Rep. No. 90-1577 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Oral Argument Recording,
    Fourth Cir. No. 11-1847, Oct. 23, 2012,
    available at http://coop.ca4.uscourts.gov/
    OAarchive/mp3/11-1847-20121023.mp3
    (last visited April 7, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Reciprocity Agreement Between Ohio and Utah*,
    available at http://www.ohioattorneygeneral.gov/Files/
    Publications/Publications-for-Law-Enforcement/Concealed-
    Carry-Publications/Concealed-Carry-Reciprocity-Agreements/
    Utah-Concealed-Carry-Reciprocity-Agreement.aspx
    (last visited April 7, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

S. Rep. No. 90-1097 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

SUMMARY OF ARGUMENT

The Government largely fails to address the issues before the Court. The various statistics and facts regarding the need to honor State firearm transfer laws are interesting, but Plaintiffs do not seek to violate any State firearm transfer law. If they prevail, Plaintiffs will gain no special ability to violate state transfer laws that is not already enjoyed by Americans residing in the United States.

Not that it would matter, but the Government also fails to establish that non-residents are more likely to engage in smuggling than are residents. And while anyone might go into the smuggling business, the Government does not explain how its ability to monitor border traffic is hampered by a would-be smuggler's residence status—or by a putative smuggler's desire to have arms for self-defense rather than "sporting."

The Government is allegedly concerned that law-abiding, responsible citizens will legally buy guns in one state and then travel with those guns to another state where they do not reside. How is this anything other than ordinary? Americans are generally free to travel the country

1

with firearms. No federal law bars people who lawfully purchased guns from transporting those guns to another state where they do not reside.

The transportation of firearms across state lines is not inherently illegal or harmful. It's an ordinary facet of American life welcomed, at least in some part, by virtually every state, and *secured*, not condemned, by federal law. 18 U.S.C. § 926A.[1] As Plaintiffs noted, even Washington, D.C. welcomes armed visitors for recreational activity. D.C. Code § 7-2502.01(b)(3).

Alas, the Government now suggests that Stephen Dearth may lawfully purchase firearms in any state where he would register a car, because registering a car is evidence that Dearth "has the intention of making a home in a particular State." Appellee's Br. 8 (citation omitted). Paradoxically, the Government persists in claiming that Dearth's ability to drive away with a firearm is reason enough to ban him from purchasing one.

Indeed, the purchase prohibition is allegedly constitutional as applied to expatriates, on the transportation theory, because

---

[1]All further statutory references are to Title 18 of the United States Code unless otherwise noted.

2

expatriates are allegedly not really harmed by being barred from the national market for all firearms and barred from acquiring any firearm for self defense. After all, they remain free to... transport guns from other countries, transport guns they previously purchased as residents, and even (presumably) transport guns they would rent or borrow for "sporting purposes" divorced from the Second Amendment's core self-defense interest.

As for that "sporting purpose" restriction, the Government does not attempt to save it beyond claiming that Congress could conclude that individuals who engage in competitive shooting are more skilled with firearms. This allegedly passes for "*intermediate* scrutiny."

Of course everything is constitutional under this form of "heightened" review, because all that matters is that, hypothetically, the government might someday find a law useful. Accordingly, the Government suggests that it may bar gun sales to expatriates, and prevent them from having arms for self-defense, because it might want to interview them in the event their firearms are misused in crime

while they are away.[2] Not to give the Government any ideas, but on this theory, "intermediate" scrutiny would allow it to seize passports from *all* gun owners, or require all gun owners to apprise the Government of their whereabouts at all times.

At least the Government does not pretend to address a fundamental right. Its first argument is that the Second Amendment does not guarantee any right to acquire arms. And not satisfied with erasing one fundamental right, the Government fails to seriously address the precedent confirming the fundamental right of international travel, including recent Supreme Court decisions.

But as a preliminary matter, the attacks on Plaintiffs' standing are no more convincing today than they were during the previous appeal.

ARGUMENT

I. REMANDING THE CASE ON STANDING WOULD BE POINTLESS.

The Government has abandoned the theories that any portion of the District Court's previously reversed dismissal remained law of the case, or that SAF is collaterally estopped by the reversed decision.

---

[2] The connection between the ability to trace guns, and the self-defense prohibition, is unexplained.

4

Yet the Government backtracks from its concession below that SAF has associational standing, instead suggesting—without explanation—that remand is necessary to evaluate the issue were it to make a difference in the case. Appellee's Br. 36 n.14. This dilatory request, coming as it does in essentially Year Six of the standing battle the government lost before this Court in 2011, is pointless. No appellate court has struggled with associational standing under these circumstances. At a minimum, the Government should have addressed Plaintiffs' arguments regarding associational/representational standing, perhaps by seeking to explain or distinguish *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011) on this point.

If SAF lacks any element of associational standing, the Government does not attempt to explain why. Instead, the Government merely cites *Lane* v. *Holder*, 703 F.3d 668 (4th Cir. 2012), which rejected SAF's *organizational* standing, but did not reach the issue of SAF's *associational* standing since it (improperly) found no individual standing.[3]

―――――――――――――――

[3]*Lane* errs on the latter point, for the reasons spelled out in this Court's earlier opinion here which *Lane* essentially rejected. In *Lane*,

5

What purpose would remand serve? We have twice been down this road with the District Court without resolution. Neither the Seventh Circuit in *Ezell*, nor the Fifth Circuit in *NRA of Am.* v. *BATFE*, 700 F.3d 185, 192 n.5 (5th Cir. 2012), had any problems understanding that firearm rights organizations have standing to challenge laws restricting their members' Second Amendment rights. This is not a complicated argument. This Court has all the information needed to resolve it.

## II.   Redressability Is Not At Issue.

Not content with delaying or avoiding the issue of SAF's standing, the government packages *another* attack on Dearth's standing on appeal, this time on the issue of redressability. This Court correctly recognized this to be a settled point. "The Government disputes only whether Dearth has suffered a cognizable injury, as the requirements of traceability and redressability are clearly met." *Dearth* v. *Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). It should remain so.

---

plaintiffs challenged the in-state residence restriction on handgun sales when the District of Columbia lost its only federal firearms licensee, thus re-establishing a de facto prohibition on the acquisition of handguns by District residents. *Lane* reasoned that plaintiffs were harmed not by the government's prohibition of interstate sales, but by the allegedly voluntary acts of gun dealers in complying with the law.

Misreading the Complaint's unambiguous text, the Government

suggests that the Complaint is limited to Dearth's specific facts or that

Dearth seeks to purchase guns in a specific state. Because Ohio and

Minnesota are said to maintain their own residency restrictions, the

Government suggests that Dearth is unable to obtain complete relief in

this case. Appellee's Br. 23.

But the Complaint reads otherwise:

> Mr. Dearth intends to purchase firearms *within the United States*,
> which he would store securely at his relatives' home in Mount
> Vernon, Ohio, and which he would *access* for lawful sporting
> purposes as well as for other purposes, including self-defense, *while
> visiting the United States*.

JA 11 (emphasis added). "Mr. Dearth holds a valid Utah permit to

publicly carry a handgun, which is *recognized in numerous states*," JA

12 (emphasis added), including Ohio.[4]

Were he to prevail, Dearth could legally purchase a gun in "the

United States," specifically, in one of the states that does not mirror the

---

[4]See *Reciprocity Agreement Between Ohio and Utah*, available at
http://www.ohioattorneygeneral.gov/Files/Publications/Publications-for-
Law-Enforcement/Concealed-Carry-Publications/Concealed-Carry-Recip
rocity-Agreements/Utah-Concealed-Carry-Reciprocity-Agreement.aspx
(last visited April 7, 2013).

7

federal restriction (e.g., Texas, Louisiana, etc.). Contrary to the

Government's assertion, Appellee's Brief, at 23 n.10, that list would

include Virginia. In *Lane*, plaintiffs challenged Virginia's non-resident

handgun restriction so that they could complete their D.C.-authorized

transactions at Virginia stores.[5] At argument (in which the

Government's counsel here participated), Virginia's Solicitor General

mooted the case with respect to Virginia by interpreting that law to

depend solely on the continuation of the federal practice, and denied

that it independently restricted interstate handgun sales:

> The only reason why the transfer to these plaintiffs would be
> blocked by the state law is because ... the transfer would violate
> federal law. If this Court declared the federal law
> unconstitutional, the Virginia law would permit the transfer
> absent any other disqualifiers.

Mr. Getchell, at 30:53-31:17, Oral Argument Recording, Fourth Cir. No.

11-1847, Oct. 23, 2012, available at http://coop.ca4.uscourts.gov/

OAarchive/mp3/11-1847-20121023.mp3 (last visited April 7, 2013).

> THE COURT: How would you compare [the Virginia law] to the
> District of Columbia law that exists right now?

---

[5]The District of Columbia was sued in *Lane*, too, and reacted by
repealing its interstate handgun transfer ban.

8

MR. GETCHELL: I think they're about the same. Because now the District of Columbia says if it's OK with the federal government, it's OK with us. And that would be the same result under the Virginia law. So if Plaintiffs are content with their situation in the District, which they claim to be, then I don't know what claim they have against the Commonwealth.

*Id.* at 31:40-32:03. "None of the costs are traceable to the Virginia law. They could do what they want to do. Drive across the bridge, go to Lorton, pick up the gun, but for the federal law." *Id.* at 32:20-32:39.

If Dearth wins this case, he will purchase arms "in the United States," which he could lawfully use just about anywhere. Moreover, SAF remains a plaintiff in the case, and its membership is not restricted to Dearth's particular circumstances. SAF has "over 650,000 members and supporters nationwide," who travel and at times reside overseas. JA 34. The Complaint seeks relief broadly on their behalf. See, e.g., JA 13, ¶19 ("American citizens, including Messrs. Hodgkins and Dearth..."); JA 15, ¶28 ("American citizens who do not reside in any state..."); JA 19 (prayer for relief).

Indeed, the Government is judicially estopped, at this late stage, from trying to tie this dispute to any particular state. "[J]udicial estoppel generally prevents a party from prevailing in one phase of a

9

case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire* v. *Maine*, 532 U.S. 742, 749 (2005) (citations omitted). Judicial estoppel "protect[s] the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* at 749-50 (citations omitted). The "purpose is to prohibit litigants from playing 'fast and loose,' or 'blowing hot and cold,' with the courts." *Donovan* v. *United States Postal Service*, 530 F. Supp. 894, 902 (D.D.C. 1981) (citations omitted).

Recall that Dearth's first case was dismissed on venue grounds because the Government denied that any acts or omissions occurred in Ohio. Was there truly nothing happening in any particular state because Dearth lives in Canada? Or is Dearth required to confine his case to some particular state, thus cementing venue somewhere else? The Government has already made its choice.

III.   THE SECOND AMENDMENT SECURES THE RIGHT TO ACQUIRE ARMS.

The Government's claim that Plaintiffs' Second Amendment rights are not implicated is frivolous. Plainly there exists a right to acquire

10

guns for self-defense. Would the government seriously argue that the right of free speech does not include the right to acquire books?

The Government fails to address the argument that Americans cannot be directed to exercise their constitutional rights in Canada.

The Government fails to address the Third Circuit's rejection of the notion that there is no right to purchase guns. *United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

The Government fails to address the argument that this Court, and the Supreme Court, both rejected the theory that the availability of some guns allows the prohibition of others. Admittedly, *Heller* v. *District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") may on this point be in tension with *Parker* v. *District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), but the Supreme Court's decision in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), is binding all the same. And it is doubtful that in *Heller II*, this Court contemplated that the availability of guns *outside the United States* could be said to minimize the impact of domestic firearms prohibitions.

11

Additionally, because the Government merely dismisses the right to acquire firearms for self-defense, it does not address Section 922(a)(9)'s essential failure. But there is, of course, a right to acquire firearms for self-defense, and that right, not the Government's belief in the wisdom of its laws, dictates the outcome of this case.

IV.   THE CHALLENGED PROVISIONS ARE NOT PRESUMPTIVELY CONSTITUTIONAL.

The Government persists in claiming that the challenged provisions are "longstanding" and thus presumptively constitutional under *Heller II*. Incredibly, the Government asserts that "Plaintiffs make no attempt" to address the historical laws it cited, Appellee's Br. 21, even though Plaintiffs demonstrated that these laws were not exactly as described by the Government, or by the District Court's mere recitation of the Government's description. See Appellants' Br. 40-41.

Rather than responding to Plaintiffs' demonstration that its cited historical antecedents do not evince any longstanding practice barring the purchase of firearms by non-residents—never mind any "sporting purpose" restriction on the acquisition of firearms by nonresidents (or anyone else)—the Government doubles down, reitrating its misplaced

12

reliance on these inapposite laws and adding citations to others. See Appellee's Br. 21 n.8 & n.9 (citing restrictions on handgun carrying).

The Government's gob of citations to various laws mentioning firearms and residence simply does not withstand examination. This case has nothing to do with the carrying of handguns in public; or historic licensing restrictions on the public carrying of handguns in, specifically, a concealed manner; or the rare residential license required to purchase some types of firearms (usually handguns).

This case does, however, concern banning expatriates from acquiring firearms—all firearms, generally—without a "sporting purpose" (e.g., self-defense), and it relates to barring expatriates from buying all firearms, not just carrying, perhaps concealed, some firearms.

At least on the latter score, the Government does reference later state enactments mirroring the challenged provisions. Appellee's Br. 22-23 n.10. But again, the Government's case is, at best, overstated. As of 1986, Section 922(b)(3) has allowed long gun sales to residents of any state, but when first enacted, the section allowed the purchase of long guns only to residents of contiguous states if, inter alia, "the

13

purchaser's State of residence permits such sale or delivery by law."
See Amendments of Act, May 19, 1986, 18 U.S.C. § 922. To take
advantage of this exception, states enacted provisions mirroring the
federal scheme. See, e.g. 1974 House Committee Comment to H. 511,
Ohio Rev. Code Ann. § 2923.22 ("The exception is not self-executing,
however, and requires affirmative enactments by each of the states
involved"). In effect, the government is citing state laws triggered by
the challenged provision's enactment as evidence that the challenged
provision is reflected in state law. And even here, as seen by Virginia's
response to *Lane*, there is less than meets the eye.

In any event, even the District Court "[had] no trouble holding that
these restrictions evince more than a de minimis effect on Dearth's
Second Amendment right." JA 181.

How could any court hold otherwise? These laws flatly forbid
Plaintiffs' acquisition of *any and all* firearms for the purpose of self-
defense, and exclude Plaintiffs from the entire national market for all
firearms. *Heller II* extends no presumption favoring such severe
practices.

14

V. THE CHALLENGED PROVISIONS WOULD FAIL ANY LEVEL OF SCRUTINY.

Even under the intermediate scrutiny standard the Government erroneously claims applies, the Government offers no serious justification for Section 922(a)(9)'s "sporting purpose" limit.

> Congress had valid reasons for concluding that persons acquiring a firearm in connection with a "lawful sporting" activity are better positioned to use that firearm knowledgeably and responsibly than persons who do not engage in any hunting or target shooting. As Congress's investigations showed, persons participating in "competitive shooting, * * * [and] informal skeet, trap, and target shooting" became "familiar with firearms and skilled in their use."

Appellee's Br. 29 (citations omitted).

On this logic, Congress may ban the use of guns for self-defense generally. But what exactly is the relationship between self-defense and illegal smuggling, or crime of any sort? How does banning expatriates' use of guns for self-defense advance any governmental interest—let alone in a manner that comports with allegedly "heightened" scrutiny?

If, as the Government claims, the time limitation inherent in renting or borrowing is important, why still the "sporting purpose" restriction?

15

The Government also offers that it had to prohibit the acquisition of firearms for non-sporting purposes because smugglers might obtain weapons under false pretenses from non-licensees, and the Gun Control Act "contains no . . . prohibition on the making of false statements to non-licensees." Appellee's Br. 28. Why not, then, criminalize the making of false statements to non-licensees in aid of smuggling? Or criminalize arms smuggling? Instead, the government posits that it criminalized this conduct because it wasn't previously a crime.

This is not "heightened" or "intermediate" scrutiny, let alone scrutiny of any kind. There is always a 100% fit between criminalizing conduct, and enabling prosecution. Here, the Government has "taken the effect of the statute"—the ability to prosecute individuals for borrowing or renting guns for self-defense—"and posited that effect as the State's interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored." *Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120 (1991).

16

The Government makes a greater effort to justify application of Section 922(b)(3)'s purchase restriction to Plaintiffs, but again fails. It persists in confusing *purchase* with *transportation*. It cannot be said more plainly: Purchase does not equal transportation. These are different concepts. Nor does residence equal "intended predominant use." Appellee's Br. 33. This Court cannot legislate such a radical revision of the Gun Control Act.

> [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon [of construction] is also the last: judicial inquiry is complete.

*Va. Dep't of Med. Assistance Servs*. v. *United States HHS*, 678 F.3d 918, 922-23 (D.C. Cir. 2012) (citations omitted). A similar concept must also govern interpretation of words in the Congressional Record if legislative history is to be any sort of guide.

Congress wanted individuals who *reside* in a particular state to follow that state's firearm transfer laws. It was concerned about the circumvention of firearm transfer laws, and so, in creating a comprehensive federal scheme for regulating the purchase of firearms, it provided that individuals follow their *home* state's laws. Congress did

17

not concern itself with, and Section 922(b)(3) did not establish any regulation of, the general transportation of firearms from state to state by non-residents. All Americans, regardless of where they live, are charged with knowing the firearm laws of the locality into which they would introduce firearms.

The "traffic" referenced in "State and local regulation of this traffic," Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225, is the *purchase* of firearms. Hence, Congress enacted the Gun Control Act "to prevent the avoidance of state and local laws controlling firearms by the simple expediency of crossing a State line to *purchase* one." H.R. Rep. No. 90-1577, at 14 (emphasis added); see also S. Rep. No. 90-1097, at 114 (1968).

Every day, countless firearms are purchased in one state, legally, by people who would have had to obey a different set of laws were they residents of some other state. This is merely federalism. But the uniqueness of any state or locality's laws does not thereby invalidate the firearms laws that operate everywhere else, nor does any locality

18

have any interest backed by federal law to prevent the legal purchase of firearms by Americans living outside its borders.

True, if Dearth prevails, he might (lawfully) buy a gun in one place and take it elsewhere. But that is also true of any resident American today. And Dearth, no more nor less than any other American, may use at least some guns for some purposes in any of the fifty states and the District of Columbia.

In any event, the government's transportation-based argument is irrational in light of its position that Dearth could buy guns in Canada, or rent them anywhere in the United States for a sporting purpose. Were Dearth bent on transporting guns into places where he shouldn't have them, he could do so consistent with the government's position in this case.

VI.   THERE IS, IN FACT, A FUNDAMENTAL RIGHT TO TRAVEL, WHICH THE GOVERNMENT VIOLATES.

Defendant's assertion that there is no fundamental right to international travel is overstated. While *Kent* v. *Dulles*, 357 U.S. 116 (1958) and *Aptheker* v. *Secretary of State*, 378 U.S. 500 (1964) "could . . .

be viewed primarily as First Amendment cases," Appellee's Br. 35, that is not how the Supreme Court views them today.

The Government failed to address Plaintiffs' citation to *Sabri* v. *United States*, 541 U.S. 600, 609-10 (2004), which places the fundamental right of international travel among other fundamental rights, alongside—not instead of—the First Amendment, in recounting rights "weighty enough" to be secured by overbreadth doctrine: "free speech, right to travel, abortion [and] legislation under § 5 of the Fourteenth Amendment." *Id.* (citing, inter alia, *Aptheker* as "right to travel") (other citations omitted); see also *Vartelas* v. *Holder*, 132 S. Ct. 1479, 1488 & n.6 (2012) ("Loss of the ability to travel abroad is itself a harsh penalty, made all the more devastating if it means enduring separation from close family members living abroad").

While some members of this Court, pre-*Sabri* and pre-*Vartelas*, took a narrow view of the right of international travel, such statements in *Hutchins* v. *District of Columbia*, 188 F.3d 531, 537 (D.C. Cir. 1999) (en banc), are dictum. *Hutchins* did not relate at all to international travel. And that particular portion of the Court's opinion commanded only the

20

votes of a plurality. See *Hutchins*, 188 F.3d at 549 n.1 (Edwards, J.,

concurring in part); *Hutchins*, 188 F.3d at 553 n.1 (Rogers, J.,

concurring in part and dissenting in part).

Moreover, in *Hutchins*, writing for herself and for Judges Tatel and

Wald, Judge Rogers offered:

> The Supreme Court's jurisprudence on the right to "move"
> encompasses several distinct concepts. The discrete components
> include the right to relocate from state to state, the right to cross
> state borders for purposes other than relocation, *the right to cross
> national borders*, and the right to intrastate or localized movement.
> These rights are "fundamental" under established doctrine.

*Hutchins*, 188 F.3d at 560 (Rogers, J., concurring in part and dissenting

in part) (footnote citing, inter alia, *Aptheker*, 378 U.S. at 517 and *Kent*,

357 U.S. at 126). As recently as 1990, the Fifth Circuit held that an

American citizen entering the country "was exercising a fundamental

Constitutional right." *Hernandez* v. *Cremer*, 913 F.2d 230, 235 (5th Cir.

1990). "[T]he right of a United States citizen to enter the country is a

right 'which the fundamental law has conferred upon him.'" *Hernandez*,

913 F.2d at 237 (citation omitted). "[T]he right of a citizen to re-enter

the United States after lawfully traveling abroad -- is fundamental."

*Hernandez*, 913 F.2d at 238.

It bears repeating that the Supreme Court has used very strong fundamental rights language in describing the right of international travel: "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values." *Kent*, 357 U.S. at 126 (citations omitted).

Of course, just because the right to international travel is fundamental does not mean that the Government would lose every case in which it is implicated. The cases primarily relied upon by the Government are hardly incompatible with a fundamental right to international travel. For example, in *Haig* v. *Agee*, 453 U.S. 280 (1981), the Court addressed an international travel right claimed by an ex-CIA agent who practically declared war on the agency, "caus[ing] serious damage to the national security or foreign policy of the United States." *Haig*, 453 U.S. at 282. Obviously, the government's strong interest in national security will justify more restrictions on the right of international travel than a mere interest in regulating interstate commerce. See also *Regan* v. *Wald*, 468 U.S. 222, 242 (1984)

22

(restrictions "justified by weighty concerns of foreign policy") (footnote omitted).

Notably, Justice Blackmun concurred in *Haig*, offering that the Court was "cutting back somewhat upon the opinions in [*Kent*] and [*Zemel* v. *Rusk,* 381 U.S. 1 (1965)] sub silentio," only "aspects" of which he would have preferred been "disavow[ed] forthrightly." *Haig*, 453 U.S. at 310 (Blackmun, J., concurring). That the majority did not join this observation is telling.

Defendant's reliance on *Califano* v. *Aznavorian*, 439 U.S 170 (1978), is likewise misplaced. In *Califano*, the Supreme Court held that

> The statutory provision in issue here does not have nearly so direct an impact on the freedom to travel internationally as occurred in the *Kent*, *Aptheker*, or *Zemel* cases. It does not limit the right to travel on grounds that may be in tension with the First Amendment. It merely withdraws a governmental benefit during and shortly after an extended absence from this country.

*Id.* at 177. In other words, the impact of the law at issue was slight, justifying a lesser standard of review.

Here, there are no weighty concerns of foreign policy. There is no rogue CIA turncoat endangering the lives of other agents and the national security of the United States. But there is a fairly direct and

23

severe impact upon the right of international travel, one justified by a
generalized commerce clause interest, and not too well at that. Indeed,
even under rational basis, it is hard to see how the challenged
provisions could survive. There is no need to repeat what has been said
before: it simply makes no sense to suppose that the acquisition of
firearms for self-defense by law-abiding citizens causes any sort of
harm, merely because those citizens reside overseas. And the
Government cannot require Americans to choose between their
fundamental Second and Fifth Amendment rights.

CONCLUSION

Perhaps were there no right to acquire firearms, or a right to exit
the country, the Constitution would merely require the government to
solemnly assert, when prodded, that its laws are desirable.

But because the Constitution possesses meaningful operative force,
the judgment below should be reversed.

24

Dated:   April 8, 2013          Respectfully submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/703.997.7665

By:   /s/ Alan Gura
Alan Gura

*Counsel for Appellants*

CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 4,487 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

/s/ Alan Gura
Alan Gura

## CERTIFICATE OF SERVICE

I certify that on this 8th day of April, 2013, I filed the foregoing Reply Brief electronically with the Clerk of the Court using the CM/ECF System. I further certify that I will submit the required paper copies to the Court via Federal Express. I further certify that counsel for Defendant-Appellee is a registered CM/ECF user and will be served via the CM/ECF system

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 8th day of April, 2013.

/s/ Alan Gura_____
Alan Gura
Counsel for Plaintiffs-Appellants