No. 12-5305
Argued September 19, 2013

𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝖋𝖔𝖗 𝖙𝖍𝖊 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙 𝖔𝖋 𝕮𝖔𝖑𝖚𝖒𝖇𝖎𝖆 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

STEPHEN DEARTH, ET AL.,

Plaintiffs-Appellants,

v.

ERIC H. HOLDER, JR.,

Defendant-Appellee.

Appeal from a Judgment of the
United States District Court for the District of Columbia
The Hon. Robert L. Wilkins, District Judge
(Dist. Ct. No. 1:09-cv-00587-RLW)

APPELLANTS' SUPPLEMENTAL BRIEF

Alan Gura
GURA & POSSESSKY, PLLC
105 Oronoco Street
Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665

February 10, 2014          *Counsel for Appellants*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.   *Parties and Amici*

The parties in the district court were plaintiffs Maxwell Hodgkins, Stephen Dearth, and The Second Amendment Foundation; and defendant Eric H. Holder, Jr. All parties below are parties before this Court in this appeal, other than Maxwell Hodgkins.

There were no amici below for either party below. The National Rifle Association of America, Inc., has given notice of its intent to participate as amicus curiae before this Court.

## B.   *Rulings Under Review*

The decision of the District Court for the District of Columbia, per the Hon. Robert L. Wilkins, entered September 27, 2012, granting Defendant-Appellee's motion for summary judgment and denying Plaintiffs-Appellants' motion for summary judgment. The decision is reported at 893 F. Supp. 2d 59. The ruling under review and judgment being appealed are set forth in the Joint Appendix ("JA") at 172-96.

*C.    Related Cases*

This case has previously been before this Court, No. 10-5062, and the decision in those proceedings was published as *Dearth* v. *Holder*, 641 F.3d 499 (D.C. Cir. 2011).

Previously, Appellants litigated their claims against Appellee's predecessors-in-interest, but each case was dismissed without prejudice on venue grounds. Appellee's predecessors claimed the District of Columbia was the dispute's only possible venue. The related cases were:

*Dearth* v. *Gonzales*, U.S. Dist. Ct. Southern District of Ohio No. 06-cv-1012, *aff'd sub nom Dearth* v. *Mukasey*, 516 F.3d 413 (6th Cir. 2008).

*Hodgkins* v. *Gonzales*, U.S. Dist. Ct. Northern District of Texas No. 06-cv-2114, *aff'd sub nom Hodgkins* v. *Mukasey*, 271 Fed. Appx. 412 (5th Cir. 2008).

CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Second Amendment Foundation, Inc., ("SAF") has no parent corporations. No publicly traded company owns 10% or more of its stock.

SAF, a tax-exempt organization under § 501(c)(3) of the Internal Revenue Code, is a non-profit educational foundation incorporated in 1974 under the laws of the State of Washington. SAF seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs. SAF has over 650,000 members and supporters residing throughout the United States.

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases. . . . . . . . . . . . . . i

Corporate Disclosure Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Non-Resident Americans Are "Home" While Visiting
        the United States as Houseguests, at Hotels and Other
        Lodgings, and at Campsites. . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Text, History, Tradition, and Precedent Establish that
        the Second Amendment Extends Beyond the Home. . . . . . . . . 10

        A.      The Supreme Court Has Long Acknowledged the
                Second Amendment's Application Beyond the Home. . . . 10

        B.      The Second Amendment's Original Public Meaning
                Confirms Its Application Beyond the Home. . . . . . . . . . . 15

        C.      Historical Restrictions of the Right to Bear Arms
                Confirm Its Existence Beyond the Home. . . . . . . . . . . . . 20

                1.      Concealed Carry. . . . . . . . . . . . . . . . . . . . . . . . . 21

                2.      Dangerous and Unusual Weapons. . . . . . . . . . . . 23

        D.      Post-*Heller* Courts Largely Confirm That the Second
                Amendment Extends Beyond the Home. . . . . . . . . . . . . 27

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

Cases

*Andrews* v. *State*,
    50 Tenn. 165 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Bateman* v. *Perdue*,
    881 F. Supp. 2d 709 (E.D.N.C. 2012) . . . . . . . . . . . . . . . . . . . . . . 30

*Bliss* v. *Commonwealth*,
    12 Ky. 90 (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bonidy* v. *United States Postal Serv.*,
    No. 10-CV-02408-RPM,
    2013 U.S. Dist. LEXIS 95435 (D. Colo. July 9, 2013) . . . . . . . . . 30

*Bonner* v. *Anderson*,
    81 F.3d 472 (4th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Boumediene* v. *Bush*,
    553 U.S. 723 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Las Vegas* v. *Moberg*,
    82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971). . . . . . . . . . . . 19

*Commonwealth* v. *Gouse*,
    461 Mass. 787, 965 N.E.2d 774 (2012). . . . . . . . . . . . . . . . . . . . 28

*Cooper's Case*,
    Cro. Car. 544, 79 Eng. Rep. 1069 (K.B. 1639). . . . . . . . . . . . . . . 8

\*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . 4, 5, 10-18, 20-27, 29

*Authorities upon which we chiefly rely are marked with asterisks.

v

*Drake* v. *Filko*,
724 F.3d 426 (3d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Dred Scott* v. *Sandford*,
60 U.S. (19 How.) 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*English* v. *State*,
35 Tex. 473 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Ex parte Thomas*,
21 Okla. 770, 97 P. 260 (1908) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 6, 14

*Fife* v. *State*,
31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hamdi* v. *Rumsfeld*,
542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Hertz* v. *Bennett*,
294 Ga. 62, 751 S.E.2d 90 (2013) . . . . . . . . . . . . . . . . . . . . . . 28

*In re Brickey*,
8 Idaho 597, 70 P. 609 (1902). . . . . . . . . . . . . . . . . . . . . . . 19, 28

*Johnson* v. *Eisentrager*,
339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Kachalsky* v. *Cnty. of Westchester*,
701 F.3d 81 (2d. Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Kennedy* v. *Mendoza-Martinez*,
372 U.S. 144 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Little* v. *United States,*
    989 A.2d 1096 (D.C. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Mancusi* v. *DeForte,*
    392 U.S. 364 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Marbury* v. *Madison,*
    5 U.S. (1 Cranch) 137 (1803). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McDonald* v. *City of Chicago,*
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . 4, 5, 11, 14, 20, 28

*McDonald* v. *United States,*
    335 U.S. 451 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Minnesota* v. *Carter,*
    525 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Minnesota* v. *Olson,*
    495 U.S. 91 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-9

*Moore* v. *Madigan,*
    702 F.2d 933 (7th Cir. 2012). . . . . . . . . . . . . . . . . 11, 12, 16, 20, 28

*Morris* v. *U.S. Army Corps of Eng'rs,*
    No. 3:13-CV-336-BLW,
    2014 U.S. Dist. LEXIS 3447 (D. Idaho Jan. 10, 2014) . . . 6, 8, 9, 30

*Muscarello* v. *United States,*
    524 U.S. 125 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Myers* v. *United States,*
    272 U.S. 52 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw,*
    719 F.3d 338 (5th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

vii

*Nunn* v. *State*,
 1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Owen* v. *State*,
 31 Ala. 387 (1858). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*O'Neill* v. *State*,
 16 Ala. 65 (1849) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Parker* v. *District of Columbia*,
 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 12

*Patton* v. *United States*,
 281 U.S. 276 (1930). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Payton* v. *New York*,
 445 U.S. 573 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*People* v. *Aguilar*,
 2013 IL 112116. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Rasul* v. *Myers*,
 563 F.3d 527 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Reid* v. *Covert*,
 354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Rex* v. *Knight*,
 38 Comb., 90 Eng. Rep. 330 (K.B. 1686). . . . . . . . . . . . . . . . . . . 24

*Roberson* v. *United States*,
 165 F.2d 752 (6th Cir. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Robertson* v. *Baldwin*,
 165 U.S. 275 (1897). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Schubert* v. *De Bard*,
  398 N.E.2d 1339 (Ind. App. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Semayne's Case*,
  5 Co. Rep. 91a, 77 Eng. Rep. 194 (K.B. 1603). . . . . . . . . . . . . . . . 8

*Simpson* v. *State*,
  13 Tenn. 356 (1833) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 27

*Stanley* v. *Georgia*,
  394 U.S. 557 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*State ex rel. City of Princeton* v. *Buckner*,
  180 W. Va. 457, 377 S.E.2d 139 (1988). . . . . . . . . . . . . . . . . . . . . 19

*State* v. *Bailey*,
  209 Conn. 322, 551 A.2d 1206 (1988) . . . . . . . . . . . . . . . . . . . . . . 18

*State* v. *Blocker*,
  291 Or. 255, 630 P.2d 824 (1981). . . . . . . . . . . . . . . . . . . . . 19, 20

*State* v. *Chandler*,
  5 La. Ann. 489 (1850). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State* v. *Christian*,
  354 Or. 22, 307 P.3d 429 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . 28

*State* v. *Hogan*,
  63 Ohio St. 202, 58 N.E. 572 (1900). . . . . . . . . . . . . . . . . . . . 19, 27

*State* v. *Huntly*,
  25 N.C. (3 Ired.) 418 (1843) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27

*State* v. *Jumel*,
  13 La. Ann. 399 (1858) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State* v. *Kessler*,
289 Or. 359, 614 P.2d 94 (1980). . . . . . . . . . . . . . . . . . . . . . . 19, 20

*State* v. *Langford*,
10 N.C. (3 Hawks) 381 (1824) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State* v. *Lanier*,
71 N.C. 288 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State* v. *Reid*,
1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22

*State* v. *Rosenthal*,
55 A. 610 (Vt. 1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*State* v. *Schoultz*,
25 Mo. 128 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Stoner* v. *California*,
376 U.S. 483 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Terry* v. *Martin*,
120 F.3d 661 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *Cruikshank*,
92 U.S. 542 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Dunn*,
480 U.S. 294 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

*United States* v. *Free*,
437 F.2d 631 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*United States* v. *Gooch*,
6 F.3d 673 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States* v. *Marzzarella*,
614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 12

*United States* v. *Miller*,
307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*United States* v. *Poe*,
556 F.3d 1113 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States* v. *Rettig*,
589 F.2d 418 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States* v. *Skoien*,
614 F.3d 638 (7th Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Weaver*, No. 2:09-CR-00222,
2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 7, 2012). . . . . . 30

*Williams* v. *Florida*,
399 U.S. 78 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Williams* v. *State*,
417 Md. 479, 10 A.3d 1167 (2010). . . . . . . . . . . . . . . . . . . . . . . 28

*Wilson* v. *Arkansas*,
514 U.S. 927 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wilson* v. *State*,
33 Ark. 557 (1878). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Woollard* v. *Gallagher*,
712 F.3d 865 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Constitutional Provisions

U.S. Const. amend. II. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. VI.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. VIII. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. amend. XVII.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S. Const. art. I, § 2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Ala. Const. of 1819, art. I, § 27. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Conn. Const. art. I, § 15 (1819). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Ky. Const. of 1799, art. XII, cl. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Mo. Const. of 1820, art. XIII, § 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.C. Declaration of Rights § 17 (1776). . . . . . . . . . . . . . . . . . . . . . . . 19

Tenn. Const. of 1796, art. XI, § 26. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Vt. Const. c. 1, art. 16 (1777) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Statutes and Rules

D.C. Code § 22-4504(a) (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Other Authorities

Black's Law Dictionary (6th Ed. 1998). . . . . . . . . . . . . . . . . . . . . . . 16

Charles Humphreys, A Compendium of the Common Law
 in Force in Kentucky (1822). . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

COLLECTED WORKS OF JAMES WILSON
  (K. Hall & M. Hall eds., 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

David Caplan, *The Right of the Individual to Bear Arms:*
  *A Recent Judicial Trend*, 4 DET. C. L. REV. 789 (1982) . . . . . . . . 24

Eugene Volokh, *State Constitutional Rights to Keep and*
  *Bear Arms*, 11 TEX. REV. LAW & POL. 191 (2006). . . . . . . . . . . . . . 18

John A. Dunlap, THE NEW-YORK JUSTICE (1815) . . . . . . . . . . . . . . . . 25

Joyce Lee Malcolm, TO KEEP AND BEAR ARMS:
  THE ORIGINS OF AN ANGLO-AMERICAN RIGHT (1994). . . . . . . . . . . 25

Merriam-Webster Dictionary, available at
  http://www.merriam-webster.com/dictionary/home
  (last visited Feb. 6, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PAPERS OF THOMAS JEFFERSON (J. Boyd ed., 1950) . . . . . . . . . . . . . . . 17

*Who Are American Citizens?*,
  THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 . . . . . . . . . . . . . . . . . 13

William Blackstone, COMMENTARIES ON THE
  LAWS OF ENGLAND (1769) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

William Hawkins, TREATISE OF THE PLEAS OF THE CROWN (1716). . . . . 25

William Oldnall Russell, A TREATISE ON CRIMES AND
  INDICTABLE MISDEMEANORS (1826). . . . . . . . . . . . . . . . . . . . . . . 26

WORKS OF THE HONOURABLE JAMES WILSON
  (Bird Wilson ed., 1804). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## SUMMARY OF ARGUMENT

Non-resident Americans visiting the United States are "home" for Second Amendment purposes to the same extent, and under the same circumstances, as are residents. Under established doctrine for defining "home" in the constitutional rights context, non-resident Americans are "home" when, in the United States, they stay with family or friends, at hotels and boarding rooms, and at campsites.

In any event, text, history, tradition and precedent confirm—as every federal appellate court to consider the matter has held or assumed—that Second Amendment rights extend beyond the home.

## ARGUMENT

I.  NON-RESIDENT AMERICANS ARE "HOME" WHILE VISITING THE UNITED STATES AS HOUSEGUESTS, AT HOTELS AND OTHER LODGINGS, AND AT CAMPSITES.

"Home" may be "a place of origin; also : one's own country."[1] In the sense that the United States is the national home of the American

---

[1] Merriam-Webster Dictionary, available at http://www.merriam-webster.com/dictionary/home (last visited Feb. 6, 2014) (definition 4) (examples omitted); see, *e.g.*, *Hamdi* v. *Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion) ("we must preserve our commitment at home to the principles for which we fight abroad").

people, all Americans are "home" while present in the United States.

When Americans living overseas visit the United States, they "come home."[2] Striking down an act that revoked draft evaders' citizenship, the Supreme Court explained, "the draft evader who wishes to exercise his citizenship rights will inevitably come home and pay his debt." *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 185 (1963). Justice Brennan added that the law's logic was that "the ordinary sanctions cannot be brought to bear against a fugitive who declines to come home; but he can be expatriated while he remains abroad . . . ." *Id.* at 191 (Brennan, J., concurring); *Id.* at 193 (Brennan, J., concurring) (some evaders "have demonstrated their underlying attachment to this country by coming home").

If "home" refers to a permanent dwelling, Americans are "home" only within their residence. But courts have never confined Americans to one "home" for constitutional purposes. See, *e.g.*, *McDonald* v. *United States*, 335 U.S. 451, 452 (1948); *United States* v. *Rettig*, 589 F.2d 418, 423 (9th Cir. 1978); *Roberson* v. *United States*, 165 F.2d 752, 754-55

---

[2]Visiting Americans are welcomed here by agents of the department tasked with providing "security" for their "homeland."

(6th Cir. 1948). In the context of evaluating constitutional rights, "home" possesses a meaning narrower than the country at-large, yet broader than a discreet dwelling. Cf. *Mancusi* v. *DeForte*, 392 U.S. 364, 367 (1968) ("[t]his Court has held that the word 'houses,' as it appears in the [Fourth] Amendment, is not to be taken literally"). "Home" is defined by an individual's relationship to a particular environment, an understanding that typically includes one's residence, but is not strictly confined by considerations of permanence or property interests. "The home is a place of repose from the outside world, including the world of government officials." *United States* v. *Free*, 437 F.2d 631, 635 (D.C. Cir. 1970) (footnote omitted). As the Supreme Court explained, in determining where "home" begins and ends, "the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." *United States* v. *Dunn*, 480 U.S. 294, 301 n.4 (1987).

The concerns elevating Second Amendment rights in the "home" relate to the heightened self-defense interest in a "home" environment. Upon reiterating its holding that "the inherent right of self-defense has been central to the Second Amendment right," the Supreme Court

observed that Washington, D.C.'s handgun ban implicated defensive arms, and "extend[ed], moreover, to the home, where the need for defense of self, family, and property is most acute." *District of Columbia* v. *Heller*, 554 U.S. 570, 628 (2008). The Second Amendment right is secured "*most notably* for self-defense within the home." *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3044 (2010). "[W]hatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.

The Supreme Court's observation that Second Amendment interests are elevated in a "home" broke no new ground. "[I]t is beyond dispute that the home is entitled to special protection as the center of the private lives of our people." *Minnesota* v. *Carter*, 525 U.S. 83, 99 (1998) (Kennedy, J., concurring); see, *e.g.*, *Stanley* v. *Georgia*, 394 U.S. 557, 565 (1969); *Payton* v. *New York*, 445 U.S. 573, 585 (1980).

There is no reason to suppose that the elements establishing "home" for Second Amendment purposes differ from those considered in asking whether someone is "home" in other constitutional right contexts. His dissent notwithstanding, Justice Stevens acknowledged that "*Heller*

carried forward this legacy" of the home as "a kind of special sanctuary in modern life." *McDonald*, 130 S. Ct. at 3105 (Stevens, J., dissenting) (citations omitted). Whatever makes a location "a kind of special sanctuary in modern life," *id.*, or "a place of repose from the outside world," *Free*, 437 F.2d at 635, does so generally.

Moreover, "[t]he first ten amendments and the original Constitution were substantially contemporaneous and should be construed *in pari materia*." *Patton* v. *United States*, 281 U.S. 276, 298 (1930), *overruled on other grounds*, *Williams* v. *Florida*, 399 U.S. 78 (1970). As courts develop Second Amendment doctrine, they look for guidance to established doctrines governing other Bill of Rights provisions. This Court, for example, cited the First and Fourth Amendments' protection of "modern communication devices" and "telephonic conversation," respectively, to conclude that the Second Amendment protects "the modern-day equivalents of the colonial pistol." *Parker* v. *District of Columbia*, 478 F.3d 370, 378 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570. The Supreme Court invoked the same syllogism. *Heller*, 554 U.S. at 582; see also *Parker*, 478 F.3d at 399 ("[t]he protections of

the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment") (citation omitted); *United States* v. *Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("we look to other constitutional areas for guidance in evaluating Second Amendment challenges"); *Ezell* v. *City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) ("First Amendment analogues are . . . appropriate").

The answer to the Court's first question—"[w]hether non-resident Americans are 'home' while visiting the United States," Order, Jan. 10, 2014—is thus found largely in Fourth Amendment doctrine, where questions of "home" are most frequently litigated. "The privacy concerns of the Fourth Amendment carry over well into the Second Amendment's security concerns." *Morris* v. *U.S. Army Corps of Eng'rs*, No. 3:13-CV-336-BLW, 2014 U.S. Dist. LEXIS 3447, at *7 (D. Idaho Jan. 10, 2014).

As the District Court aptly noted, "as an overnight guest with a friend or relative in the United States, it is well-settled that Dearth would enjoy" Fourth Amendment rights, JA 182 n.11 (citations omitted)—of a degree pertaining, specifically, to the home. "To hold

that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share." *Minnesota* v. *Olson*, 495 U.S. 91, 98 (1990). The Supreme Court rejected a "needlessly complex" 12-factor test for when a guest is at "home," "based on the mistaken premise that a place must be *one's* 'home' . . . ." *Id.* at 96 (footnote omitted) (emphasis added).[3]

Indeed, in holding that the Fourth Amendment required police to obtain a warrant before arresting a home's overnight guest, the Supreme Court described the "home" interests in precisely the same way that would support heightened Second Amendment interests:

> From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. *We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings.* It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

---

[3]Courts differ as to whether social guests who do not spend the night warrant "home" protection. Compare *United States* v. *Poe*, 556 F.3d 1113, 1122 (10th Cir. 2009) (no need for overnight stay); *Bonner* v. *Anderson*, 81 F.3d 472, 475 (4th Cir. 1996) (same) with *Terry* v. *Martin*, 120 F.3d 661, 663 (7th Cir. 1997) (*Olson* limited to overnight guests).

*Id.* at 99 (emphasis added); *see also Morris* at *7.

The common law supports this description of a traveler's interest in temporary lodging, having long acknowledged that overnight guests have the same self-defense rights held by their hosts. Centuries before *Olson*, a jury acquitted Cooper of killing a late-night intruder while "lying in the house of one Anne Carricke," upon the instruction

> that if it were true [the intruder] brake the house with an intent to commit burglary, or to kill any therein, and a party within the house (although he be not the master, but a lodger or sojourner therein) kill him who made the assault, and intended mischief to any in it, that is not felony, but excusable . . . .

*Cooper's Case*, Cro. Car. 544, 544, 79 Eng. Rep. 1069, 1069 (K.B. 1639).[4]

The Supreme Court's reference to "hotel rooms" as substitute homes serving sheltering purposes when "we are at our most vulnerable,"

---

[4]Regarding the Sheriff's knock and announce obligation, the common law held "that the house of any one is not a castle or privilege but for himself, and shall not extend to protect any person who flies to his house, or the goods of any other [removed] into his house, to prevent a lawful execution, and to escape the ordinary process of law." *Semayne's Case*, 5 Co. Rep. 91a, 93a, 77 Eng. Rep. 194, 198 (K.B. 1603). Unlike a fleeing fugitive, a homeowner is entitled "to shut the door of his own house." *Id.* at 93b, 77 Eng. Rep. at 199. Fourth Amendment doctrine is in accord, dispensing with the knock and announce requirement where police pursue fleeing prisoners. *Wilson* v. *Arkansas*, 514 U.S. 927, 936 (1995). *Semayne* did not address lawful social guests.

*Olson*, 495 U.S. at 99, reflected the established rule that hotel rooms and lodgings are on par with residences when considering the balance between individual rights and regulatory interests. "No less than a tenant of a house, or the occupant of a room in a boarding house, a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." *Stoner* v. *California*, 376 U.S. 483, 490 (1964) (citations omitted).

Americans are also "home" when sleeping in tents, including tents "pitched . . . on a public campground where one is legally permitted to camp." *United States* v. *Gooch*, 6 F.3d 673, 677 (9th Cir. 1993). "[T]ents are protected under the Fourth Amendment like a more permanent structure." *Id.* And indeed, one court has already held that tents are "homes" for Second Amendment purposes.

> While often temporary, a tent is more importantly a place—just like a home—where a person withdraws from public view, and seeks privacy and security for himself and perhaps also for his family and/or his property. Indeed, a typical home at the time the Second Amendment was passed was cramped and drafty with a dirt floor— more akin to a large tent than a modern home. Americans in 1791— the year the Second Amendment was ratified—were probably more apt to see a tent as a home than we are today.

*Morris*, 2014 U.S. Dist. LEXIS 3447 at *6.

Appellants can locate no precedent considering the question, let alone concluding, that Americans who are "home" for any constitutional purpose nevertheless lose that status because they reside overseas.[5] Non-resident Americans are "home" when visiting the United States, in the same locations that all Americans are "home" when away from their residence—in the homes of family and friends (at least when hosted overnight), hotels, boarding houses, and at lawful campsites.

## II. TEXT, HISTORY, TRADITION, AND PRECEDENT ESTABLISH THAT THE SECOND AMENDMENT EXTENDS BEYOND THE HOME.

### A. The Supreme Court Has Long Acknowledged the Second Amendment's Application Beyond the Home.

Although "the need for defense of self, family, and property is *most acute*" in the home, *Heller*, 554 U.S. at 628 (emphasis added);

---

[5]The Constitution's protection is not conditioned on domestic residence. "When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land." *Reid* v. *Covert*, 354 U.S. 1, 6 (1957) (plurality opinion); cf. *Rasul* v. *Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009) (per curiam). "[P]ractical considerations" may inform the question of what rights Americans enjoy *overseas*, *Boumediene* v. *Bush*, 553 U.S. 723, 761-62 (2008), but it is never "impractical" for the Government to respect a citizen's fundamental rights on American soil. While the Constitution arguably tethers voting ability to residence, see U.S. Const. art. I, § 2, and amend. XVII, that power lies within "a context other than 'rights.'" *Heller*, 554 U.S. at 579.

*McDonald*, 130 S. Ct. at 3036, and the right to arms is secured "*most notably* for self-defense within the home," *id*. at 3044 (emphasis added), the Second Amendment is no different in this respect than the First or Fourth. And "that doesn't mean [the need] is not acute outside the home." *Moore* v. *Madigan*, 702 F.2d 933, 935 (7th Cir. 2012).

Indeed, *Heller* noted that it was not limited to its facts. The "policy choices [taken] off the table . . . *include* the absolute prohibition of handguns held and used for self-defense in the home," *Heller*, 554 U.S. at 636 (emphasis added), but "since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field . . . ." *Id*. at 635.

Accordingly, "the Second Amendment creates individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates . . . *were left open*." *United States* v. *Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis added).[6]

---

[6]Some misinterpret the direction that the District of Columbia "must issue [Heller] a license to carry [his handgun] in the home." *Heller*, 554 U.S. at 635. Heller challenged, among other provisions, former D.C. Code § 22-4504(a) (2008), which had provided that carrying

> *Heller* delineates *some* of the boundaries of the Second Amendment right to bear arms. At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home. And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms *for other, as-yet-undefined, lawful purposes.*

*Marzzarella*, 614 F.3d at 92 (emphasis added).

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. "Confrontations are not limited to the home," *Moore*, 702 F.3d at 936, as the Court has long indicated. The infamous *Dred Scott* opinion reasoned that no Southern state would have adopted a constitution obligating it to respect privileges and immunities of citizenship held by African-Americans, including "the full liberty . . . to keep and carry arms wherever they went." *Dred Scott* v. *Sandford*, 60 U.S. (19 How.) 393, 417 (1857).[7]

-----------------------

handguns *inside one's home* without a permit was a misdemeanor offense, in contrast to the felony offense of carrying a gun in public. Heller did *not* seek a permit to publicly carry a handgun. *Parker*, 478 F.3d at 400. The Court's reference to an in-home carry permit merely tracked Heller's prayer for relief. See *Heller*, 554 U.S. at 630-31.

[7]Abolitionists found *Dred Scott*'s enumeration of rights ironically underscored slavery's essential injustice. "[I]t is of these privileges and rights that the colored man is deprived, and it is of that deprivation he

12

While *Dred Scott*'s odious holding was never correct, its recognition of citizens' right to publicly carry arms was no aberration. Reviewing an indictment for violating the Second Amendment rights of individuals disarmed and murdered while guarding a courthouse, "[w]e described the right protected by the Second Amendment as 'bearing arms for a lawful purpose.'" *Heller*, 554 U.S. at 620 (quoting *United States* v. *Cruikshank*, 92 U.S. 542, 553 (1876)) (footnotes omitted). Seventy-five years later, the Court observed that "during military occupation irreconcilable enem[ies] could [not] require the American Judiciary to assure them . . . [the] right to bear arms as in the Second [Amendment] . . . ." *Johnson* v. *Eisentrager*, 339 U.S. 763, 784 (1950). The reference was not limited to home self-defense.

The Supreme Court's first direct foray into Second Amendment law centered around the question of whether individuals had the right to transport a sawed-off shotgun on interstate highways. *United States* v.

---

complains. I could find, sir, in that very *Dred Scott* decision, an enumeration, by the Supreme Court itself, of the rights guaranteed by the Constitution of the United States . . . Those rights are to bear arms . . . Of all these, in the express terms of the decision, the colored man is deprived . . ." *Who Are American Citizens?*, THE LIBERATOR, Jan. 21, 1859, at 10, col. 2 (quoting Massachusetts State Rep. Wells).

*Miller*, 307 U.S. 174, 175 (1939). The case was not dismissed for implicating conduct outside the home, but remanded for evidence as to whether the firearm merited constitutional protection. *Id*. at 178.

Quite apart from carrying guns for self-defense, the Supreme Court has extolled some essential corollary Second Amendment rights that are difficult if not impossible to exercise inside the home. Owning a gun, even if only for home defense, inherently requires obtaining and maintaining proficiency in its use. "No doubt, a citizen who . . . practices in safe places the use of [his pistol] and in due time teaches his sons to do the same, exercises his individual right [to bear arms]." *Heller*, 554 U.S. at 619 (quotation omitted). The Seventh Circuit thus recognized that "the right to maintain proficiency in firearm use [is] an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Ezell*, 651 F.3d at 708. Moreover, the right was valued "for self-defense *and hunting*." *Heller*, 554 U.S. at 599 (emphasis added). "The settlers' dependence on game for food and economic livelihood, moreover, undoubtedly undergirded . . . state constitutional guarantees [of the right to arms]." *McDonald*, 130 S. Ct. at 3042 n.27. Possessed land on which some gun owners might locate

an outdoor range or hunt would probably not qualify as a "home." *Dunn*, 480 U.S. at 300. Justice Stevens foresaw the Second Amendment's application beyond the home, "given the presumption that most citizens are law abiding, and the reality that the need to defend oneself may suddenly arise in a host of locations outside the home . . . ." *Heller*, 554 U.S. at 679-80 (Stevens, J., dissenting); *see also id.* at 677 n.38 (majority secures right to arms for "self-defense, recreation, and other lawful purposes") (Stevens, J., dissenting).

> B. The Second Amendment's Original Public Meaning Confirms Its Application Beyond the Home.

"[K]eep and bear," U.S. Const. amend. II, describes two distinct concepts. Cf. U.S. Const. amend. VI ("speedy and public trial"); U.S. Const. amend. VIII ("cruel and unusual punishment"). "It cannot be presumed that any clause in the constitution is intended to be without effect; and therefore such construction is inadmissible, unless the words require it." *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). "[T]he usual canon of [constitutional] interpretation . . . requires that real effect should be given to all the words it uses." *Myers* v. *United States*, 272 U.S. 52, 151 (1926) (citations omitted).

Rejecting an argument that the term "bear arms" indicates an exclusively military undertaking, the Court held that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584 (citations omitted). To "bear arms," as used in the Second Amendment, is to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Id.* (quoting *Muscarello* v. *United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)). Accordingly, the Court repeatedly referred to "the Second Amendment right, protecting only individuals' liberty to keep *and carry* arms." *Heller*, 554 U.S. at 604 (emphasis added); see also *id.* at 626.

> The right to "bear" as distinct from the right to "keep" arms is unlikely to refer to the home. To speak of "bearing" arms within one's home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home. And one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home.

*Moore*, 702 F.3d at 936.

This understanding of "bear arms" comports with original meaning. In 1785, Second Amendment author James Madison introduced in

16

Virginia's legislature a hunting bill drafted by Thomas Jefferson. The bill provided that an offender would breach his recognizance "if, within twelve months . . . he shall *bear a gun* out of his inclosed ground, unless whilst performing military duty . . . ." *A Bill for Preservation of Deer* (1785), in 2 PAPERS OF THOMAS JEFFERSON 443-44 (J. Boyd ed., 1950) (emphasis added).

Numerous sources upon which the Supreme Court relied to interpret the Second Amendment likewise reflect the right's inclusion of public self-defense. Had *Heller* intended to limit "bear arms" to the home, it would have been most natural to do so when explaining "that 'bear arms' did not refer only to carrying a weapon in an organized military unit." *Heller*, 554 U.S. at 585. Instead, the Court offered that

> Justice James Wilson interpreted the Pennsylvania Constitution's arms-bearing right . . . as a recognition of the natural right of defense "of one's person *or* house" — what he called the law of "self preservation."

*Id.* (emphasis added) (quoting 2 COLLECTED WORKS OF JAMES WILSON 1142, and n.x (K. Hall & M. Hall eds., 2007)) (other citations omitted).[8]

---

[8]*Heller* endorsed other sources that clearly saw a dimension to the right to bear arms distinct from home defense. See *Heller*, 554 U.S. at 615 ("[a]ll men, without distinction of color, have the right to keep and

Indeed, *Heller* offered that "state constitutional provisions written in the 18th century or the first two decades of the 19th" were the examples "most prominent [and] most relevant to the Second Amendment" in defining the meaning of "bear arms." *Heller*, 554 U.S. at 584. None of these state constitutional provisions have been interpreted as relating solely to the home, but most, in addition to Pennsylvania's provision as noted by *Heller*, were held to secure the public carrying of arms in at least some manner. *State* v. *Reid*, 1 Ala. 612 (1840) (interpreting Ala. Const. of 1819, art. I, § 27); *State* v. *Bailey*, 209 Conn. 322, 346, 551 A.2d 1206, 1218 (1988) (Conn. Const. art. I, § 15 (1819));[9] *Bliss* v. *Commonwealth*, 12 Ky. 90 (1822) (Ky. Const. of 1799, art. XII, cl. 23); *State* v. *Schoultz*, 25 Mo. 128, 155 (1857) (Mo. Const. of 1820, art. XIII, § 3); *State* v. *Huntly*, 25 N.C. (3

---

bear arms to defend their homes, families or themselves") (quotation omitted); *id.* at 616 ("right to bear arms for the defense of himself and family and his homestead") (quotation omitted); *id.* at 625 ("weapons used by militiamen and weapons used in defense of person and home were one and the same") (quotation omitted).

[9]Revised in 1956 to change "defence" to "defense." Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. LAW & POL. 191, 194 n.10 (2006).

Ired.) 418, 423 (1843) (N.C. Declaration of Rights § 17 (1776)); *Simpson* v. *State*, 13 Tenn. 356 (1833) (Tenn. Const. of 1796, art. XI, § 26); *State* v. *Rosenthal*, 55 A. 610 (Vt. 1903) (Vt. Const. c. 1, art. 16 (1777)).

The same conclusion—that people enjoy a right to publicly carry arms for self-defense—was also reached interpreting state constitutional arms-bearing provisions with predecessors dating to the early republic. See *State* v. *Hogan*, 63 Ohio St. 202, 219, 58 N.E. 572, 575 (1900); *Schubert* v. *De Bard*, 398 N.E.2d 1339, 1341 (Ind. App. 1980). Later state constitutional "bear arms" provisions are likewise understood. See, *e.g.*, *State ex rel. City of Princeton* v. *Buckner*, 180 W. Va. 457, 462, 377 S.E.2d 139, 144 (1988); *City of Las Vegas* v. *Moberg*, 82 N.M. 626, 627-28, 485 P.2d 737, 738-39 (N.M. Ct. App. 1971); *In re Brickey*, 8 Idaho 597, 599, 70 P. 609, 609 (1902).

Particularly instructive is the Oregon Supreme Court's opinion upholding the right to publicly carry a club for self-defense. *State* v. *Blocker*, 291 Or. 255, 630 P.2d 824 (1981). That court had earlier held that the state constitutional arms-bearing provision secured the right to possess a billy club. *State* v. *Kessler*, 289 Or. 359, 614 P.2d 94 (1980).

Prosecutors argued that the right should be confined to *Kessler*'s facts, arising in the context of home possession. But the court refused, explaining that it had "started from the premise that . . . a person has a right to bear arms for defense of self," and "then moved from that general proposition to the more particular one that a person had the constitutional right to have a billy in his home for defense." *Blocker*, 291 Or. at 259, 630 P.2d at 825-26 (citation and footnote omitted).

*McDonald*'s description of *Heller* neatly parallels *Blocker*'s description of *Kessler*:

> [I]n [*Heller*], we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home.

*McDonald*, 130 S. Ct. at 3020; see *Moore*, 702 F.3d at 935.

C.    Historical Restrictions of the Right to Bear Arms
        Confirm Its Existence Beyond the Home.

Debate over the right to bear arms historically concerned not whether, but how and under what circumstances, the right could be exercised outside the home. Stating that the right is "not unlimited," in that there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626

(citations omitted), the Court thus confirmed that a right exists to carry some weapons, in some manner, for some purpose. The Court then listed as "presumptively lawful," *id.* at 627 n.26, "laws forbidding the carrying of firearms in sensitive places," *id.*, at 626, suggesting that carrying bans are not lawful in non-sensitive places. Particularly illuminating are *Heller*'s discussions of prohibitions targeting carrying concealed handguns, and dangerous and unusual weapons.

## 1. Concealed Carry

"[T]he right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of concealed weapons . . . ." *Robertson* v. *Baldwin*, 165 U.S. 275, 281-82 (1897). Yet concealed carry bans are only "presumptively" constitutional, *Heller*, 554 U.S. at 627 n.26, because concealed carry prohibitions have been upheld as mere regulations of the manner in which arms are carried—with the understanding that a complete ban on the carrying of handguns, openly and concealed, is unconstitutional. *Heller* positively discussed several state supreme court opinions referencing this rule.

Upholding a ban on the carrying of concealed weapons, Alabama's high court cautioned:

We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.

*Reid*, 1 Ala. at 616-17.

Georgia's Supreme Court followed *Reid*, quashing an indictment for publicly carrying a pistol that failed to specify how the gun was carried:

so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

*Nunn* v. *State*, 1 Ga. 243, 251 (1846).

Tennessee's Supreme Court held unconstitutional the application of a weapons carrying ban to a man carrying a revolver, declaring:

If the Legislature think proper, they may by a proper law regulate the carrying of this weapon publicly, or abroad, in such a manner as may be deemed most conducive to the public peace, and the protection and safety of the community from lawless violence. We only hold that, as to this weapon, the prohibition is too broad to be sustained.

*Andrews* v. *State*, 50 Tenn. 165, 187-88 (1871).

Finally, as *Heller* observed*,*

the Louisiana Supreme Court held that citizens had a right to carry arms openly: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."

*Heller*, 554 U.S. at 613 (quoting *State* v. *Chandler*, 5 La. Ann. 489, 490 (1850)). Other decisions reflected the rule of allowing concealed-carry prohibitions only as regulations of the manner of carrying guns. See, *e.g.*, *State* v. *Jumel*, 13 La. Ann. 399, 400 (1858) ("a measure of police, prohibiting only a *particular mode* of bearing arms which is found dangerous to the peace of society") (emphasis original); *Owen* v. *State*, 31 Ala. 387, 388 (1858) ("a mere regulation of the manner in which certain weapons are to be borne").

 2. Dangerous and Unusual Weapons

*Heller* approvingly referenced "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citations omitted). This prohibition does not merely refer to types of weapons, but to types of *conduct* with weapons, reflecting the ancient common law offense of affray. Affray required as an element that arms be used or carried in such manner as to terrorize the population, rather

than in a manner suitable for ordinary self-defense. Early sources, including some referenced by *Heller*, distinguished affrays from the legitimate public exercise of the right to bear arms.[10]

Blackstone offered that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, *by terrifying the good people of the land*." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 148 (1769) (emphasis added). Blackstone referenced the 1328 Statute of Northampton, which, by the time of the American Revolution, had long been limited to prohibit the carrying of arms only with evil intent, "in order to preserve the common law principle of allowing 'Gentlemen to ride armed for their Security.'" David Caplan, *The Right of the Individual to Bear Arms: A Recent Judicial Trend*, 4 DET. C. L. REV. 789, 795 (1982) (citing *Rex* v. *Knight*, 38 Comb., 90 Eng. Rep. 330 (K.B. 1686)).

> [N]o wearing of Arms is within the meaning of this Statute, unless it be accompanied with such circumstances as are apt to terrify the People; from whence it seems clearly to follow, that Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons . . . for their Ornament or Defence, in such Places, and upon such Occasions, in which it is the common Fashion to make use of them, without causing the least Suspicion of

---

[10]*See Heller*, 554 U.S. at 620 ("bearing arms for a lawful purpose").

an intention to commit any Act of Violence or Disturbance of the Peace . . . .

William Hawkins, 1 TREATISE OF THE PLEAS OF THE CROWN, ch. 63, § 9 (1716); *see* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 104-05 (1994).

*Heller*'s subsequent sources for the "dangerous and unusual" doctrine, 554 U.S. at 627, are in accord. "[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, *in such a manner, as will naturally diffuse a terrour among the people.*" 3 WORKS OF THE HONOURABLE JAMES WILSON 79 (Bird Wilson ed., 1804) (footnote omitted) (emphasis added). "It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, *in such manner as will naturally cause terror to the people.*" John A. Dunlap, THE NEW-YORK JUSTICE 8 (1815) (emphasis added).

> Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . . But here it should be remembered, that in this country the constitution guarranties [sic] to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily.

Charles Humphreys, A COMPENDIUM OF THE COMMON LAW IN FORCE IN

KENTUCKY 482 (1822); *Heller*, 554 U.S. at 588 n.10 (quoting same); accord 1 William Oldnall Russell, A TREATISE ON CRIMES AND INDICTABLE MISDEMEANORS 271-72 (1826).

The other treatises *Heller* cites in support of the "dangerous and unusual" doctrine are in accord, as are the cases *Heller* cites. See *O'Neill* v. *State*, 16 Ala. 65, 67 (1849) (affray "probable" "if persons arm themselves with deadly or unusual weapons for the purpose of an affray, *and in such manner as to strike terror to the people*") (emphasis added); *State* v. *Lanier*, 71 N.C. 288, 290 (1874) (riding horse through courthouse, unarmed, is "very bad behavior" but "may be criminal or innocent" depending on whether people alarmed); *State* v. *Langford*, 10 N.C. (3 Hawks) 381, 383-384 (1824) (affray "when a man arms himself with dangerous and unusual weapons, *in such a manner as will naturally cause a terror to the people*") (emphasis added); *English* v. *State*, 35 Tex. 473, 476 (1871) ("terrifying the good people of the land").

Early courts took the view espoused in *Heller*, that securing the right to bear arms in public is consistent with the prohibition on provocative behavior with arms. "[N]either, after so solemn an instrument hath

said the people may carry arms, can we be permitted to impute to the acts thus licensed, such a necessarily consequent operation as terror to the people to be incurred thereby." *Simpson*, 13 Tenn. at 360. "A man may carry a gun for any lawful purpose, for business or amusement, but he cannot go about with that or any other dangerous weapon to terrify and alarm a peaceful people." *Hogan*, 63 Ohio St. at 219, 58 N.E. at 575-76; *Huntly*, 25 N.C. (3 Ired.) at 422-23 ("carrying of a gun per se constitutes no offence . . . perfect liberty" absent "wicked purpose").[11]

> D.   Post-*Heller* Courts Largely Confirm That the
>       Second Amendment Extends Beyond the Home.

Federal appellate courts are deeply split as to which activities fall within the Second Amendment's application outside the home, and the level of judicial protection afforded them. But even circuits adopting the most parsimonious view of the right to bear arms acknowledge or

---

[11]Some state courts upheld all-manner handgun carry bans, primarily in post-Civil War South, but these bans pertained only to particular handguns, exempting others. See, *e.g.*, *English*, 35 Tex. at 476 (Second Amendment protects "holster pistols" and "side arms"); *Fife* v. *State*, 31 Ark. 455, 460-61 (1876) (distinguishing "army and navy repeaters" from prohibited "pistol"); *Andrews*, 50 Tenn. at 188 (carry ban fails "as to this weapon"); *Ex parte Thomas*, 21 Okla. 770, 777-78, 97 P. 260, 263 (1908) ("horseman's pistols" among protected "arms"); *Wilson* v. *State*, 33 Ark. 557, 560 (1878).

assume that the Second Amendment extends beyond the home.[12]

The Seventh Circuit struck down Illinois's total ban on the carrying of handguns for self-defense. "The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside." *Moore*, 702 F.3d at 942. "To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Id.* at 937. Taking a more deferential attitude toward the right outside the home, the Second and Fourth Circuits upheld laws barring the carrying of handguns by anyone lacking "proper cause" and "good and substantial reason" to do so, respectively. *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81 (2d. Cir. 2012); *Woollard* v. *Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013). Yet both courts insisted that their conclusions assumed that the right extends beyond the home.

---

[12]State high courts are split 4-3 in favor of acknowledging the right outside the home. Compare *People* v. *Aguilar*, 2013 IL 112116, ¶ 20; *Brickey*, 8 Idaho 597, 70 P. 609; *State* v. *Christian*, 354 Or. 22, 44 n.11, 307 P.3d 429, 443 n.11 (2013); *Hertz* v. *Bennett*, 294 Ga. 62, 65-66, 751 S.E.2d 90, 94 (2013) with *Commonwealth* v. *Gouse*, 461 Mass. 787, 802, 965 N.E.2d 774, 786 (2012); *Williams* v. *State*, 417 Md. 479, 496, 10 A.3d 1167, 1177 (2010); *Little* v. *United States*, 989 A.2d 1096, 1101 (D.C. 2010).

Although the Supreme Court's cases applying the Second Amendment have arisen only in connection with prohibitions on the possession of firearms in the home, the Court's analysis suggests, as Justice Stevens's dissent in *Heller* and Defendants in this case before us acknowledge, that the Amendment must have *some* application in the very different context of the public possession of firearms. Our analysis proceeds on this assumption.

*Kachalsky*, 701 F.3d at 89 (footnote omitted). The Fourth Circuit did not go quite this far, but for argument's sake "merely assume[d] that the *Heller* right exists outside the home and that such right of Appellee Woollard has been infringed." *Woollard*, 712 F.3d at 876. The Fifth Circuit likewise apparently assumed a right to carry handguns exists, upholding a prohibition on its exercise by adults aged 18-20 on account of their youth. *Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 338 (5th Cir. 2013), *petition for cert. pending*, No. 13-390.

Breaking from this trend, a Third Circuit majority held (over a more compelling dissent) that carrying handguns outside the home for self-defense "fall[s] outside the Second Amendment's guarantee." *Drake* v. *Filko*, 724 F.3d 426, 434 (3d Cir. 2013), *petition for cert. pending*, No. 13-827. Yet still, it "recognize[d] that the Second Amendment's individual right to bear arms *may* have some application beyond the

home." *Id.* at 431. Other federal courts have less doubt. *Morris*, 2014 U.S. Dist. LEXIS 3447 at *9-*10 (striking down gun carry ban on Army Corps of Engineers land); *Bonidy* v. *United States Postal Serv.*, No. 10-CV-02408-RPM, 2013 U.S. Dist. LEXIS 95435 (D. Colo. July 9, 2013) (striking down gun ban in Post Office parking lot); *Bateman* v. *Perdue*, 881 F. Supp. 2d 709, 714 (E.D.N.C. 2012) (striking down gun carry ban during emergencies, Second Amendment "undoubtedly is not limited to the confines of the home"); *United States* v. *Weaver*, No. 2:09-CR-00222, 2012 U.S. Dist. LEXIS 29613, at *14 (S.D. W. Va. Mar. 7, 2012).

## CONCLUSION

The answer to each of the Court's questions is affirmative.

Dated:   February 10, 2014        Respectfully submitted,

    /s/ Alan Gura
Alan Gura
GURA & POSSESSKY, PLLC
105 Oronoco Street, Suite 305
Alexandria, VA 22314
703.835.9085/703.997.7665

*Counsel for Appellants*

CERTIFICATE OF COMPLIANCE

This brief complies with the Court's Order of January 10, 2014, as to length, in that it is limited to 30 pages.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Corel Wordperfect in 14-point Century Schoolbook font.

/s/ Alan Gura
Alan Gura

CERTIFICATE OF SERVICE

I certify that on this 10th day of February, 2014, I filed the foregoing Supplemental Brief electronically with the Clerk of the Court using the CM/ECF System. I further certify that I will submit the required paper copies to the Court via Federal Express. I further certify that counsel for Defendant-Appellee is a registered CM/ECF user and will be served via the CM/ECF system

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 10th day of February, 2014.

/s/ Alan Gura
Alan Gura

*Counsel for Plaintiffs-Appellants*