[ORAL ARGUMENT HELD SEPTEMBER 19, 2013]

No. 12-5305
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

STEVEN DEARTH AND SECOND AMENDMENT, FOUNDATION, INC.,

*Appellants,*

v.

ERIC H. HOLDER,

*Appellee.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA (NO. 09-587 (RLW))
_____

**CORRECTED BRIEF FOR *AMICUS CURIAE* NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC. IN SUPPORT OF APPELLANTS
AND REVERSAL**

BRIAN S. KOUKOUTCHOS
28 Eagle Trace
Mandeville, LA 70471
(985) 626-5052
bkoukoutchos@gmail.com

CHARLES J. COOPER
DAVID H. THOMPSON
PETER A. PATTERSON
BRIAN W. BARNES
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for* Amicus Curiae *National Rifle Association of America, Inc.*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certifies that:

(A) Parties and *Amici*: All parties and *amici* appearing before the district court and those that have filed an appearance or notice of appearance in this court are listed in the Appellants' Supplemental Brief.

(B) Rulings Under Review: References to the ruling at issue appear in the Appellants' Supplemental Brief.

(C) Related Cases: References to all related cases appear in the Appellants' Supplemental Brief.

Dated: February 18, 2014

/s/ Charles J. Cooper
*Counsel for* Amicus Curiae
*National Rifle Association of America, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and Circuit Rules 26.1 and 29(b), *Amicus Curiae* National Rifle Association of America, Inc. hereby states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

February 18, 2014

<u>/s/ Charles J. Cooper</u>
*Counsel for* Amicus Curiae
*National Rifle Association of*
*America, Inc.*

## **TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT ....................................... ii

TABLE OF AUTHORITIES ....................................................iv

INTEREST OF *AMICUS CURIAE*...........................................1

ARGUMENT ...............................................................1

    I.    THE SUPREME COURT'S READING OF THE TEXT AND HISTORY OF THE SECOND AMENDMENT. ...............................................2

    II.    *MOORE V. MADIGAN.* ............................................7

    III.    NOTHING IN THIS COURT'S DECISION IN *HELLER II* CONFLICTS WITH THE RECOGNITION THAT THE SECOND AMENDMENT RIGHT EXTENDS OUTSIDE ONE'S HOME.......................................12

CONCLUSION ..............................................................13

# TABLE OF AUTHORITIES[*]

**Cases**                                                                                    **Page**

*Commonwealth v. Perez*, 952 N.E.2d 441 (Mass. App. Ct. 2011) .........................12

\* *District of Columbia v. Heller*, 554 U.S. 570 (2008) ......... 1, 2, 3, 4, 6, 7, 10, 11, 13

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...........................................................8

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ......................................2, 12

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...................2, 12, 13

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012).........................................8

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)......................8, 11

*Little v. United States*, 989 A.2d 1096 (D.C. 2010)................................................12

\* *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)..................................1, 10, 13

\* *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)............................2, 7, 8, 9, 10, 11

*People v. Aguilar*, No. 112116, 2013 IL 112116 (Ill. Sept. 12, 2013) ...................12

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)...........................................12

*Sierra Club v. EPA*, 322 F.3d 718 (D.C. Cir. 2003)...............................................12

*United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012)..............................................8

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011).............................8, 11

*Williams v. State*, 10 A.3d 1167 (Md. 2011) .........................................................12

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013)..............................................8

*Wright v. United States*, 302 U.S. 583 (1938) ..........................................................7

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

iv

## Constitutional Provisions

\* U.S. CONST. amend. II ......................................... 1, 2, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13

U.S. CONST. amend. IV ................................................................................7

## Other

1 THE WRITINGS OF THOMAS JEFFERSON (H. A. Washington ed., 1853) .................5

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803)..............5

"An Act for the Better Security of the Inhabitants, by Obliging the Male White Persons To Carry Fire Arms to Places of Public Worship" (Ga. 1770) in A DIGEST OF THE LAWS OF THE STATE OF GEORGIA (1800) ..................6

BENJAMIN OGLE TAYLOE, IN MEMORIAM 95 (1872)...................................................5

John Adams, First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in 6 MASTERPIECES OF ELOQUENCE 2569 (Mayo Williamson Hazeltine et al. eds., 1905).......................................................................................................5, 6

JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS (1994).........................................6

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012)..............................................................................6

## INTEREST OF *AMICUS CURIAE*

The National Rifle Association of America, Inc. ("NRA") is America's foremost and oldest defender of Second Amendment rights.  Founded in 1871, the NRA has approximately five million members and is America's leading provider of firearms marksmanship and safety training for civilians.  The NRA has a strong interest in the second question on which this Court has requested supplemental briefing: "Whether the Second Amendment extends beyond the home."  Order (filed Jan. 10, 2014).  With the consent of the parties and this Court's leave, the NRA respectfully submits this brief.  This brief was not authored in whole or in part by a party's counsel, a party or a party's counsel has not contributed money that was intended to fund preparing or submitting this brief, and no person other than the *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.  *Amicus* is not aware of any other party that intends to file an *amicus* brief in support of appellants.

## ARGUMENT

The question "[w]hether the Second Amendment extends beyond the home" is not difficult.  The text and history of the Second Amendment, as authoritatively construed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), leave no doubt at all that the right to armed self-defense extends beyond the home.  The only fed-

eral Court of Appeals to decide this precise issue has so held, *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), and nothing in this Court's decision in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), suggests otherwise.

## I.     THE SUPREME COURT'S READING OF THE TEXT AND HISTORY OF THE SECOND AMENDMENT.

In *Heller*, 554 U.S. at 595, the Court explained that the Second Amendment is to be interpreted "on the basis of both text and history." *See also id*. at 626-27. The historical inquiry involves "examination of a variety of legal and other sources to determine *the public understanding* of [the] legal text," *id.* at 605 (emphasis in original), with particular stress on the understanding of the Second Amendment during "the founding period," *id*. at 604-05. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-35. Consequently, "*Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification." *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011).

The substance of the Second Amendment right resides in the *twin verbs* of the operative clause: "the right of the people to *keep* and *bear* Arms, shall not be infringed." (Emphasis added.) If this language assured only the right to possess firearms in one's home, a right to "keep" arms—that is, to "have weapons"—

2

would have been sufficient; the Framers would have had no reason to include an explicit guarantee of the right to "bear" arms as well. *See Heller*, 554 U.S. at 581-82. Yet "the founding generation were for every man *bearing his arms about him and keeping them in his house*, his castle, *for his own defense*." *Id.* at 616 (emphasis added) (internal quotation marks omitted). Therefore " 'to bear arms implies something more than the mere keeping.' " *Id*. at 617 (quoting THOMAS COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW 271 (1880)).

As the Supreme Court explained in *Heller*, "[a]t the time of the Founding, as now, to 'bear' meant to 'carry,' " and "[w]hen used with 'arms,' . . . the term has a meaning that refers to carrying for a particular purpose—*confrontation*." 554 U.S. at 584 (emphasis added). By the time our Constitution was written, the common-law right to bear arms "had become fundamental for English subjects" and was "understood to be an individual right protecting against both *public* and private violence." *Id*. at 593, 594 (emphasis added). Accordingly, the Second Amendment "guarantee[s] the *individual right to . . . carry weapons in case of confrontation*." *Id*. at 592 (emphasis added).

The Court's repeated choice of that locution cannot be dismissed as accidental, and that language harbors no hint of a distinction between the right of armed self-defense inside and outside the home. Relying on a line of authority interpreting federal firearms statutes, the Supreme Court stressed that "the natural

3

meaning of 'bear arms' " is to " 'wear, bear, or *carry . . . upon the person* or in the clothing or in a pocket, *for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict* with another person.' " *Id*. at 584 (alteration in original) (emphasis added) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (in turn quoting BLACK'S LAW DICTIONARY 214 (6th ed. 1998). *Heller* contains a host of references to historical materials affirming the right of armed self-defense both inside and outside the home.[2]

If there were any lingering doubt about the meaning of the right to bear arms in the Second Amendment's "operative clause," it would be dispelled by the Amendment's "prefatory clause," which "announces the purpose for which the right was codified: to prevent elimination of the militia" by ensuring that the regular citizenry could never be disarmed by the government. *Heller*, 554 U.S. at 599.

---

[2] *See, e.g.*, 554 U.S. at 611 ("[A] citizen has 'a right to carry arms in defence of his property or person, and to use them, if either were assailed . . . .' " (quoting *Johnson v. Tompkins*, 13 F. Cas. 840, 850, 852 (C.C.E.D. Pa. 1833))); *id*. at 585 (discussing "the natural right of defense 'of one's person or house' "); *id*. at 615 (All men "have the right to keep and bear arms to defend their homes, families or themselves."); *id*. at 616 (noting the constitutional right "to bear arms for the defense of himself and family and his homestead"); *id*. at 609 (" 'The rifle has ever been the companion of the pioneer and, under God, his tutelary protector against the red man and the beast of the forest.' " (quoting the "Bleeding Kansas" speech of Sen. Charles Sumner (1856))); *id*. at 583 n.7 (collecting 18th-century sources affirming right to bear arms "upon Journeys or Hunting" or for "Hunting, Navigation, Travelling"); *id*. at 628-29 (Handguns are "most preferred firearm in the nation to keep and use for protection of one's home and family . . . ." (internal quotation marks omitted)); *id*. at 625 (Weapons used "in defense of person and home were one and the same." (internal quotation marks omitted)).

4

If the government could confine the right to bear arms to the home, the Framers' purpose of preserving the viability of a citizen militia would have been negated. The American Revolution was not fought in the colonists' kitchens; when the Minutemen answered the call to arms on April 19, 1775, they met the Redcoats on the village green in Lexington and at North Bridge in Concord. A home-bound right to bear arms would not have permitted even militia training, let alone active militia service.

The common practices of the founding generation confirm this understanding of the right to bear arms. Judge St. George Tucker observed that, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. 19 (St. George Tucker ed., 1803). George Washington rode between Alexandria and Mount Vernon with pistols holstered to his horse's saddle, "[a]s was then the custom." BENJAMIN OGLE TAYLOE, IN MEMORIAM 95 (1872). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks." *See* 1 THE WRITINGS OF THOMAS JEFFERSON 398 (letter of August 19, 1785) (H. A. Washington ed., 1853). And even in defending the British soldiers charged in the Boston Massacre, John Adams recognized that "every private person is authorized to arm himself; and on the strength of this authority I do not deny

5

the inhabitants had a right to arm themselves at that time for their defence." John

Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murder-*

*ing Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF

ELOQUENCE 2569, 2578 (Mayo Williamson Hazeltine et al. eds., 1905).

Indeed, "[m]any colonial statutes *required* individual arms-bearing for pub-

lic-safety reasons." *Heller*, 554 U.S. at 601 (emphasis added). Some colonies

even mandated that citizens carry their firearms to church services and other public

gatherings.[3] Plainly, if the law imposed on individual citizens a civic *duty* to bear

arms in public in the interest of public safety (even when not on militia service),

the law necessarily conferred on those citizens a corresponding *right* to do so.

Even *Heller*'s discussion of potential limitations on Second Amendment

rights reinforces that those rights are not limited to the home. *Heller* noted that the

decision should not "be taken to cast doubt on longstanding prohibitions on . . .

---

[3] *See, e.g.*, "An Act for the Better Security of the Inhabitants, by Obliging the Male White Persons To Carry Fire Arms to Places of Public Worship" (Ga. 1770) *in* A DIGEST OF THE LAWS OF THE STATE OF GEORGIA 157-58 (1800); *see also* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 139 (1994) ("The dangers all the colonies faced, however, were so great that not only militia members but all householders were ordered to be armed."); *id.* (discussing various statutes) ("Colonial law went another step beyond English law and required colonists to carry weapons."); *id.* at 139 & nn.21-24 (citing colonial laws and 18th century statutes, some enacted just five years prior to the Revolution, that required citizens to carry firearms in public, including "places of public worship"). *See also* NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106-08 (2012).

laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 626. The obvious implication is that the Second Amendment generally protects the right to carry a firearm in public, but that there is an exception for particularly sensitive places.

In sum, the explicit guarantee of the right to "bear" arms would mean nothing if it did not protect the right to "bear" arms outside of the home where they are "kept." The most fundamental canons of construction forbid any interpretation that would relegate explicit text of the Bill of Rights to the status of meaningless surplusage. *See, e.g.*, *Wright v. United States*, 302 U.S. 583, 588 (1938). Ignoring the Second Amendment's explicit distinction between the people's right to "keep" arms for self-defense and to "bear" them for self-defense would be on the order of ignoring the word "persons" in the Fourth Amendment's guarantee of the people's right to be secure "in their persons, houses, papers, and effects." U.S. CONST. amend. IV.

## II.    *MOORE V. MADIGAN.*

Illinois lost its unique status as the only remaining State in the Union to ban completely the public carrying of firearms when that ban was struck down in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012). The *Moore* decision is particularly significant because it is the only decision of a federal Court of Appeals that actually decides the question whether the Second Amendment extends beyond the

7

home.  Although the issue has been raised in many other appellate opinions, in each instance the court assumed an answer *arguendo*, rested its decision on another ground, or otherwise skirted the issue.[4]

The Seventh Circuit confronted the issue head-on: "The parties and the *amici curiae* have treated us to hundreds of pages of argument" with a "main focus" on "history."  *Id*. at 935.  Those defending the Illinois law presented what they called "historical evidence that there was no generally recognized private right to carry arms in public in 1791, the year the Second Amendment was ratified."  *Id*.  But the Seventh Circuit observed that a similar historical argument against Second Amendment rights had already been pressed in *Heller*, and "[t]he Supreme Court

---

[4] *See e.g.*, *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("assum[ing]" without deciding that Second Amendment "must have *some* application" outside the home (emphasis in original)); *Woollard v. Gallagher*, 712 F.3d 865, 875 (4th Cir. 2013) ("[W]e are not obliged" to decide whether amendment applies outside the home and "deem[ ] it prudent to instead resolve" the case by assuming it does and applying some form of intermediate scrutiny.); *United States v. Masciandaro*, 638 F.3d 458, 474 (4th Cir. 2011) (deeming it "unnecessary to explore in this case the question of whether and to what extent the Second Amendment right recognized in *Heller* applies outside the home"); *United States v. Mahin*, 668 F.3d 119, 123-24 (4th Cir. 2012) (refusing to address issue and upholding challenged law even if amendment does extend outside home); *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (noting court "not inclined to address [the plaintiffs' claim of a historic right to carry arms in public] by engaging in a round of full-blown historical analysis"); *Hightower v. City of Boston*, 693 F.3d 61, 72 n.8 (1st Cir. 2012) ("We do not reach the issue of the scope of the Second Amendment as to carrying firearms outside the vicinity of the home without any reference to protection of the home.").

rejected the argument." *Id*.[5]  In Judge Posner's words, Illinois and its *amici* "ask us to repudiate the [Supreme] Court's historical analysis.  That we can't do.  Nor can we ignore the implication of the analysis that the constitutional right of armed self-defense is broader than the right to have a gun in one's home." *Id*.[6]  The Second Amendment on its face guarantees " 'the right of the people to keep *and bear Arms*.' "  *Id.* at 936 (emphasis in original).

> The right to "bear" as distinct from the right to "keep" arms is unlikely to refer to the home.  To speak of "bearing" arms within one's home would at all times have been an awkward usage.  A right to bear arms thus implies a right to carry a loaded gun outside the home.

*Id*.

In short, the Second Amendment guarantees the right to carry weapons for the purpose of self-defense—*not* just for self-defense *within the home*, but for self-defense, *period*.  The Supreme Court has consistently stressed "self-defense . . .

---

[5] Those who invoke the Statute of Northampton and other English laws to deny a right to bear arms in public simply misread history.  "[Lord] Coke's reference to 'assemble force' suggests that the statutory limitation of the right of self-defense was based on a concern with armed gangs, thieves, and assassins rather than with indoors versus outdoors as such."  *Moore*, 702 F.3d at 936.

[6] We are disinclined to engage in another round of historical analysis to determine whether eighteenth-century America understood the Second Amendment to include a right to bear guns outside the home.  The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.

*Moore*, 702 F.3d at 942.

[ ]as the *central component* of the right itself." *Heller*, 554 U.S. at 599 (emphasis in original). *See also McDonald*, 130 S. Ct. at 3036 (controlling opinion of Alito, J.) ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in *Heller*, we held that individual self-defense is 'the *central component*' of the Second Amendment right." (emphasis in original)). The *Moore* court understood that the core purpose of the right to keep and bear arms—self-defense—cannot be limited to the home: "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home, as when it says that the amendment 'guarantee[s] the individual right to possess and carry weapons in case of confrontation.' " *Moore*, 702 F.3d at 935-36 (alteration in original) (quoting *Heller*, 554 U.S. at 592). Noting that "[c]onfrontations are not limited to the home," *id*. at 936, Judge Posner observed that in the founding era "a distinction between keeping arms for self-defense in the home and carrying them outside the home *would . . . have been irrational*," *id.* at 937 (emphasis added).[7]

---

[7]      And one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home. Suppose one lived in what was then the wild west—the Ohio Valley for example (for until the Louisiana Purchase the Mississippi River was the western boundary of the United States), where there were hostile Indians. One would need from time to time to leave one's home to obtain supplies from the nearest trading post, and en route one would be as much

The Seventh Circuit also criticized the Fourth Circuit's refusal to address whether the Second Amendment applies outside the home:

> Judge Wilkinson expressed concern in *United States v. Masciandaro* . . . that "there may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are [or] what the criteria for selecting them should be . . . . The notion that 'self-defense has to take place wherever [a] person happens to be,' appears to us to portend all sorts of litigation over schools, airports, parks . . . and various additional government facilities . . . . The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree." Fair enough; but that "vast *terra incognita*" has been opened to judicial exploration by *Heller* and *McDonald*. *There is no turning back by the lower federal courts* . . . .

*Id*. at 942 (emphasis added) (citations omitted).

In sum, the Supreme Court in *Heller* concluded: (i) that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added); (ii) that the "core" or "central component" of this right is "self-defense," *id*. at 599, 630; and (iii) that the right is "enshrined with the scope [it was] understood to have when the people adopted [it]," *id*. at 634-35. Each of these conclusions was essential to the Court's decision

---

(probably more) at risk if unarmed as one would be in one's home unarmed.

*Moore*, 702 F.3d at 936. *See also United States v. Masciandaro*, 638 F.3d 458, 468 (4th Cir. 2011) (Niemeyer, J., concurring) ("Because self-defense has to take place wherever [a] person happens to be, it follows that the right extends to public areas beyond the home." (alteration in original) (internal quotation marks omitted)).

to strike down D.C.'s handgun ban, and thus each of these conclusions is binding on lower courts. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result" that are binding); *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003) ("[W]e cannot ignore the unmistakable import of a Supreme Court decision's analysis." (brackets and internal quotation marks omitted)). The task of the lower courts is "to follow the Court's lead in resolving questions about the scope of the Second Amendment by consulting its original public meaning." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011).[8]

## III.   NOTHING IN THIS COURT'S DECISION IN *HELLER II* CONFLICTS WITH THE RECOGNITION THAT THE SECOND AMENDMENT RIGHT EXTENDS OUTSIDE ONE'S HOME.

In *Heller II*, this Court upheld the District's requirement that handguns be registered and its ban on possession, inside or outside the home, of certain types of semiautomatic rifles and ammunition magazines. 670 F.3d at 1264. This Court

---

[8] The Illinois State Courts have also held that bearing a handgun for self-defense in public is "the exercise of a personal right that is specifically named in and guaranteed by the United States Constitution, as construed by the United States Supreme Court." *People v. Aguilar*, No. 112116, 2013 IL 112116, at *5 (Ill. Sept. 12, 2013). Some other State courts, by contrast, have applied the facile and arbitrary reasoning that, because *Heller* itself happened to involve firearms restrictions inside the home, restrictions outside the home do not even implicate the Second Amendment. *See, e.g.*, *Williams v. State*, 10 A.3d 1167, 1169 (Md. 2011); *Little v. United States*, 989 A.2d 1096, 1101 (D.C. 2010); *Commonwealth v. Perez*, 952 N.E.2d 441, 451 (Mass. App. Ct. 2011).

drew no distinction between government regulation of firearms inside or outside the home, expressly finding that that "none of the District's registration requirements prevents an individual from possessing a firearm in his home *or elsewhere*, whether for self-defense or hunting, or any other lawful purpose." *Id*. at 1258 (emphasis added). Indeed, the Court repeatedly referred to the Second Amendment's protection of the possession and use of firearms outside the home for the purpose of hunting. *See, e.g.*, *id.* at 1260, 1261, 1262. Thus, nothing in *Heller II* hinders this Court from giving full force to the Supreme Court's recognition in *Heller* and *McDonald* that, when it was adopted, the Second Amendment was "understood to be an individual right protecting against both *public* and private violence," *Heller*, 554 U.S. at 593-94 (emphasis added), and that the Amendment therefore "guarantee[s] the individual *right to . . . carry weapons in case of confrontation.*" *Id*. at 592 (emphasis added). *See also id.* at 584, 590, 592; *McDonald*, 130 S. Ct. at 3044 (controlling opinion of Alito, J.) ("The Second Amendment protects a personal right to keep *and bear arms* for lawful purposes . . . ." (emphasis added)).

## CONCLUSION

We respectfully submit that the Second Amendment right to keep and bear arms extends beyond the home, just like its "*central component*," the right to self-defense. *Heller*, 554 U.S. at 599.

February 18, 2014                          Respectfully submitted,


Brian S. Koukoutchos                       s/ Charles J. Cooper
28 Eagle Trace                             Charles J. Cooper
Mandeville, LA 70471                       David H. Thompson
(985) 626-5052                             Peter A. Patterson
bkoukoutchos@gmail.com                     Brian W. Barnes
                                           COOPER & KIRK, PLLC
                                           1523 New Hampshire Avenue, N.W.
                                           Washington, D.C. 20036
                                           (202) 220-9600
                                           ccooper@cooperkirk.com

*Counsel for* Amicus Curiae *National Rifle Association of America, Inc.*

14

## CERTIFICATE OF COMPLIANCE

1. This brief complies with FED. R. APP. P. 29(d) because it is less than 15 pages in length, excluding the parts exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and D.C. Cir. Rule 32(a)(1).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

/s/ Charles J. Cooper
*Counsel for* Amici Curiae

Dated: February 18, 2014

15

## CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of February, 2014, I electronically filed the original of the foregoing document with the clerk of this Court by using the CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

February 18, 2014                    /s/ Charles J. Cooper
                                     *Counsel for* Amicus Curiae