# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 19, 2013       Decided June 23, 2015
Reargued March 9, 2015

No. 12-5305

STEPHEN DEARTH AND SECOND AMENDMENT FOUNDATION,
INC.,
APPELLANTS

v.

LORETTA E. LYNCH,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00587)

———

*Alan Gura* argued the cause and filed the briefs for
appellants.

*Charles J. Cooper*, *David H. Thompson*, *Peter Patterson*,
*Brian W. Barnes*, and *Brian S. Koukoutchos* were on the brief
for *amicus curiae* National Rifle Association of America, Inc. in
support of appellants.

*Daniel Tenny*, Attorney, U.S. Department of Justice, argued
the cause for appellee. With him on the briefs were *Stuart F.
Delery*, Assistant Attorney General at the time the briefs were

2

filed, *Ronald C. Machen Jr.*, U.S. Attorney, and *Mark B. Stern*, *Michael S. Raab*, and *Anisha S. Dasgupta*, Attorneys.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge.*

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in the judgment filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

RANDOLPH, *Senior Circuit Judge*:

I.

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs and supplemental briefs and oral arguments of counsel. For the reasons stated below, it is

**ORDERED AND ADJUDGED** that the district court's grant of summary judgment in favor of the United States is vacated with respect to plaintiff Dearth and plaintiff Second Amendment Foundation, Inc. (insofar as its claim is based on Dearth's standing), and the case is remanded for trial.

II.

We take this action although it may well be that, in the words of Rule 56(a), "there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). Even in those circumstances, the courts retain discretion to refuse to decide

3

cases on the basis of a record developed on summary judgment. *See Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256-57 (1948); 10A Charles Allen Wright et al., FED. PRACTICE & PROCEDURE § 2728 (3d ed. 2013).

The question in this case is whether a citizen who permanently resides outside the United States has a right under the Second Amendment to the United States Constitution to purchase a firearm for self-defense while he is temporarily visiting this country. Dearth alleges that 18 U.S.C. § 922(a)(9) & (b)(3) and implementing regulations, 27 C.F.R. §§ 478.29a, 478.96, 478.99, 478.124, are unconstitutional because the provisions, in effect, prohibit citizens not residing in any state from purchasing firearms. In addition to mounting a facial attack on the provisions, Dearth purports to be bringing an as applied challenge.

This case therefore raises "an extremely important question," and "summary procedures, however salutary where issues are clear-cut and simple, present a treacherous record for deciding issues of far-flung import." *Kennedy*, 334 U.S. at 256-57 (footnote omitted). *See, e.g., Univ. of Notre Dame v. Burwell*, No. 13-3853, 2015 WL 2374764, at *14, ___ F.3d ___ (7th Cir. 2015) (Hamilton, J., concurring) ("Where the law is evolving rapidly and the facts are complex, the better course is usually full exploration of the evidence and thorough findings of fact by the district court, rather than reliance on sweeping legal doctrines and hypothesized or assumed facts." (citing, *inter alia*, *Doe v. Walker*, 193 F.3d 42, 46 (1st Cir. 1999))). Here there are too many unanswered questions regarding Dearth's particular situation even though he seeks to mount an as applied challenge.

At the summary judgment stage, Dearth could no longer "rest on . . . mere allegations," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), that might satisfy the pleading

4

requirements, as he did in his earlier appeal, *see Dearth v. Holder,* 641 F.3d 499 (D.C. Cir. 2011).  He had to set forth "specific facts." *Lujan,* 504 U.S. at 561 (citing FED. R. CIV. P. 56) (internal quotation marks omitted), not mere "conclusory statement[s]." *Ass'n of Flight Attendants v. Dep't of Transp.,* 564 F.3d 462, 465 (D.C. Cir. 2009).  Nevertheless, Dearth filed nothing other than a short affidavit merely repeating the complaint's sparse allegations regarding his particular circumstances.

For example, we are able to discern, from the caption on his complaint, filed in 2009, that Dearth's address at that time was Winnipeg, Canada.  He asks us now to assume that his status has remained static.  Whether he had ever been a resident of any state, and if so which one, he does not reveal.  Whether he is still considered a state resident for tax purposes we do not know.  Whether he still votes in federal elections or pays federal taxes on his income, including income earned outside the United States, is not addressed.  Dearth says he comes back to this country on occasion.  Exactly where or when he comes back, to what state or states, his affidavit does not tell us.  His affidavit does say that on two occasions, once in 2006 and again in 2007, while he was in the United States he unsuccessfully tried to purchase "a firearm."  What type of firearm – a hunting rifle, for instance, or a handgun – he does not mention.  He swears that he "intend[s] to purchase firearms" for "lawful sporting purposes as well as for other purposes, including self-defense."  This appears deliberately ambiguous.  Did he try to buy a hunting rifle, which he would also use for self-defense?  Did he try to purchase a handgun solely for self-defense?  We cannot tell, yet the question may be significant because in some circumstances federal law allows non-residents to obtain firearms for "lawful sporting purposes." *See* 18 U.S.C. § 922(a)(5), (a)(9), (b)(3); 27 C.F.R. §§ 478.29a, 478.99(a), 478.115(d)(1).  Where Dearth sought to engage in these transactions he neglects to mention.

5

The omission may be significant. The laws of many states bar non-state residents like Dearth from buying a handgun so that no matter what the outcome of this case, Dearth still could not purchase a handgun in such a state.[1]

Dearth stated in his affidavit that he holds a "valid Utah permit to publicly carry a handgun." But we do not know whether, if once he had a valid permit from Utah, he still does. States may require such permits to be renewed periodically. In the same sentence, Dearth adds that the Utah public-carry permit "is recognized in numerous states." Which states? And more to the point, has Dearth visited such states in the past and is there evidence that he will do so in the future?

Dearth's counsel stated in the district court that his client possessed firearms in Canada. Here again that is not evidence, and we do not know what sort of firearms he has there, or whether he has brought his firearms with him when he entered the United States on visits, or whether there was any impediment to his doing so.

One final point deserves mention. Dearth, in his complaint, purports to be bringing his as applied claim on behalf of himself and "similarly situated individuals." But the evidence tells us very little about Dearth's specific situation. In addition, the complaint seems to be reciting a class action allegation yet

---

[1] At reargument Dearth's counsel proposed that his client might be able to purchase a firearm in Texas, for instance, because – according to counsel – Texas does not have a residency requirement. But of course counsel's proposal is not evidence. And we have no evidence that Dearth has ever been in Texas, or that he would drive or fly there to engage in such a transaction, or that he would legally be able to transport a firearm from Texas into whatever other state he was visiting.

6

Dearth never sought, and the district court never granted, class action status to his action.

In short, for the foregoing reasons, we exercise our discretion to require that the case proceed to trial on the subjects we have mentioned and any others that bear on Dearth's claims.

GRIFFITH, *Circuit Judge*, concurring in the judgment:

After more than two years of consideration, three rounds of briefing, and two oral arguments, I agree with the dissent that we have sufficient information to decide this case. But since we cannot reach agreement either as to our authority to hear this case or as to the merits, I reluctantly concur in the remand so as to break this stalemate and allow the case to proceed. I concur only in Part I of the majority opinion, however, not in the rationale on which it relies in Part II to decide that remand is appropriate.

Many of the questions the opinion poses appear aimed at determining whether Dearth may be considered a resident of the United States even though he lives in Canada, in which case he would not satisfy the injury-in-fact requirement of Article III standing to challenge laws that prevent nonresidents from purchasing firearms. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). But a prior panel of this court has already held that Dearth has standing, *see Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011), which binds this panel absent a relevant change in factual circumstances, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) ("When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court." (internal quotation marks and citation omitted)). Even if Dearth's standing was still an open question, Dearth has averred, and the government has conceded, that he is a United States citizen, that he "does not maintain a residence within the United States," and that he was unable to purchase a firearm in the United States because he could not provide a state of residence on the form the ATF requires him to complete before such a purchase. *See* J.A. 29-30, 164. Based on these undisputed facts that the government has taken for granted in the six years since Dearth filed his complaint, this case is properly before us.

2

Other questions posed in the opinion seek to determine where Dearth has previously sought to purchase firearms. Answers to these questions are irrelevant as well. It is true, as the opinion notes, that many states have their own laws that bar nonresidents from buying firearms, *see* Maj. Op. at 5 & n.1. The upshot of these state laws, the opinion seems to imply, is that perhaps Dearth will not be able to purchase a firearm even if he prevails in this suit, in which case he would lack standing because his injury would not be redressable by a favorable outcome. *See Lujan*, 504 U.S. at 561. But once again, a prior panel has already addressed this issue and determined that Dearth's injury is redressable. *See Dearth*, 641 F.3d at 501. As that panel noted, the government never contended otherwise. *See id.* ("The Government disputes only whether Dearth has suffered a cognizable injury, as the requirements of traceability and redressability are clearly met."). Despite this, the opinion implies that Dearth may need to show that he has visited Texas in the past or demonstrate to some undefined degree of certainty that he will return there to buy a firearm if he prevails in this suit. *See* Maj. Op. at 5 n.1.

I disagree. Even if it were open to us to reconsider this point, Dearth's injury remains just as redressable now as it was at the time of the prior panel's decision. Dearth has sworn that he "intend[s] to purchase firearms within the United States." *See*, *e.g.*, J.A. 32. And he has noted for our benefit that even as a nonresident, the laws of Texas, Louisiana, and Virginia would allow him to purchase firearms if federal law did not prohibit him from doing so. *See* Appellant's Reply Br. at 7-8. Dearth has thus shown that if he prevailed here he would be able to redress his injury by purchasing a firearm in the United States and he has sworn under penalty of perjury that he will do exactly that if federal law permits him. Article III does not

3

require him to allege anything more about his shopping plans or his travel itinerary.*

Satisfied that Dearth has standing to bring this suit, I also believe we have enough facts in the record to decide this case. Judge Henderson agrees. We disagree, however, on the merits. Forced to side either with a position that thinks we must remand for further factual development or with one that decides the issues differently than I would, I choose to break the tie in favor of the former. *See, e.g.*, *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 455 (2003) (Stevens, J., concurring in the judgment and dissenting in part) (abandoning his "preferred disposition of the case" and voting to remand so that there could be a "controlling judgment of the Court"); *Screws v. United States*, 325 U.S. 91, 134 (1945) (Rutledge, J., concurring) (concurring in the judgment and voting to remand, despite his views on the merits, "in order that disposition may be made of this case").

Because there will not be a controlling opinion on the merits of the issues in this case, I do not find it appropriate to expound upon the important constitutional questions the case presents. *See, e.g.*, *Blair v. United States*, 250 U.S. 273, 279 (1919) ("Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged

---

* I also note that the opinion does not ask Dearth to identify the county or city in which he previously tried to purchase a firearm (or would in the future), even though those jurisdictions may have laws or regulations prohibiting the sale of firearms to nonresidents. The reason that we do not need that information, of course, is that the Constitution does not require it—just as it does not require him to specify in which state he previously attempted to buy a gun (or where he will if allowed).

4

to do so in the proper performance of our judicial function . . . ."). But I raise just two qualms with the dissent.

The dissent asserts that Dearth may purchase a firearm in Canada and bring it into the United States so long as the firearm itself is "generally recognized as particularly suitable for or readily adaptable to sporting purposes." Dissent at 12. That is incorrect. Although the statutes the dissent cites may allow for such transport, *see* 18 U.S.C. §§ 922(*l*), 925(d), federal regulations bar it, *see* 27 C.F.R. § 478.111 ("[N]o firearm, firearm barrel, or ammunition may be imported or brought into the United States except as provided by this part."); *id*. § 478.115(d)(1) (excepting from section 478.111 certain firearms only if the nonresident intends to use them "for legitimate hunting or lawful sporting purposes"). Though the statutes, as the dissent rightfully notes, "turn on the nature of the firearm, not its owner's purpose," Dissent at 12, the regulations do just the opposite.

The dissent sees no problem because regulations cannot trump statutes. Dissent at 12 n.7. But Dearth faces real-life consequences as a result of the way the "regulations are interpreted and enforced in practice," Dissent at 12 n.7, regardless of whether a court might one day invalidate those regulations. So long as 27 C.F.R. § 478.111 remains in force, any firearms Dearth purchased abroad will be subject to seizure and forfeiture if he attempts to bring them into the United States for self-defense. *See* 27 C.F.R. § 478.152. Yet the dissent suggests that the burden Dearth faces is somehow lessened because he has "ample alternative means of exercising" his rights. Dissent at 12. But mark what Dearth must do to bring a firearm purchased abroad into the United States to defend himself: He must carry that weapon over the border, have it seized, argue to a judicial or administrative tribunal that the seizure was improper because the regulations

5

are inconsistent with the relevant statutory text, and then keep his fingers crossed that the tribunal agrees. I fail to see how an alternative that requires breaking the law and then seeking vindication through litigation lessens any potential burden.

The dissent also suggests that Dearth lacks standing to challenge "the ban on rental or loan of a firearm" to nonresidents. Dissent at 21. I disagree. The challenged statutes do not contain a "ban on rental or loan of a firearm." One of the statutes bans a nonresident from "receiv[ing] any firearms," *see* 18 U.S.C. § 922(a)(9), while the other bans licensed firearm dealers from "sell[ing] or deliver[ing] . . . any firearm to any" nonresident, *see id.* § 922(b)(3). That second statute, section 922(b)(3), excepts any dealer who rents a firearm to a nonresident—thus *permitting* rentals in a narrow set of circumstances. Dearth attempted to "receive" a firearm by asking a licensed dealer to "sell" one to him and was turned away because he is a nonresident. The statutes he challenges have thus caused him to suffer a "concrete and particularized" injury sufficient to satisfy constitutional standing requirements. *See Lujan*, 504 U.S. at 560. The Constitution does not require Dearth to suffer an injury in every imaginable application of the statute. *Cf. Dearth*, 641 F.3d at 502 (holding that Dearth has standing because "the challenged provisions have . . . thwarted [his] best efforts to acquire a firearm"). Had the statutes instead banned the purchase, rental, or loan of a firearm (or the sale, loan, or rental of one by a dealer), then this would be a different case, and Dearth would have standing to challenge only the prohibition that injures him. But since Congress chose a blanket ban on "receiv[ing]" and "sell[ing]" a firearm, and Dearth suffered an injury due to those restrictions, he has standing to challenge both statutes.

Finally, though I think a remand is unnecessary, I do agree that the record could be better developed. It is not entirely

6

clear, for instance, whether Dearth intends to purchase firearms that he can use interchangeably for both sport and for self-defense, or whether he has in mind different firearms uniquely suited to each activity. I believe there is enough in the record to infer the answer to that question, but perhaps further factfinding on remand will eliminate the need for inferences. Dearth also notes that he plans to store his firearms at his parents' house in Ohio. Nothing in the record, however, suggests that his parents have consented to that plan. I leave it to the district court to settle these details, along with any others it deems appropriate.

KAREN LECRAFT HENDERSON, *Circuit Judge*, dissenting: I know enough about this case to decide it now. Stephen Dearth, a non-resident U.S. citizen, and similarly situated members of the Second Amendment Foundation challenge two subsections of 18 U.S.C. § 922, which are "part of a carefully constructed package of gun control legislation . . . in existence for many years." *Ball v. United States*, 470 U.S. 856, 862 (1985) (citation omitted). A federal firearms licensee (FFL) may not "sell or deliver" a firearm to a person who "does not reside in . . . the State in which the [FFL's] place of business is located." 18 U.S.C. § 922(b)(3). That provision has two exceptions, one of which is relevant here: An FFL may lend or rent a firearm to any person for "temporary use for lawful sporting purposes." *Id.* § 922(b)(3)(B). On the reverse side of the coin, it is unlawful for "any person . . . who does not reside in any State to *receive* any firearms unless such receipt is for lawful sporting purposes." *Id.* § 922(a)(9) (emphasis added). Because a non-resident citizen like Dearth does not reside in a "State," these provisions prevent him from (1) purchasing a firearm for any purpose while visiting the United States and (2) renting a firearm for self-defense while here. The plaintiffs contend that these provisions violate the Second Amendment.[1]

---

[1] The plaintiffs also contend that these provisions violate their rights to international travel and equal protection. I do not consider these claims separately, however, because they trigger nothing more than rational-basis scrutiny. *See Califano v. Aznavorian*, 439 U.S. 170, 177 (1978) (laws with only incidental effect on right to international travel evaluated under rational-basis scrutiny); *Dixon v. Dist. of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011) (same for laws that do not draw suspect classifications or violate fundamental rights); *Kwong v. Bloomberg*, 723 F.3d 160, 170 n.19 (2d Cir. 2013) (equal protection does not provide additional safeguard for Second Amendment rights), *cert. denied*, 134 S. Ct. 2696 (2014). The challenged laws easily satisfy that standard.

2

Since *District of Columbia v. Heller*, 554 U.S. 570 (2008), we have dealt with the predictable wave of Second Amendment litigation by adopting a two-step approach that asks whether the provision under review impinges on an individual's Second Amendment right and, if so, whether it nonetheless passes muster under the appropriate level of scrutiny. *See Schrader v. Holder*, 704 F.3d 980, 988–89 (D.C. Cir.), *cert. denied*, 134 S. Ct. 512 (2013); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1252–53 (D.C. Cir. 2011). Both of our cases since *Heller* and the overwhelming majority of cases from our sister circuits have followed this approach and applied intermediate scrutiny to various statutes regulating firearms. In my view, the proper application of intermediate scrutiny compels the conclusion that the challenged provisions of section 922 are constitutional.

Constitutional challenges to other provisions of section 922 have, post-*Heller*, been rejected again, and again, and again.[2] Indeed, I can find no case in which a court of appeals

---

[2] *See, e.g.*, *United States v. Decastro*, 682 F.3d 160, 161 (2d Cir. 2012) (transportation of firearm from another state into one's state of residence under section 922(a)(3)), *cert. denied*, 133 S. Ct. 838 (2013); *NRA v. ATF*, 700 F.3d 185, 203–04 (5th Cir. 2012) (sale of handgun by federally licensed dealer to person under 21 years old pursuant to section 922(b)(1)), *cert. denied*, 134 S. Ct. 1364 (2014); *United States v. Moore*, 666 F.3d 313, 316–17 (4th Cir. 2012) (possession of firearm by felon under section 922(g)(1)); *Schrader*, 704 F.3d at 990–91 (section 922(g)(1) as applied to common-law misdemeanants); *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (section 922(g)(1) as applied to non-violent felons); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011) (possession of firearm by unlawful user of controlled substance under section 922(g)(3)); *United States v. McRobie*, No. 08-4632, 2009 WL 82715, at *1 (4th Cir. Jan. 14, 2009) (unpublished per curiam) (possession of firearm by person

3

has struck down any part of this criminal statute.[3]  The
Supreme Court has at times shown "a general reticence to

committed to mental institution under section 922(g)(4)); *United
States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012)
(possession of firearm by illegal alien under section 922(g)(5)),
*cert. denied*, 134 S. Ct. 58 (2013); *United States v. Mahin*, 668 F.3d
119, 123–24 (4th Cir. 2012) (possession of firearm while subject to
domestic protection order under section 922(g)(8)); *United States v.
Booker*, 644 F.3d 12, 26 (1st Cir. 2011) (possession of firearm by
person convicted of domestic violence misdemeanor under section
922(g)(9)), *cert. denied*, 132 S. Ct. 1538 (2012); *United States v.
Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010) (possession of
firearm with obliterated serial number under section 922(k)), *cert.
denied*, 131 S. Ct. 958 (2011); *United States v. Henry*, 688 F.3d
637, 640 & n.3 (9th Cir. 2012) (possession of machine gun under
section 922(*o*)), *cert. denied*, 133 S. Ct. 996 (2013); *United States
v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (possession of handgun
by juvenile under section 922(x)(2)), *cert. denied*, 558 U.S. 1133
(2010).

[3]  The Fourth Circuit has twice remanded challenges to
provisions of section 922 to the district court for further evidentiary
development because the Government had not satisfied its burden
of demonstrating the fit between the government interest and the
challenged provision.  *See United States v. Carter*, 669 F.3d 411,
421 (4th Cir. 2012) (section 922(g)(3)); *United States v. Chester*,
628 F.3d 673, 683 (4th Cir. 2010) (section 922(g)(9)).  In each case,
the district court upheld the statute on remand, *see United States v.
Carter*, No. 2:09-cr-00055, 2012 WL 5935710, at *7 (S.D.W. Va.
Nov. 27, 2012); *United States v. Chester*, 847 F. Supp. 2d 902, 912
(S.D.W. Va. 2012), and the Fourth Circuit affirmed, *see United
States v. Carter*, 750 F.3d 462, 464 (4th Cir. 2014); *United States v.
Chester*, 514 F. App'x 393, 395 (4th Cir. 2013); *see also United
States v. Staten*, 666 F.3d 154, 167 (4th Cir. 2011), *cert. denied*,
132 S. Ct. 1937 (2012).

The Sixth Circuit, applying *strict* scrutiny, held that section
922(g)(4)—which prohibits possession of firearms by any person

4

invalidate the acts of the Nation's elected leaders" and noted that " '[p]roper respect for a coordinate branch of the government' requires that we strike down an Act of Congress only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.' " *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2579 (2012) (quoting *United States v. Harris*, 106 U.S. 629, 635 (1883) (first alteration added)). I share that reticence. If more exacting scrutiny is needed to invalidate a firearms law, the Supreme Court must lead the way. For the following reasons, I respectfully dissent from my colleagues' decision to remand the plaintiffs' Second Amendment challenge to section 922's ban on the sale of a firearm to a non-resident citizen.[4]

## I. SCOPE OF SECOND AMENDMENT RIGHT

At the first step of the analysis, we ask whether the challenged restrictions impinge upon an individual's Second Amendment right. As just explained, the challenged provisions of section 922 prohibit a non-resident citizen from

---

"who has been committed to a mental institution"—was unconstitutional on the record before it. *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 330, 344 (6th Cir. 2014). That opinion has since been vacated and the case will be reheard *en banc*.

[4] I believe the plaintiffs lack standing to challenge section 922's ban on *rental* of a firearm by a non-resident citizen. Their complaint and declarations state only that they want to *purchase* firearms and, thus, that is the only aspect of the challenged provisions they have standing to contest. *See Lewis v. Casey*, 518 U.S. 343, 357–58 & n.6 (1996) (because "standing is not dispensed in gross," a plaintiff "who has been subject to injurious conduct of one kind" does not "possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject").

5

purchasing a firearm to use for self-defense while visiting the United States. Because a non-resident citizen is by definition outside his residence when he is here, the facts of this case implicate, if somewhat obliquely, the currently disputed question whether the Second Amendment has any application outside one's *home*. *Heller*'s holding guaranteeing the individual right to keep and bear arms for self-defense is expressly confined to the "home," 554 U.S. at 635–36, and the Court was careful to emphasize that the Second Amendment, "[l]ike most rights, . . . is not unlimited," *id.* at 626. That is, it does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*

Whether, and to what extent, the Second Amendment applies to a *resident* citizen outside his house has split the circuits: One circuit has held that the Second Amendment affords no less protection outside the house than in; three have concluded that, if the Second Amendment affords any protection outside the house, it is more limited. *Compare Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside."),[5] *with Drake v. Filko*, 724 F.3d 426, 431, 436 (3d Cir. 2013) (assuming "the Second Amendment's individual right to bear arms *may* have some application beyond the home" but stating "[i]f the Second Amendment protects the right to carry a handgun outside the home for self-defense at all, that right is not part of the core of

_____

[5] A panel of the Ninth Circuit agreed with the Seventh Circuit that "carrying weapons in public for the lawful purpose of self defense is a central component of the right to bear arms." *Peruta v. County of San Diego*, 742 F.3d 1144, 1175 (9th Cir. 2014). That case, however, is currently being reheard *en banc*.

6

the Amendment" (emphasis in original; brackets and quotation marks omitted)), *cert. denied*, 134 S. Ct. 2134 (2014), *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir.) (assuming arguendo that right has some application outside house), *cert. denied*, 134 S. Ct. 422 (2013), *and Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89, 96 (2d Cir. 2012) (assuming right has "*some* application" outside house but applying intermediate scrutiny "[b]ecause our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public"), *cert. denied*, 133 S. Ct. 1806 (2013). State courts are also split. *Compare People v. Aguilar*, 2 N.E.3d 321, 327 (Ill. 2013) (agreeing with *Moore*), *with Williams v. State*, 10 A.3d 1167, 1177 (Md.) ("If the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly."), *cert. denied*, 132 S. Ct. 93 (2011). The Supreme Court has to date declined invitations to resolve the split.

I prefer the Second, Third and Fourth Circuits' slant and would hold that, assuming the Second Amendment has *some* application in this context, its core protection is not implicated by provisions that affect one's ability to carry a firearm outside his house. *See Drake*, 724 F.3d at 436; *Kachalsky*, 701 F.3d at 94; *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir.) ("[A]s we move outside the home, firearm rights have always been more limited . . . ."), *cert. denied*, 132 S. Ct. 756 (2011). As already noted, the Supreme Court expressly and repeatedly limited its holding to the "home." *See, e.g.*, *Heller*, 554 U.S. at 573, 635–36. I would extend *Heller* no further unless and until the Supreme Court does so itself:

> On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself. . . .

7

There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions.  It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation.  The notion that "self-defense has to take place wherever [a] person happens to be," appears to us to portend all sorts of litigation over schools, airports, parks, public thoroughfares, and various additional government facilities.  And even that may not address the place of any right in a private facility where a public officer effects an arrest.  The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree. . . .

There simply is no need in this litigation to break ground that our superiors have not tread.  To the degree that we push the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee.  This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. . . .

*If ever there was an occasion for restraint, this would seem to be it.*

*Masciandaro*, 638 F.3d at 475–76 (citations omitted) (emphasis added).

8

Moreover, the long history of state restrictions on the carrying of firearms in public supports the view that Second Amendment rights are more limited outside the house.  That history has been exhaustively canvassed by numerous courts.  *See Kachalsky*, 701 F.3d at 94–96 (documenting "longstanding tradition of states regulating firearm possession and use in public because of the dangers posed to public safety"); *Peruta*, 742 F.3d at 1182–91 (Thomas, J., dissenting) (history of right to carry concealed firearms in public); *see also Drake*, 724 F.3d at 431 ("We reject [the] contention that a historical analysis leads *inevitably* to the conclusion that the Second Amendment confers upon individuals a right to carry handguns in public for self-defense."); *Peterson v. Martinez*, 707 F.3d 1197, 1210 (10th Cir. 2013) ("There can be little doubt that bans on the concealed carrying of firearms are longstanding."); *Masciandaro*, 638 F.3d at 470–71 ("longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable" and therefore "a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home").  I will not rehash that discussion here.

I would point out, however, that if we consider a factor unique to this case, the Government's position becomes even stronger: In addition to the long history of regulating possession of firearms outside the house, there is a long history of regulating the acquisition and use of firearms by *non-residents* of a given State.   The Government has identified twelve States and the District of Columbia that, in the early 20th century, imposed various restrictions on the acquisition, use or possession of firearms by non-residents.  In 1919, North Carolina made it unlawful "for any person . . . to sell, . . . purchase or receive . . . any pistol [or] so-called pump-gun" without a permit, which permits were available

9

only to residents of North Carolina.  Act of Mar. 10, 1919, ch. 197, §§ 1–2, 1919 N.C. Laws 397, 397–98, *reprinted in* Joint Appendix (JA) 159.  Just as North Carolina law did a century ago, section 922 makes it unlawful for an FFL to "sell" a firearm to a non-resident of the FFL's State, 18 U.S.C. § 922(b)(3), or for a person who does not reside in any State to "receive" a firearm therein, *id.* § 922(a)(9).  In the 1920s, Michigan and Missouri banned the purchase of pistols and revolvers by non-residents.  *See* Act of June 2, 1927, ch. 372, § 2, 1927 Mich. Acts 887, 887–88, *reprinted in* JA 155 (banning purchase of pistol without license, which license was available only to individuals residing in State for six months or more); Act of Apr. 7, 1921, § 2, 1921 Mo. Laws 692, *reprinted in* JA 156 ("[n]o person . . . shall . . . buy, sell, . . . deliver or receive . . . any pistol [or] revolver" without permit obtained from circuit clerk in Missouri county in which applicant resided).  And numerous states prohibited non-residents from obtaining permits to carry pistols and revolvers.[6]  This history "demonstrates that while the Second

---

[6] *See* Act of May 21, 1913, ch. 608, § 1, 1913 N.Y. Laws 1627, 1628–29, *reprinted in* JA 157–59 (permit to carry pistol or revolver inapplicable to "any person not a citizen of and usually resident in the state of New York"); Act of May 29, 1922, ch. 485, § 9, 1922 Mass. Acts 560, 563, *reprinted in* JA 155 (permit to carry pistol or revolver issued only to "persons residing or having a place of business within the jurisdiction of the person issuing the license"); Act of Feb. 16, 1909, ch. 51, 1909 W. Va. Acts 394, 395–96, *reprinted in* JA 160–61 (same); Act of Mar. 11, 1924, ch. 137 §§ 1–2, 1924 N.J. Acts 305, 305–06, *reprinted in* JA 157 (same for "revolver, pistol or other firearm"); Act of June 2, 1923, ch. 252, §§ 2–3, 1923 Conn. Acts 3707, *reprinted in* JA 153 (permit to carry pistol or revolver issued to any person having "bona fide residence" in local jurisdiction or to any "bona fide resident of the United States having a permit or license to carry any firearm" in another State); Act of Mar. 12, 1925, ch. 207 §§ 5, 7, 1925 Ind. Laws 495, 496–97, *reprinted in* JA 154 (same); Act of

10

Amendment's core concerns are strongest inside hearth and home, states have long recognized a countervailing and competing set of concerns" regarding the sale of firearms to non-residents and therefore "tradition . . . clearly indicates a substantial role for state regulation." *Kachalsky*, 701 F.3d at 96.

The plaintiffs' only response is to insist on carbon copy historical analogs. *See* Appellants' Br. 41; Appellants' Reply Br. 13. But "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *NRA*, 700 F.3d at 196; *accord United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*) ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."). If we demanded the telescopic level of similarity the plaintiffs demand, few laws could ever be deemed "longstanding"— including, perhaps, the laws considered longstanding in *Heller* itself. *See Heller II*, 670 F.3d at 1253 (noting that "*Heller* considered prohibitions on the possession of firearms by felons to be longstanding although states did not start to enact them until the early 20th century" (quotation marks omitted)); *United States v. McCane*, 573 F.3d 1037, 1047–49

July 8, 1932, ch. 465, §§ 4, 6, 47 Stat. 650, 651 (1932), *reprinted in* JA 153–54 (similar District of Columbia statute including concealed carry permits); Firearms Act, ch. 1052, §§ 4, 6, 1927 R.I. LAWS 256, 257, 258, *reprinted in* JA 160 (same); Act of Feb. 25, 1939, ch. 14, 1939 ME. ACTS 53, *reprinted in* JA 154–55 (concealed carry permits available only to residents of local jurisdiction); Act of June 2, 1927, ch. 372, § 6, 1927 MICH. ACTS 887, 888–89, *reprinted in* JA 155–56 (banning concealed carrying of pistol without license, which licenses were available only to individuals residing in State for six months or more); Act of Mar. 3, 1919, ch. 74, § 5, 1919 MONT. ACTS 147, 148, *reprinted in* JA 156–57 (same).

11

(10th Cir. 2009) (Tymkovich, J., concurring) (questioning *Heller*'s statement that felon dispossession laws are "longstanding"). The salient point is that, for at least a century, numerous States have considered an individual's residency to be a *sine qua non* of possessing firearms. Thus, whether or not the Second Amendment provides any protection outside one's residence generally, the "core" Second Amendment protection announced in *Heller* does not include the right of a non-resident citizen to possess a firearm without regard to his residence. And, by definition, a non-resident citizen like Dearth is away from his residence while visiting the United States.

## II. MEANS/END SCRUTINY

### A. Level of Scrutiny

"[T]he level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Heller II*, 670 F.3d at 1257 (quotation marks omitted). "That is, a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify." *Id.* Our precedent dictates that, although a statute's burden may be "severe," intermediate scrutiny applies if the burden "falls on individuals who cannot be said to be exercising the core of the Second Amendment right identified in *Heller*." *Schrader*, 704 F.3d at 989. For the reasons explained in Part I *supra*, I believe the plaintiffs do not seek to exercise a core Second Amendment right. Intermediate scrutiny should therefore apply.

12

Further, the plaintiffs have ample alternative means of exercising their right. A citizen like Dearth who previously resided in the United States can purchase a firearm while he is a resident and, later, as a non-resident, carry that firearm into the United States with him for any lawful purpose. 18 U.S.C. § 925(d)(4); 27 C.F.R. § 478.115(a). Dearth admits that he never availed himself of this option. Appellants' 2d Supp. Br. 25. And we know that one of the original plaintiffs *did* have such firearms. Sept. 20, 2012 Hr'g Tr. 4. Additionally, the plaintiffs could purchase firearms *abroad* and bring them into the United States so long as the firearm is "generally recognized as particularly suitable for or readily adaptable to sporting purposes." *See* 18 U.S.C. §§ 922(*l*), 925(d). The availability of this option turns on the nature of the firearm, not its owner's purpose, so the plaintiffs could presumably bring such firearms into the United States and use them for self-defense. *See Springfield, Inc. v. Buckles*, 292 F.3d 813, 817 (D.C. Cir. 2002) ("the phrase 'generally recognized as particularly suitable for or readily adaptable to sporting purposes' . . . refer[s] to the *characteristics of the firearm*" (quoting ATF report) (emphasis added)).[7] The availability of

---

[7] The concurrence contends that the ATF regulations, 27 C.F.R. §§ 478.111(a), .115(d)(1), somehow supersede the statutory command that "[t]he Attorney General *shall* authorize a firearm or ammunition to be imported or brought into the United States or any possession thereof if the firearm or ammunition . . . is generally recognized as particularly suitable for or readily adaptable to sporting purposes." 18 U.S.C. § 925(d)(3) (emphasis added). However those regulations are interpreted and enforced in practice, they plainly cannot "bar" what the statute "allow[s] for." Concur. Op. 2. *See Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) (regulations cannot be "inconsistent with the statutory mandate" or "supersede the language chosen by Congress"); *see also Gun South, Inc. v. Brady*, 877 F.2d 858, 863 (11th Cir. 1989) ("Section

13

these alternative means of exercising the Second Amendment right further justifies intermediate scrutiny. *See Heller II*, 670 F.3d at 1262. Even if the plaintiffs never took advantage of these options, their failure to do so weighs against them. *Cf. Decastro*, 682 F.3d at 168.

In the Second Amendment context, intermediate scrutiny is satisfied so long as "the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest." *Heller II*, 670 F.3d at 1258 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989)). Although the Government must establish a "tight 'fit' between the [regulations] and an important or substantial governmental interest," it need not employ "the least restrictive means," but only "a means narrowly tailored to achieve the desired objective." *Id.* (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). Put differently, "the fit between the challenged regulation and the asserted objective need only be reasonable, not perfect." *Schrader*, 704 F.3d at 990 (quoting *Marzzarella*, 614 F.3d at 98 (brackets omitted)); *accord Staten*, 666 F.3d at 167; *see also Fox*, 492 U.S. at 480 ("What our decisions require is . . . a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." (citation omitted)); *Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981) (plurality opinion) ("The relevant inquiry . . . is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the . . . Legislature is within constitutional limitations."); *Nat'l Cable & Telecomms. Ass'n v. FCC*, 555

---

925(d)(3) . . . *unambiguously* requires the [Attorney General] to authorize the importation of sporting firearms." (emphasis added)).

14

F.3d 996, 1002 (D.C. Cir. 2009) ("The government does not have to show that it has adopted the least restrictive means for bringing about its regulatory objective; it does not have to demonstrate a perfect means-ends fit; and it does not have to satisfy a court that it has chosen the best conceivable option. The only condition is that the regulation be proportionate to the interests sought to be advanced." (citing *Fox*, 492 U.S. at 476–81)).

"In assessing this 'fit,' we afford 'substantial deference to the predictive judgments of Congress.' " *Schrader*, 704 F.3d at 990 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994)). We do so because "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* (quoting *Kachalsky*, 701 F.3d at 97 (quoting *Turner Broad. Sys.*, 512 U.S. at 665)). We have said that the Government "needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments." *Heller II*, 670 F.3d at 1259; *accord Chester*, 628 F.3d at 683. At the same time, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). And even when applying strict scrutiny, the Supreme Court has allowed the Government to carry its burden by relying "solely on history, consensus, and 'simple common sense.' " *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)); *accord Carter*, 669 F.3d at 418 (applying this precedent in Second Amendment context); *see also Nat'l Cable & Telecomms. Ass'n.*, 555 F.3d at 1002 (our precedent does not always "require exhaustive evidence documenting the

15

necessity of" given regulation but instead has "relied on Congress's reasonable, commonsense determination" that regulation is required).  I would find that the Government has carried its burden here.

### B.  Government Interest

Intermediate scrutiny requires a "substantial" or "important" government interest.  *Heller II*, 670 F.3d at 1258. The Government's interest in preventing crime is not merely substantial and important; it is "compelling."  *See United States v. Salerno*, 481 U.S. 739, 749 (1987); *Schall v. Martin*, 467 U.S. 253, 264 (1984); *Schrader*, 704 F.3d at 989–90; *Heller II*, 670 F.3d at 1258.  The Government offers two specific ways in which the challenged provisions of section 922 contribute to its interest in stopping crime: (1) preventing circumvention of State firearms regulations and (2) preventing international firearms trafficking.  *See* Appellee's Br. 25–30.

In the Omnibus Crime Control and Safe Streets Act of 1968, the Congress found:

> (1) that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce . . . ;

> (2) that the ease with which any person can acquire firearms other than a rifle or shotgun . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States;

> (3) that only through adequate Federal control over interstate and foreign commerce in these weapons . . . can this grave problem be properly dealt with . . . ; [and]

16

> (5) that the sale or other disposition of concealable weapons by [FFLs] to nonresidents of the State in which the [FFLs'] places of business are located, has tended to make ineffective the laws . . . in the several States and local jurisdictions regarding such firearms . . . .

Pub. L. No. 90-351, Title IV, § 901(a), 82 Stat. 197, 225.

Among the provisions enacted in order "to cope with the conditions referred to" in the above findings, 82 Stat. at 226, was 18 U.S.C. § 922(b)(3). Section 922(b)(3)'s ban on the sale of a firearm to a person who does not reside in the FFL's home state was a response to concerns that local law enforcement efforts in States with stricter firearms regulations were being undermined by an influx of firearms purchased by their residents in States with looser regulations. *See* S. REP. NO. 89-1866, at 19–20, *reprinted in* JA 59; H.R. REP. NO. 90-1577, at 4420 (section 922(b)(3) enacted in order to "prevent the avoidance of state and local laws controlling firearms by the simple expediency of crossing a State line to purchase one"); *accord* S. REP. NO. 90-1097, at 2204. For instance, the Massachusetts State Police traced 87% of the concealable firearms used in crimes to out-of-state purchases. S. REP. NO. 89-1866, at 3, *reprinted in* JA 43; *see also id.* at 61–62, *reprinted in* JA 101–02 (individual Senators' views summarizing testimony and stating "[t]he record is replete with testimony documenting the fact that the purchase of firearms by persons in other than their resident State is a serious contributing factor to crime"). Section 922(b)(3) is buttressed by section 922(a)(5), which prevents a person other than an FFL from doing what an FFL cannot. Together, these provisions were intended to fix the problem of circumvention of State firearms laws.

17

The Congress did not, however, cover every angle. As originally codified, section 922(a)(5) barred non-FFLs from transferring firearms to "any person . . . who the transferor knows . . . resides in any State other than that in which the transferor resides." 18 U.S.C. § 922(a)(5) (1970). In a statement covering proposed amendments to several firearms laws, the U.S. Department of Justice observed that "[r]ead literally, this language may make it impossible to prosecute an individual who delivers a firearm to an alien or other person, such as a transient, who does not reside in '*any* State.'" 134 CONG. REC. 12,309 (1988) (emphasis added). One Senator addressed the problem again in 1991 and proposed an amendment to close the loophole. He explained:

> This section addresses the law enforcement problem posed by aliens legally in the United States, but not residing in any State, who acquire firearms from [FFLs] by utilizing an intermediary. Having acquired firearms in this country, such aliens often smuggle the weapons out of the country. . . . However, the alien's receipt of a firearm from a licensee or through an intermediary does not violate any specific portion of the Act.

137 CONG. REC. 2743 (1991). When the amendment was finally enacted as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, Title XI, § 110514, 108 Stat. 1796, 2019, it closed the loophole by making it unlawful "for any person, other than a [FFL], who does not reside in any State to *receive* any firearms unless such receipt is for lawful sporting purposes." 18 U.S.C. § 922(a)(9) (emphasis added).

To summarize: Section 922(b)(3)'s ban on the sale of a firearm to a non-resident responded to specific Congressional findings about the need for such a ban to prevent the

18

circumvention of State firearms laws; section 922(a)(9)'s ban on receipt of a firearm by a non-resident patched a loophole in the statute that increased the likelihood of international firearms trafficking. There can be no doubt, therefore, that the provisions serve the "compelling" governmental interest of crime prevention. *See Salerno*, 481 U.S. at 749; *Schall*, 467 U.S. at 264; *Schrader*, 704 F.3d at 989–90; *Heller II*, 670 F.3d at 1258.

## C. Narrow Tailoring

The next inquiry is whether the government interest "would be achieved less effectively absent the regulation[s], and [whether] the means chosen are not substantially broader than necessary to achieve that interest." *Heller II*, 670 F.3d at 1258 (quoting *Ward*, 491 U.S. at 782–83). The challenged provisions of section 922 play a vital role in combatting violent crime by preventing the circumvention of State firearms regulations and international firearms trafficking and they are narrowly tailored to serve their purpose.

Section 922(b)(3) prohibits an FFL from selling firearms (with an exception not relevant here) to a non-resident of the FFL's State. The provision directly addresses the problem of circumvention of local firearms regulations identified by the Congress. *See* Pub. L. No. 90-351, Title IV, § 901(a), 82 Stat. at 225; S. REP. NO. 89-1866, at 19, *reprinted in* JA 59; H.R. REP. NO. 90-1577, at 4420; S. REP. NO. 90-1097, at 2204. Standing alone, it plainly passes muster. *See Decastro*, 682 F.3d at 168 (finding that accompanying provision banning transportation of firearms bought in another State into one's State of residence "does not substantially burden [the] right to keep and bear arms" because it "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything"). Section 922(a)(5)—not challenged here—likewise furthers

19

this interest by preventing a non-FFL from doing what an FFL cannot.

Section 922(a)(9)'s ban on receipt of a firearm by a non-resident is aimed at a different goal: preventing aliens and others not residing in any State from acquiring firearms they might smuggle out of the country. *See* 134 CONG. REC. 12,309 (1988); 137 CONG. REC. 2743 (1991). If preventing international firearms trafficking is the goal, preventing individuals who reside abroad from obtaining firearms in the United States is a "common sense" solution to the problem. *Fla. Bar*, 515 U.S. at 628 (citation omitted); *see Burson*, 504 U.S. at 211; *Shrink Mo. Gov't PAC*, 528 U.S. at 391; *cf. TSSAA v. Brentwood Acad.*, 551 U.S. 291, 300 (2007) ("We need no empirical data to credit [the] commonsense conclusion that hard-sell tactics directed at middle school students could lead to exploitation . . . ."). This is particularly so with respect to a non-resident *citizen*, who by virtue of his citizenship may have an easier time crossing our borders. *Cf. Moore*, 702 F.3d at 940 ("[T]he state can prevail with less evidence when . . . guns are forbidden to a class of persons who present a higher than average risk of misusing a gun."). In addition, the Government has presented anecdotal evidence that firearms trafficking by non-resident citizens is indeed a substantial law enforcement concern. *See* Appellee's Br. 32 n.13 (collecting ATF press releases and other news reports identifying instances of non-resident United States citizens prosecuted for smuggling weapons across Canadian and Mexican borders). Restrictions on speech may be justified by studies and anecdotes, even ones "pertaining to different locales altogether," *Fla. Bar*, 515 U.S. at 628 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 50–51 (1986)); *accord Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 558 (2001) (collecting cases), and there is no reason that

20

restrictions on the receipt of firearms should be treated differently.

The success of sections 922(a)(9) & (b)(3) in preventing circumvention of state law and international firearms trafficking depends in part on the definition of residency. The U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives defines an individual's "State of residence" to require "presen[ce] in a State with the intention of making a home in that State." 27 C.F.R. § 478.11. This definition addresses the problem the Congress identified back in 1968 that local law enforcement authorities were unaware of out-of-state firearms being brought into their jurisdictions and used for violent crime. *See* S. REP. No. 89-1866, at 19, *reprinted in* JA 59. The requisite continuity of presence, when coupled with the identifying information that must be provided when purchasing a firearm, also facilitates law enforcement efforts to trace firearms in the course of criminal investigations. 131 CONG. REC. 18,201 (1985); *see Abramski v. United States*, 134 S. Ct. 2259, 2269 (2014) (section 922's record-keeping provisions "help[] to fight serious crime" by facilitating tracing (citing *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 204 (D.C. Cir. 2013))); *Peterson*, 707 F.3d at 1221 (Lucero, J., concurring) (Colorado residency requirement for concealed handgun license justified because local law enforcement officials have access to greater level of information with respect to resident applicants than non-residents and greater ability to monitor if residents come into contact with local law enforcement authorities).

Each statutory provision challenged here therefore constitutes an independently supported restriction that is narrowly tailored to achieving the compelling government interest in crime prevention. The plaintiffs nevertheless object that taken together these restrictions prevent a non-resident citizen from *acquiring* firearms in the United States

21

for anything other than the excepted temporary use for sport. As noted, however, the plaintiffs lack standing to challenge the ban on *rental or loan* of a firearm to a non-resident citizen. *See supra* n.4. This disposes of the bulk of the plaintiffs' arguments, which are largely directed at the "lawful sporting purpose" exception that exists for the rental ban but not the sales ban. Their remaining arguments are unpersuasive.

The plaintiffs appear to suggest that the government interest in preventing non-residents from acquiring firearms in the United States is limited to a non-resident *alien* and therefore the provisions are overbroad in their application to a non-resident *citizen*. *See* Appellants' Br. 34–35; *see also id.* at 3 ("Congress did not intentionally create this legal landscape. In 1994, Congress surmised that foreign visitors might illegally smuggle arms overseas . . . ."). In my view, the provisions are justified as applied to non-resident citizens as well as to aliens. The salient characteristic of the anti-smuggling rationale is *residence*. The ability of an individual who lives abroad to obtain firearms in the United States causes concern whether he is a citizen or an alien.[8]

---

[8] Even if the application of the provisions to a non-resident citizen were overbroad, we have permitted some degree of over-inclusiveness in firearms legislation. *See Schrader*, 704 F.3d at 990–91 ("To be sure, *some* common-law misdemeanants, perhaps even Schrader, may well present no such risk, but 'Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.' " (quoting *Skoien*, 704 F.3d at 641)). Our sister circuits have repeatedly done the same. *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (rejecting claim that handgun storage requirement is impermissibly over-inclusive because some handgun owners live alone and thus risk of unauthorized access by children

22

The plaintiffs also fault the Government for submitting what is admittedly a sparse evidentiary record demonstrating the Congress's rationale for applying the ban on receipt of firearms to non-resident citizens. *See* Appellants' Br. 36–38. It is hardly surprising that the Government is not able to offer more because the provisions at issue here were enacted in 1968 and 1994—long before the individual-right view of the Second Amendment became the law of the land. *See United States v. Miller*, 307 U.S. 174, 178 (1939); *Lewis v. United States*, 445 U.S. 55, 65–66 & n.8 (1980) (citing *Miller* for proposition that "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia'"); *Heller*, 554 U.S. at 638 n.2 (Stevens, J., dissenting) (collecting appellate decisions uniformly holding same until 2001). The Congress had no indication from the judiciary that the challenged provisions might run afoul of the Second Amendment; indeed, several Senators expressly stated their view to the contrary. *See* S.

---

is absent); *Peterson*, 707 F.3d at 1222 (Lucero, J., concurring) (residency requirement justified because officials have access to more information about residents than non-residents in the aggregate "even if . . . this information gap may not be present in every case"); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1170 (10th Cir.) (upholding section 922(g)(5) and noting "[i]t is surely a generalization to suggest, as courts do, that unlawfully present aliens, as a group, pose a greater threat to public safety—but general laws deal in generalities" (citation omitted)), *cert. denied*, 133 S. Ct. 289 (2012); *Carter*, 669 F.3d at 420–21 (rejecting argument that section 922(g)(3) is over-inclusive because it disarms all drug users without individualized determination of threat to public safety); *Marzzarella*, 614 F.3d at 99–101 (rejecting argument that section 922(k)'s ban on firearms with obliterated serial number is fatally over-inclusive because laboratory tests can often reveal serial number).

23

REP. NO. 89-1866, at 68, *reprinted in* JA 108 ("The decisions hold that the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the States of the Union." (citing *Miller* and other cases)).  The Congress had no reason to make an extensive record of findings regarding the Second Amendment consequences of the provisions as applied to this narrow class of individuals.  As the Third Circuit recently observed in upholding New Jersey's handgun permit law:

> New Jersey's inability to muster legislative history indicating what reports, statistical information, and other studies its legislature pondered when it concluded that requiring handgun permit applicants to demonstrate a "justifiable need" would reasonably further its substantial public safety interest, notwithstanding the potential burden on Second Amendment rights, is unsurprising.  First, at each relevant moment in the history of New Jersey gun laws, spanning from 1905 to 1981, the legislature could not have foreseen that restrictions on carrying a firearm outside the home could run afoul of a Second Amendment that had not yet been held to protect an *individual* right to bear arms, given that the teachings of *Heller* were not available until that landmark case was decided in 2008 . . . .  Simply put, New Jersey's legislators could not have known that they were potentially burdening protected Second Amendment conduct, and as such we refuse to hold that the fit here is not reasonable merely because New Jersey cannot identify a study or tables of crime statistics upon which it based its predictive judgment.

*Drake*, 724 F.3d at 437–38 (footnotes omitted).

24

Although we demand "evidence, not mere assertions," *Heller II*, 670 F.3d at 1259, the "quantum of empirical evidence" required is lower where, as here, the justifications offered are plausible, not novel, *Shrink Mo. Gov't PAC*, 528 U.S. at 391. Such evidence may take many forms, including anecdotal evidence, history, consensus and, perhaps most importantly, good old common sense. *Fla. Bar*, 515 U.S. at 628. The Government has demonstrated that the challenged provisions are tailored to the specific interests identified: preventing international firearms trafficking and circumvention of State firearms regulations. It has done so by pointing to legislative findings regarding the law enforcement problems posed by the purchase of firearms by non-residents and anecdotal evidence about international firearms trafficking by non-resident citizens.

For these reasons, I would hold that the challenged provisions of section 922 are constitutional insofar as they ban the sale of a firearm to a non-resident citizen. Therefore, I respectfully dissent from my colleagues' decision to remand.